No. 13-2282

# United States Court of Appeals for the First Circuit

HEARST STATIONS INC.

Plaintiff-Appellant

v.

AEREO, INC.

Defendant-Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

## BRIEF FOR PLAINTIFF-APPELLANT

December 9, 2013

HOLLAND & KNIGHT LLP
James D. Smeallie (No. 60563)
Joshua C. Krumholz (No. 25262)
Brian G. Leary (No. 1160939)
10 St. James Avenue
Boston, MA 02116
Telephone: (617) 523-2700
Facsimile:  (617) 523-6850
Email:      jd.smeallie@hklaw.com
            joshua.krumholz@hklaw.com
            brian.leary@hklaw.com

*Attorneys for Appellant*

THE HEARST CORPORATION
Eve Burton
Jonathan Donnellan
Ravi Sitwala
300 West 57th Street
New York, NY 10019
Telephone: 212-649-2020
Facsimile:  212-649-2035
Email:      eburton@hearst.com
            jdonnellan@hearst.com
            rsitwala@hearst.com

*Of Counsel*

## CORPORATE DISCLOSURE STATEMENT

The appellant, by and through its undersigned counsel, hereby makes the following corporate disclosures pursuant to Fed. R. App. P. 26.1:

Hearst Stations Inc., d/b/a Television Station WCVB-TV, states that it is owned by Hearst Television Inc., whose ultimate parent is The Hearst Corporation. Hearst Stations Inc., Hearst Television Inc., and The Hearst Corporation all are privately held, and, thus, no publicly held corporation owns 10% or more of Hearst Stations Inc.'s stock.

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................iv

CORPORATE DISCLOSURE STATEMENT ........................................i

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD .............1

JURISDICTIONAL STATEMENT ..........................................................2

STATEMENT OF THE ISSUES ..............................................................3

STATEMENT OF THE CASE ..................................................................4

    I.      PROCEDURAL HISTORY .................................................4

    II.     RULINGS PRESENTED FOR REVIEW ...........................5

    III.    STATEMENT OF THE FACTS .........................................6

        A.     THE COPYRIGHT ACT OF 1976.............................6

        B.     WCVB.........................................................................8

        C.     AEREO ...................................................................10

SUMMARY OF THE ARGUMENT .......................................................11

ARGUMENT ..........................................................................................18

    I.      STANDARD OF REVIEW ................................................19

    II.     THE DISTRICT COURT ERRED IN CONCLUDING THAT WCVB IS NOT LIKELY TO PROVE THAT AEREO INFRINGES WCVB'S EXCLUSIVE RIGHT OF PUBLIC PERFORMANCE ...............................................................19

        A.     THE PLAIN LANGUAGE OF THE 1976 COPYRIGHT ACT MAKES CLEAR THAT AEREO ENGAGES IN PUBLIC PERFORMANCE WHEN IT RETRANSMITS WCVB'S BROADCASTS OF ITS COPYRIGHTED PROGRAMS.................................................................19

            1.     Under A Plain Reading Of The Transmit Clause, Aereo Engages In "Public Performance" .......................19

            2.     Aereo's Claim That Its Simultaneous Individual Retransmissions Constitute Private Performances Is Inconsistent With A Plain Reading Of The Transmit Clause ...........................................................22

B.    THE LEGISLATIVE HISTORY MAKES CLEAR THAT AEREO'S RETRANSMISSIONS CONSTITUTE A PUBLIC PERFORMANCE...................................27

    1.    Congress Intended The Transmit Clause To Cover Enterprises Like Aereo ................................27

    2.    The Transmit Clause Is Technology-Neutral ................30

C.    THE DISTRICT COURT'S RELIANCE ON *CABLEVISION* IS MISPLACED ...........................................34

III.    THE DISTRICT COURT ERRED IN CONCLUDING THAT WCVB IS NOT LIKELY TO PROVE THAT AEREO INFRINGES WCVB'S EXCLUSIVE RIGHT OF REPRODUCTION ..............................................................39

IV.    THE DISTRICT COURT ERRED IN RULING THAT WCVB WILL NOT SUFFER IRREPARABLE INJURY IN THE ABSENCE OF IMMEDIATE INJUNCTIVE RELIEF.....................48

A.    THE UNAUTHORIZED RETRANSMISSION OF COPYRIGHTED MATERIALS IS THE TYPE OF CONDUCT ROUTINELY FOUND TO CAUSE IRREPARABLE INJURY ......................................48

B.    AEREO'S CONDUCT WILL CAUSE WCVB TO LOSE CONTROL OVER ITS COPYRIGHTED WORKS ...................................................................50

    1.    Aereo's Conduct Will Cause WCVB To Lose "First Mover" Status On The Internet ...........................51

    2.    Aereo's Conduct Will Cause WCVB To Lose Unquantifiable Retransmission Fees .............................54

    3.    Aereo's Conduct Will Cause WCVB To Lose Unquantifiable Advertising Revenue ...........................57

V.    AN INJUNCTION IS IN THE PUBLIC INTEREST AND THE BALANCE OF EQUITIES WEIGHS HEAVILY IN WCVB'S FAVOR................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Broadcasting Cos., Inc. v. Aereo, Inc.*,
  874 F. Supp. 2d 373 (S.D.N.Y. 2012) ("*Aereo I*")  ............. 33, 38, 40, 49, 56–58

*Butamax Advanced Biofuels LLC v. Gevo, Inc.*,
  868 F. Supp. 2d 359 (D. Del. 2012)....................................................52

*C.R. Bard, Inc. v. Solano*,
  No. 88-CV-1617-Z, 1988 WL 92469
  (D. Mass. Aug. 4, 1988)....................................................................52

*Cablevision Systems Development Co. v.
  Motion Picture Association of America, Inc.*,
  836 F.2d 599 (D.C. Cir. 1988) ........................................27, 29, 30, 61

*Cartoon Network LP, LLP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008) ("*Cablevision*")............... 14, 16, 23, 33–39, 43–47

*CBS Broadcasting, Inc. v. FilmOn.com*,
  No. 10-cv-07532-NRB, Dkt. No. 8
  (S.D.N.Y. Nov. 22, 2010) ................................................................49

*Columbia Pictures Industries, Inc. v.
  Redd Horne, Inc.*, 749 F.2d 154 (3d Cir. 1984)................................33

*Corley v. United States*,
  556 U.S. 303 (2009).........................................................................26

*CoStar Group, Inc. v. Loopnet, Inc.*,
  373 F.3d 544 (4th Cir. 2004) ....................................42, 43, 44, 47, 48

*EF Cultural Travel BV v. Explorica, Inc.*,
  274 F.3d 577 (1st Cir. 2001).......................................................19, 23

*Fortnightly Corp. v. United Artists Television, Inc.*,
  392 U.S. 390 (1968).........................................................7, 28, 29, 30

iv

*Fox Television Stations, Inc. v.*
   *BarryDriller Content Systems, PLC*,
   915 F. Supp. 2d 1138 (C.D. Cal. 2012)
   ("*BarryDriller*")............................................................ 22, 25, 36–38, 49, 55, 56

*Fox Television Stations, Inc. v. FilmOn X LLC*,
   No. 13-758, 2013 WL 4763414
   (D.D.C. Sept. 5, 2013) ("*Filmon X*") ........................... 22, 26, 32, 36, 38, 49, 50

*I.P. Lund Trading v. Kohler Co.*,
   163 F.3d 27 (1st Cir. 1998)..................................................................56, 57

*In re Baylis*,
   313 F.3d 9 (1st Cir. 2002)..................................................................24

*Jalbert v. Grautski*,
   554 F. Supp. 2d 57 (D. Mass. 2008)..................................................18

*Kalem Co. v. Harper Bros.*,
   222 U.S. 55 (1911)...........................................................................46

*Kartell v. Blue Shield of Massachusetts, Inc.*,
   687 F.2d 543 (1st Cir. 1982)..............................................................56

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
   658 F.3d 936 (9th Cir. 2011) ............................................................19

*Mohamad v. Palestinian Authority*,
   132 S. Ct. 1702 (2012)......................................................................24

*National Cable Television Association, Inc. v.*
   *Broadcasting Music, Inc.*,
   772 F. Supp. 614 (D.D.C. 1991).......................................................31

*National Football League v.*
   *Insight Telecommications Corp.*,
   158 F. Supp. 2d 124 (D. Mass. 2001)................................................31

*New Boston Television, Inc. v.*
   *Entertainment Sports Programming Network, Inc.*,
   No. 81-1010-Z, 1981 WL 1374 (D. Mass. Aug. 3, 1981)...........................53, 58

*On Command Video Corp. v. Columbia Pictures Indus.*,
   777 F. Supp. 787(N.D. Cal. 1991) ....................................................34

*Playboy Enterprises, Inc. v. Webbworld, Inc.*,
   991 F. Supp. 543 (N.D. Tex. 1997) ...............................................46

*Polymer Technologies, Inc. v. Bridwell*,
   103 F.3d 970 (Fed. Cir. 1996) .......................................................53

*Religious Technology Center v.*
   *Netcom On-Line Communication Services, Inc.*,
   907 F. Supp. 1361 (N.D. Cal. 1995)...............................42, 43, 44, 47

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
   102 F.3d 12 (1st Cir. 1996).......................................................49, 56

*Society of Holy Transfiguration Monastery, Inc. v. Gregory*,
   689 F.3d 29 (1st Cir. 2012) ("*Society*")..............................18, 41, 46

*Sony Corporation of America v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984).......................................................................46

*Teleprompter Corp. v. Columbia Broadcasting System, Inc.*,
   415 U.S. 394 (1974)...........................................................7, 28, 29, 30

*Turner Broadcasting System, Inc. v. FCC*,
   512 U.S. 622 (1994)........................................................................59

*Turner Broadcasting System, Inc. v. FCC*,
   520 U.S. 180 (1997)........................................................................59

*Twentieth Century Fox Film Corp. v. iCraveTV*,
   Nos. 00-121 & 00-120, 2000 WL 255989
   (W.D. Pa. Feb. 8, 2000) ..................................................................49

*Twentieth Century Music Corp. v. Aiken*,
   422 U.S. 151 (1975)........................................................................61

*Warner Brothers Entertainment, Inc. v. WTV Systems, Inc.*,
   824 F. Supp. 2d 1003 (C.D. Cal. 2011) ("*Zediva*").........38, 49, 55, 62

*WNET v. Aereo, Inc.*,
   712 F.3d 676 (2d Cir. 2013) ("*Aereo II*")..................29, 32, 36, 38, 39

*WNET v. Aereo, Inc.*,
    722 F.3d 500 (2d Cir. 2013) ("*Aereo III*")........................... 26, 36, 50, 54, 55, 60

*WPIX, Inc. v. ivi, Inc.*,
    765 F. Supp. 2d 594 (S.D.N.Y. 2011) ("*ivi I*").......................................49, 60, 61

*WPIX, Inc. v. ivi, Inc.*,
    691 F.3d 275 (2d. Cir. 2012) ("*ivi II*") .......................................49, 50, 55, 56, 57


STATUTES

17 U.S.C. § 101 ................................................................................................passim

17 U.S.C. § 106 ...........................................................................6, 18, 19, 22, 31, 39

17 U.S.C. § 111 ........................................................................................11, 30, 34

28 U.S.C. § 1292(a)(1).............................................................................................2

28 U.S.C. § 1331 .....................................................................................................2

28 U.S.C. § 1338(a) .................................................................................................2

47 U.S.C. § 301 .......................................................................................................6

47 U.S.C. § 307 .......................................................................................................6

47 U.S.C. § 325 .................................................................................................7, 11, 35


OTHER AUTHORITIES

47 C.F.R. § 73.624(b) ......................................................................................6, 9, 11

47 C.F.R. § 73.1740(c).............................................................................................6

Federal Rule of Appellate Procedure 4(a)(1)(A) ....................................................3

Federal Rule of Appellate Procedure 29................................................................19

H.R. Rep. No. 94-1476 (1976),
    *reprinted in* U.S.C.C.A.N. 5659 ........................... 7, 11, 24, 27, 28, 30, 31, 40, 61

S. Rep. No. 102-92 (1992),
    *reprinted in* 1992 U.S.C.C.A.N. 1133 ................................................................60

Staff of the H. Comm. on the Judiciary, 89th Cong.,
    Copyright Law Revision, Part 6:  *Supplementary*
    *Report of the Register of Copyrights on the General*
    *Revision of the U.S. Copyright Law:  1965 Revision*
    *Bill* 19 (Comm. Print 1965). ..............................................................32

*Am. Heritage Dictionary* (4th ed. 2006) ..................................................47

U.S. Amicus Br., 2009 WL 1511740 (May 29, 2009)...........................................39

Carrie Bodner, *Master Copies, Unique Copies &*
    *Volitional Conduct: Cartoon Network's*
    *Implications for the Liability of Cyber Lockers*,
    36 Colum. J.L. & Arts 491 (Spring 2013) ...........................................44

Jane C. Ginsburg, *Recent Developments in US Copyright*
    *Law—Part II, Caselaw: Exclusive Rights on the Ebb?*,
    Colum. Pub. L. Research Paper No. 08-192 (2008),
    *pub'd in* Revue Internationale du Droit d'Auteur (Jan. 2009) ..............15, 36, 38

Paul Goldstein, *Goldstein on Copyright* (3d ed. 2013) ....................................36, 38

Jeffrey Malkan, *The Public Performance Problem in*
    Cartoon Network LP v. CSC Holdings, Inc.,
    89 Or. L. Rev. 505 (2011) ..........................................................23, 36

## <u>REASONS WHY ORAL ARGUMENT SHOULD BE HEARD</u>

Simply put, this case affects the very future of over-the-air broadcasting as we know it. It involves numerous issues of first impression in this circuit concerning the Copyright Act, 17 U.S.C. §§ 101, *et seq.* (the "Copyright Act"), including a highly controversial argument, which is the subject of a petition for certiorari currently pending before the Supreme Court.

Aereo is in the business of retransmitting broadcast television to members of the public for profit. It explicitly markets itself as a service through which its subscribers may watch "live" television over the internet for a fee. Decades ago, Congress amended the Copyright Act to make crystal clear that the right to retransmit a copyrighted work—indeed, quite specifically, the right to retransmit broadcast television—to the public is one of the exclusive rights of the copyright holder. Yet Aereo insists, and the district court agreed, that Aereo may copy and retransmit copyrighted broadcast television to its subscribers without receiving authorization from, or providing any kind of compensation to, the holders of the copyrights in the programming it retransmits.

Aereo retransmits broadcasts to its subscribers using a contrived system that utilizes thousands of mini antennas and program copies unique to each subscriber. Aereo freely acknowledges that it does this in an attempt to exploit a perceived "loophole" created by a much criticized Second Circuit decision. According to this

theory, if thousands of Aereo subscribers simultaneously watch the same broadcast of the Super Bowl using Aereo, Aereo is not publicly performing the Super Bowl. Rather, simply because it uses thousands of little antennas rather than one big antenna, and thousands of individual copies, it is making thousands of simultaneous "private" performances, and thus evading liability for its blatant unauthorized exploitation of copyrighted works.

Except for the district court below, this dubious logic has been rejected by every court outside the Second Circuit to consider it (not to mention numerous copyright scholars). The District Court for the District of Columbia not only rejected the Second Circuit's logic, but also enjoined an Aereo competitor with essentially the same technology from operating throughout most of the country, including in Boston. Yet Aereo is permitted to continue its infringing activity here unabated. Oral argument will greatly assist the Court in analyzing the important issues presented by this appeal.

## JURISDICTIONAL STATEMENT

The district court has exclusive subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the action arises under the Copyright Act. This Court has jurisdiction over this appeal pursuant to 28 U.S.C.

§ 1292(a)(1) because it is an appeal from the district court's order refusing to grant a preliminary injunction.  ADD20.[1]

This appeal is timely filed pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A).  The district court entered the order at issue on October 10, 2013. JA477.  The plaintiff-appellant, Hearst Stations Inc., d/b/a WCVB-TV ("WCVB"), filed its notice of appeal the same day, *see* JA469, well before the 30-day deadline imposed by Rule 4(a)(1)(A).

## STATEMENT OF THE ISSUES

1.      Where the Copyright Act proscribes the unlicensed retransmission of copyrighted programming to the public using "any device or process," can the internet television retransmission service of the defendant, Aereo, Inc. ("Aereo"), avoid liability for infringing WCVB's public performance rights by using technology that captures WCVB's broadcasts with mini antennas, creates individual subscriber copies, and retransmits those copies to Aereo's paying subscribers?

2.      Does Aereo's internet television retransmission service, which provides subscribers with access to copyrighted television programming and creates technologically unnecessary copies in order for its subscribers to watch that

---

[1] References to "ADD" indicate the page referenced in the Addendum attached to this brief.  References to "JA" indicate the page referenced in the Joint Appendix and Supplemental Appendix - Filed Under Seal.

programming, directly infringe WCVB's exclusive right of reproduction under the Copyright Act?

3.     Does Aereo's internet television retransmission service, which retransmits over the internet, without authorization, WCVB's broadcasts of copyrighted programming irreparably harm WCVB by usurping WCVB's control over its copyrighted works, including any advantage WCVB would otherwise possess as the first to market its own programming online and its ability to generate revenues from retransmission agreements and advertising?

## STATEMENT OF THE CASE

## I.     PROCEDURAL HISTORY

WCVB filed its copyright infringement complaint on July 9, 2013.[2]  JA473. It alleges that Aereo is infringing WCVB's exclusive rights under the Copyright Act to publicly perform, reproduce, distribute, and create derivative works of WCVB's original copyrighted programming.  Aereo infringes WCVB's copyrights by, among other things, retransmitting, without authorization, WCVB's broadcasts of programs to Aereo's paying subscribers through Aereo's website, www.aereo.com.

---

[2] WCVB amended its complaint on July 30, 2013 to add additional copyrighted programming to the list of WCVB shows retransmitted by Aereo without WCVB's authorization.  JA133–219.

On July 9, 2013, WCVB filed a motion for a preliminary injunction seeking to enjoin Aereo from retransmitting WCVB's broadcasts to Aereo's customers. JA473. In support of its motion, WCVB demonstrated that Aereo's retransmission service violates the plain language of the Copyright Act, as well as Congress' clearly expressed intent concerning that Act. WCVB further proved that it was being irreparably harmed by Aereo's service, which competes directly with WCVB and the cable and other providers that pay to lawfully transmit WCVB's broadcasts.

On July 16, 2013, Aereo filed a motion to transfer the case to the Southern District of New York and a motion to stay the proceedings pending the district court's disposition of the transfer motion. JA474. After oral argument, the district court (Gorton, J.) denied all three motions in a Memorandum and Order entered on October 10, 2013 ("Order"). ADD20.

## II.    RULINGS PRESENTED FOR REVIEW

In its Order, the district court denied WCVB's request for injunctive relief, erroneously concluding that WCVB was unlikely to succeed on any of its copyright claims. ADD8–16. In denying WCVB's public performance argument, the district court failed to engage in any independent analysis and appears to have relied exclusively on the reasoning of a Second Circuit case, which has been harshly criticized by copyright scholars and had not been followed by any other

court outside that circuit.  ADD9–13.  Further, in considering WCVB's reproduction argument, the court relied on a test that has not been adopted in the First Circuit and does not apply to Aereo's business model.  ADD13–15.  While the district court recognized that WCVB showed the prospect of irreparable harm, it concluded that this showing was outweighed by the court's determination that WCVB was unlikely to succeed on the merits of its claims.  ADD17–20.[3]

## III.  STATEMENT OF THE FACTS

### A.    THE COPYRIGHT ACT OF 1976

The Copyright Act rewards the creative investment of copyright owners with "exclusive rights to do and to authorize" certain uses of their works.  17 U.S.C. § 106.  Among those rights is the exclusive right "to reproduce the copyrighted work in copies" and "in the case of . . . motion pictures and other audiovisual works, *to perform the copyrighted work publicly*."  *Id.* at § 106(1) & (4).

The extraordinary creative and economic investments made by over-the-air broadcasters in producing high-quality local news and entertainment programming is at particular risk of exploitation because, pursuant to licensing by the Federal Communications Commission ("FCC"), that programming must be offered over-the-air to the public for free.  *See* 47 U.S.C. §§ 301, 307; 47 C.F.R. §§ 73.624(b),

---

[3] While the district court erred with respect to WCVB's claims regarding its rights of distribution and derivation, for purposes of this appeal, WCVB focuses only upon its rights of public performance and reproduction.

6

73.1740(c).  In passing revisions to the Copyright Act in 1976, Congress addressed the danger that profiteering third parties would exploit this arrangement by intercepting free over-the-air broadcasts and retransmitting them to the public for a fee.  In so doing, Congress emphatically rejected the Supreme Court's conclusion in *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968) and *Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394 (1974) that early cable companies merely were enhancing a viewer's ability to receive free programming.  Instead, Congress broadly defined the public performance right to prevent any unauthorized retransmission of over-the-air broadcasts through any medium or technology, then known or later developed, to the public.  *See* 17 U.S.C. § 101.

The result is that retransmission services, such as cable and satellite companies, that take over-the-air broadcasts and retransmit them to their subscribers must obtain licenses to do so, and, generally, pay substantial royalties. *See* 47 U.S.C. § 325(b); H.R. Rep. No. 94-1476, at 88–90 (1976), *reprinted in* U.S.C.C.A.N. 5659, 5702–705 ("House Report"); JA15 at ¶ 29.  As Congress explained, the Copyright Act provides that "commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material" must pay "copyright royalties . . . to the creators of such programs." House Report at 89–90.  The Copyright Act focused initially on the actions of

early cable companies but also looked to the future in proscribing retransmissions using any "device" or "process" whether "now known or later developed." 17 U.S.C. § 101. Aereo is a commercial internet television business that uses a new—albeit highly inefficient—device and process in seeking to supplant current authorized retransmission services. JA68–69, at 185:7–186:24; JA261.

### B. WCVB

Over the forty years of its existence, WCVB has become a leader in the Boston television market and, on multiple occasions, its programming has received some of the industry's highest honors. JA9 at ¶ 9. In total, WCVB creates, produces, broadcasts, and distributes well over 43 hours per week of original programming, including local news, weather, emergency information, sports, entertainment, and health and wellness programs.[4] JA8–9 at ¶ 7. WCVB's programming includes shows such as: *Chronicle*, a unique, locally-produced, weekday magazine; *CityLine*, an award-winning urban news and features weekly magazine; and *On The Record*, a weekly political roundtable featuring discussions with local Massachusetts newsmakers. JA9 at ¶ 8. WCVB owns the exclusive rights to its copyrighted programming. JA11 at ¶ 15.

---

[4] In addition, WCVB also pays for the right to transmit network and syndicated programming produced by others. JA11 at ¶ 13.

WCVB expends considerable amounts of money, time, energy, and creativity in producing its original programming, and in building the substantial broadcasting infrastructure necessary to transmit and distribute its works. JA10–11 at ¶¶ 12, 14. To date, WCVB transmits its programming primarily in two ways. First, it broadcasts over the air, as required by federal regulation. JA11 at ¶ 15; 47 C.F.R. § 73.624(b). Second, cable, satellite, and other telecommunications companies retransmit WCVB's programming pursuant to agreements with WCVB. JA11 at ¶ 15. WCVB is compensated for its works through commercial advertising revenue, copyright fees, and retransmission fees paid by cable, satellite, and other telecommunications companies, all of which directly compete with Aereo for subscribers. JA12 at ¶ 17; JA15–16 at ¶¶ 30–32; JA293; JA261.

WCVB also is actively involved in developing new ways to transmit its programming over the internet. JA13–14 at ¶ 24. Before WCVB can fully stream its daily programming over the internet, however, it must ensure that it complies with all interested parties' rights and obligations. JA13–15 at ¶¶ 23, 27, 28. Doing so involves discussions, negotiations, and agreements between and among various stakeholders, such as copyright holders of syndicated shows and the cable, satellite, and other telecommunications companies that presently transmit WCVB's programming with authorization. JA13–15 at ¶¶ 24, 27, 28. Those discussions are in process. JA13 at ¶ 24.

9

## C.    AEREO[5]

On or about May 30, 2013, Aereo made its service available to the general public in the Boston television market.[6]    JA56.   When subscribers log on to Aereo's website, they have two options.   From a menu of content that Aereo selects, subscribers can either "Watch" a copyrighted program airing "live" or "Record" that program.   JA39; JA534 at ¶ 6; JA554 at ¶ 55.   To divert a program into its internet service, Aereo deploys thousands of mini antennas, which intercept WCVB's broadcast signals intended for use by the general consuming public. JA58; JA504 at Fig. 10.   Aereo then routes these intercepted signals through its processors, altering their format to make them internet-compatible.   JA550 at ¶ 41. Aereo offers WCVB's programs in real time over the internet to its subscribers for a fee, at the same time that those programs are broadcast over the air.   JA39; JA58; JA240.

During this process, Aereo makes three copies of each WCVB program and stores the copies on Aereo hard-drives.   JA550 at ¶ 42; JA571.   Aereo makes its copies regardless of whether a subscriber chooses to watch a program "live" or

---

[5] The facts set forth in this section are based upon statements made by Aereo. WCVB accepts those statements as true only for purposes of the underlying motion and this appeal.

[6] Aereo launched a more limited service on or about May 15, 2013, but did not go fully online until May 30, 2013.  JA56.

instead records that program.  JA534 at n.1; JA553 at ¶51; JA571.  In either instance, Aereo delivers WCVB's programming only via copies.  *Id.*

Aereo retransmits broadcasts of copyrighted programs to multiple paying subscribers.  In doing so, as Aereo has admitted, it is performing the same service as cable companies, JA68–69, at 185:7–186:24; JA261, which, unlike Aereo, hold statutory copyright licenses to retransmit WCVB's programs or secure the consent of WCVB to retransmit the station's signal.  *See* 17 U.S.C. § 111; 47 USC § 325; House Report at 89–90; JA15 at ¶ 29.  Aereo uses WCVB's intercepted programming for commercial gain, charging each subscriber a monthly payment for its service.  JA67, at 183:7–18; JA95.

## SUMMARY OF THE ARGUMENT

Aereo's use of contrived technology to free-ride on WCVB's substantial investment in its copyrighted programming directly clashes with long-settled law that proscribes retransmitting over-the-air broadcasts without permission.  It also clashes with a finely-balanced regulatory scheme that promotes investment in critical local news and entertainment programming.  The district court's failure to preliminarily enjoin Aereo's retransmission service upends this regime and threatens the entire over-the-air broadcast industry.

As a copyright holder, WCVB possesses the exclusive right to control who publicly performs its copyrighted works.  Under the Transmit Clause of the

Copyright Act, one publicly performs a work when he or she "transmit[s] . . . a performance . . . of the work . . . to the public." 17 U.S.C. § 101. Aereo retransmits WCVB's over-the-air broadcasts of its copyrighted programming over the internet to Aereo's paying subscribers, who consist of members of the general public. Under a plain reading of the Transmit Clause, Aereo thus publicly performs WCVB's copyrighted works. This application of the Transmit Clause is further supported by the legislative history, which reflects Congress' clear intent that the Act cover retransmission enterprises like Aereo.

To avoid liability, Aereo makes two arguments. First, Aereo argues that its retransmission of over-the-air broadcasts to its paying subscribers is not a "public" performance because each Aereo subscriber receives an individualized transmission streamed from an individual subscriber-associated, digital copy of the broadcast transmission. Under Aereo's theory, this technical contrivance makes Aereo's simultaneous transmissions "private." Thus, for example, Aereo could have 500,000 subscribers simultaneously watching the same Super Bowl using Aereo, but Aereo would not be "publicly" performing the Super Bowl. Instead, Aereo would be making 500,000 simultaneous "private" performances to its subscribers.

Aereo's theory re-writes the Transmit Clause. The Transmit Clause expressly instructs that whether a performance has been transmitted "to the public"

12

depends on whether "members of the public [are] capable of receiving the *performance*." Yet under Aereo's reading, a performance that reaches thousands of members of the public nonetheless would be "private" simply because it occurs through thousands of individual transmissions. In other words, Aereo impermissibly replaces "performance" with "transmission." Those words are not interchangeable. In addition, Aereo's "individual transmission" argument renders the statute incomprehensible. The statute provides that a performance is public "whether the members of the public capable of receiving the *performance* . . . receive it in the same place or in separate places and at the same time or *at different times*." 17 U.S.C. § 101 (emphasis added). But an individual *transmission* (as opposed to the underlying *performance*) cannot be received "at different times." Instead, the clear statutory language expressly contemplates a single public performance consisting of multiple transmissions of an underlying performance received by different viewers "at different times." Aereo's theory renders the "at different times" language meaningless.

Aereo also argues that it is not engaging in public performances because it is a mere provider of equipment through which consumers can enhance their over-the-air broadcast experience. That argument, however, was explicitly rejected by Congress in 1976 when it enacted the current version of the Transmit Clause.

Moreover, Congress made clear that it intended the Copyright Act to be technology-neutral and to cover unforeseen and unforeseeable technological changes. In doing so, Congress focused on the performance being transmitted, not the technical details of how it was accomplished. Congress was unequivocal in stating that retransmission enterprises like Aereo's were covered by the Copyright Act, regardless of technical contrivances.

Aereo's system of technologically unnecessary mini antennas and supposedly separate transmissions of subscriber-associated copies was built solely to exploit a perceived public performance "loophole" created by *Cartoon Network LP, LLP v. CSC Holdings, Inc.,* 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"). But any reliance on *Cablevision* is misplaced. First, unlike Aereo, Cablevision involved cable subscribers' use of a remote DVR service to "time-shift" programming that the cable company *already was authorized* to retransmit.

Further, in concluding that the later transmissions of these time-shifted copies to subscribers were "private" performances, *Cablevision* focused not on "members of the public capable of receiving the ***performance***" as the Transmit Clause is written, but, rather, on members of the public capable of receiving each ***transmission***. Moreover, recognizing that its interpretation would render superfluous a key term in the Transmit Clause, the court created, out of whole cloth, an exception to its transmission-focused theory that multiple transmissions

14

made from the ***same copy*** of a work are nevertheless public. This wholesale re-writing of the Transmit Clause has been roundly criticized by other courts and copyright scholars. Further, it has not been followed outside the Second Circuit (except for the district court below) and should not be followed here.

In addition to infringing WCVB's public performance right, Aereo's business violates WCVB's right to control the reproduction of its copyrighted works. Aereo does not dispute that WCVB's works are reproduced, but claims that Aereo merely provides the copying equipment to subscribers who, in turn, create the copies. Accordingly, Aereo suggests that it lacks the necessary "volition" to be liable for its own copying. Although recognizing that it was a close call, the district court agreed.

This Court has not adopted any particular volitional requirement for copyright infringement, and there is no reason to do so here given Aereo's clearly intentional copying. Further, Aereo's conduct unquestionably exceeds the volitional threshold established by some courts. Aereo looks nothing like the early internet service providers that courts sought to protect from liability when their users decided to copy and display infringing content that the users themselves provided. Nor is Aereo, as the district court suggested, a mere supplier of copying equipment that subscribers use to make copies of content they themselves provide. Rather, Aereo offers ***content***, including WCVB's content, to paying subscribers at

a fraction of the cost of the ***authorized*** programming offered by cable companies and other retransmitters, with which Aereo aims to compete. Unquestionably, Aereo exercises complete authority and control over the content that it makes available to its subscribers, and when and if that content is copied.

Moreover, Aereo gives its subscribers no choice but to make copies. Aereo provides a "live" feature that, as the name implies, allows subscribers to watch programs essentially in real time as the programs are broadcast. In electing to watch "live" television, Aereo's subscribers do not request, nor do they necessarily have any interest in making, a copy. Nevertheless, Aereo's system forces the creation of unique, subscriber-associated copies, solely because Aereo theorizes that the perceived *Cablevision* "loophole" permits its otherwise unauthorized retransmissions of programming if unique copies are created.

Aereo claims (and the district court agreed) that its subscribers act volitionally because Aereo provides notice that copies are being made. Volition, however, requires choice, not just knowledge, and Aereo's subscribers have no choice but to make copies if they want access to "live" programs.

Finally, Aereo's illegal conduct has resulted in irreparable harm to WCVB. Every other case that has addressed whether irreparable harm results from the unauthorized retransmission of copyrighted television broadcasts over the internet has concluded unequivocally that it does. WCVB's irreparable harm is consistent

16

with these prior decisions. By retransmitting WCVB's broadcasts of its copyrighted programming without authorization from WCVB, Aereo usurps WCVB's ability to control how, when, where, and by whom its programming will be performed and reproduced.

Aereo's actions irreparably harm WVCB in several ways. First, Aereo has co-opted WCVB's "first-mover" opportunity to develop an internet market for WCVB's own programming. Second, Aereo's service model has created real, but unquantifiable harm to WCVB with regard to its ability to negotiate retransmission fees from cable and other partners, some of which already have threatened to follow Aereo's model and pay no fees at all. Third, because neither WCVB nor the industry's audience ratings services can measure the Aereo subscribers who are accessing WCVB's programming, WCVB cannot maximize the amount that advertisers would be willing to pay to WCVB.

Finally, an injunction is in the public interest and the balance of the equities weighs heavily in WCVB's favor. Courts have long recognized the strong public interest in preserving over-the-air broadcasting. Aereo directly threatens these services and puts WCVB's financial viability at risk, and, with it, the vital public service that WCVB provides. For all these reasons, the district court's decision should be reversed.

## ARGUMENT

To establish copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 39 (1st Cir. 2012) ("*Society*") (citation omitted).  In this context, "'[c]opying is a shorthand . . . [for] infringing any of the copyright owner's five exclusive rights set forth at [Section 106 of the Copyright Act].'"  *Jalbert v. Grautski*, 554 F. Supp. 2d 57, 67 (D. Mass. 2008) (citation omitted).  Those exclusive rights include, *inter alia*, the right to control the public performance and reproduction of the copyrighted work.  *See* 17 U.S.C. § 106(1) & (4).

In the proceedings below, Aereo did not contest WCVB's ownership of the asserted copyrights, or that WCVB's copyrighted programming is available on Aereo's website.  Aereo contested only whether the manner in which that programming was transmitted and copied constitutes copyright infringement.  *See* Def. Aereo, Inc.'s Mem. of Law in Opp. to Hearst Stations Inc.'s Mot. for a Prelim. Inj. (Dkt. No. 41) ("Aereo's Opposition") 6–15.  Those issues are addressed herein.[7]

---

[7] In the proceedings below, Aereo improperly relied upon an *amicus* brief from *WNET v. Aereo, Inc.*, No. 12-cv-2786 (2d. Cir.) to support its opposition to WCVB's public performance claim.  *See* Aereo's Opposition 9 n.10.  Over WCVB's objection, Aereo insisted upon including that brief in the Joint Appendix.  *See* JA317–45.  Submission of *amicus* briefs, however, can be made only by

## I.    STANDARD OF REVIEW

"As in any other appeal, [the Court] review[s] the merits of a preliminary injunction depending on the issue under consideration."  *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 581 (1st Cir. 2001).  "[P]ure issues of law (e.g., the construction of a statute) are reviewed de novo, findings of fact for clear error, and judgment calls with considerable deference."  *Id.* (citations and internal quotation marks omitted).

## II.    THE DISTRICT COURT ERRED IN CONCLUDING THAT WCVB IS NOT LIKELY TO PROVE THAT AEREO INFRINGES WCVB'S EXCLUSIVE RIGHT OF PUBLIC PERFORMANCE

### A.    THE PLAIN LANGUAGE OF THE 1976 COPYRIGHT ACT MAKES CLEAR THAT AEREO ENGAGES IN PUBLIC PERFORMANCE WHEN IT RETRANSMITS WCVB'S BROADCASTS OF ITS COPYRIGHTED PROGRAMS

#### 1.    Under A Plain Reading Of The Transmit Clause, Aereo Engages In "Public Performance"

The Copyright Act gives a copyright holder the exclusive right to "perform [its] copyrighted work publicly."  17 U.S.C. § 106(4).  Two words illuminate that right:  "perform" and "publicly."  Each of those words is defined broadly in the statute.  "To 'perform' a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or

_____

motion.  *See* Fed. R. App. P. 29; *see also Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 940 n.2 (9th Cir. 2011) (refusing to take judicial notice of an amicus brief filed in another case in another circuit).  The Court should disregard the brief and any references to it in Aereo's papers.

other audiovisual work, ***to show its images in any sequence or to make the sounds accompanying it audible***." 17 U.S.C. § 101 (emphasis added).

The Copyright Act also defines when a performance (or display) is considered public:

> (1) to perform or display [the work] at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

> (2) to ***transmit*** or otherwise communicate a ***performance*** or display ***of the work to a place specified by clause (1) or to the public, by means of any device or process***, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and ***at the same time or at different times***.

*Id.* (emphasis added).

The second clause, known as the Transmit Clause, is the subject of this lawsuit. This clause covers performances that may not occur in a public place, but are nevertheless public. By its plain terms, the statute asks whether "members of the public" are "capable of receiving the performance" of a copyrighted work. *Id.* It does not matter whether they "receive" the performance "in the same place or in separate places" or "at the same time or at different times." *Id.* Likewise, it does not matter what kind of "device or process" is used "to transmit or otherwise communicate [the] performance." Rather, Congress defined "device or process" broadly to include "***any device or process*** whereby images or sounds are ***received beyond the place from which they are sent***," whether "now known or later

developed." *Id.* (emphasis added). Thus, regardless of whether there is one transmission or multiple transmissions, or whether the technology is ordinary or innovative, "any device or process" that "transmit[s] . . . a performance" of a copyrighted work "to the public" performs the work "publicly" within the meaning of the Copyright Act. *Id.* Under this definition, WCVB undoubtedly engages in public performance when it broadcasts an episode of *Chronicle* over the air, and WCVB's authorized licensees similarly engage in public performances when they retransmit the original broadcast of that same episode to their subscribers.

Under any reasonable construction of the Transmit Clause, Aereo, like WCVB and its authorized licensees, publicly performs WCVB's copyrighted works in the following way:

| COPYRIGHT ACT | AEREO |
|---|---|
| "transmits" | intercepts over-the-air signals with mini antennas and communicates them through servers over the internet to other locations |
| "a performance" | the WCVB broadcast |
| "of the work" | the program, *e.g.,* an episode of *Chronicle* |
| "to the public" | to Aereo subscribers, who are paying strangers |
| "by means of any device or process" | the Aereo system |

Aereo does this without authorization or license. As such, Aereo publicly performs WCVB's copyrighted works in clear violation of WCVB's exclusive rights under Section 106(4) of the Copyright Act. *See Fox Television Stations, Inc. v. FilmOn X LLC*, -- F. Supp. 2d --, No. 13-758, 2013 WL 4763414, *13 (D.D.C. Sept. 5, 2013) ("*FilmOn X*") (concluding that Aereo competitor with virtually identical technology publicly performs copyrighted works); *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1144–46 (C.D. Cal. 2012) ("*BarryDriller*") (same).

### 2.    Aereo's Claim That Its Simultaneous Individual Retransmissions Constitute Private Performances Is Inconsistent With A Plain Reading Of The Transmit Clause

According to Aereo, it is not engaged in public performance because it uses thousands of mini antennas to create individualized copies of WCVB's programming and then sends individual transmissions from each copy of the same performance to only one Aereo subscriber at a time. *See* Aereo's Opposition 6–11; JA451–55, at 25:16–29:5. Under this view, Aereo could have 500,000 subscribers simultaneously watching the same Super Bowl using Aereo, but Aereo would not be "publicly" performing the Super Bowl. Instead Aereo would be making 500,000 simultaneous "private" performances to its subscribers.

Although the district court offered little explanation for its decision, it appears to have adopted Aereo's argument that it is "transmitting private rather

than public performances per *Cablevision*." ADD12–13. The district court's conclusion was plainly wrong and the proper construction is subject to *de novo* review by this Court. *See EF Cultural Travel BV*, 274 F.3d at 581.

Aereo's and the district court's construction contradicts the plain language of the statute. The Transmit Clause asks "whether the members of the public [are] capable of receiving the ***performance***," not the ***transmission***. 17 U.S.C. § 101 (emphasis added). In effect, Aereo seeks to re-write the Transmit Clause as follows:

> [T]o transmit or otherwise communicate a performance or display of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the ~~**performance**~~ [**transmission**] or display receive ~~**it**~~ [**the transmission**] in the same place or in separate places ~~and at the same time or different times~~.

"Performance" and transmission, however, are not interchangeable terms under the Copyright Act, and it is not proper to treat them as such.[8] *See, e.g.,* Jeffrey Malkan, *The Public Performance Problem in Cartoon Network LP v. CSC Holdings, Inc.,* 89 Or. L. Rev. 505, 536 (2011) ("[T]ransmission and . . . performance remain, technically and legally, two distinct things."); *see also infra* page 36, discussing courts' and copyright scholars' criticisms of the Second

---

[8] Indeed, the statute does not even use the noun "transmission." Rather, it uses the verb "transmit." "Transmit(ting)" plainly anticipates performances that may use one or multiple transmissions, further reinforcing WCVB's interpretation of the statute

Circuit's contrary interpretation. Aereo's construction thus violates the bedrock principle of statutory construction that when two different terms are used in a statute, those terms should be construed to have different meanings. *See Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1708 (2012) ("[Courts] generally seek to respect Congress' decision to use different terms to describe different categories of people or things."); *In re Baylis*, 313 F.3d 9, 20 (1st Cir. 2002) (recognizing court's obligation to construe different terms in statute to have different meanings).

The district court ignored these problems, claiming instead that WCVB's construction "reads the terms 'a performance or display' out of the statutory phrase "a performance or display of the work.'" ADD13. The court, however, offered no guidance on how it reached this puzzling conclusion. *Id*. Nor could it, as WCVB's construction plainly gives meaning to both "performance" and "work." Each *Chronicle* episode is a copyrighted "work." WCVB "performs" that work when WCVB broadcasts it. Aereo publicly performs the copyright episode when it retransmits the broadcast (the performance) of that episode (the work) to multiple paying subscribers (the public)—just as cable systems do when they retransmit the broadcast of a program to their subscribers. *See, e.g.,* House Report at 63 ("[A] local broadcaster is performing when it transmits the network broadcast, a cable television system is performing when it retransmits the broadcast to its

subscribers."). Under this construction, each term in the Transmit Clause retains its meaning.

In fact, it is Aereo's construction that reads words out of the statute. The Transmit Clause clearly states that a performance is public regardless of whether the public receives it "in the same place or in separate places and at the same time or *at different times*." 17 U.S.C. § 101 (emphasis added). By stating that members of the public can receive the same performance "at different times," the statute expressly contemplates that the existence of separate transmissions does not convert an otherwise public performance into a private one. Indeed, the "at different times" language makes no sense otherwise, because two people cannot receive the same transmission of a performance at different times. *See, e.g.*, Jane C. Ginsburg, *Recent Developments in US Copyright Law—Part II, Caselaw: Exclusive Rights on the Ebb?*, Colum. Pub. L. Research Paper No. 08-192 (2008), *pub'd in* Revue Internationale du Droit d'Auteur, Jan. 2009, at 26 ("[I]t is not possible to transmit a performance 'created by *the* act of transmission' to members of the public 'at different times.'") (emphasis in original).

On the face of the statute, therefore, a person publicly performs when she either transmits a performance at one time to many members of the public (like a television broadcast) or transmits that same performance at different times to those same members of the public (like video-on-demand). *See BarryDriller*, 915 F.

Supp. 2d at 1144 ("The statute provides an exclusive right to transmit a performance publicly, but does not by its express terms require that two members of the public receive the performance from the same transmission."). The point is that the same transmitter is transmitting the same performance to members of the public, regardless of whether the performance is being transmitted through one or many transmissions. *See WNET v. Aereo, Inc.*, 722 F.3d 500, 509–10 (2d Cir. 2013) ("*Aereo III*") (Chin, J., dissenting) ("It is the transmitter's *actions* that render him liable, not his individual *transmissions*, and he can 'transmit' by sending one transmission or multiple transmissions.") (emphasis in original); *FilmOn X*, 2013 WL 4763414, at *14 ("It is incongruous to suggest that FilmOn X does not 'perform' 'publicly' by making Plaintiffs' programs available to any person with an Internet-enabled device.").

In concluding otherwise, the district court essentially deleted the words "at different times" from the statute and, in so doing, violated "the 'canon against surplusage,'" which requires courts "to give meaning to every statutory term if possible." ADD13; *see also Corley v. United States*, 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons[] [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (internal quotation marks and alterations omitted).

**B.    THE LEGISLATIVE HISTORY MAKES CLEAR THAT AEREO'S RETRANSMISSIONS CONSTITUTE A PUBLIC PERFORMANCE**

**1.    Congress Intended The Transmit Clause To Cover Enterprises Like Aereo**

The language of the Transmit Clause makes clear that Aereo's retransmissions constitute a public performance. When the statute is read in light of the legislative history, that conclusion becomes even clearer. First, as Congress explained, the 1976 revisions to the Copyright Act were designed to ensure that "commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material" must pay "copyright royalties . . . to the creators of such programs." House Report at 89. The Circuit Court for the District of Columbia further amplified this point:

> [A]s part of its revision of the copyright laws [in 1976, Congress] addressed in particular this problem of "secondary transmissions." When a cable system takes a broadcast signal ("primary transmission") and delivers it to the system's subscribers ("secondary transmission"), the system is earning money by selling to its customers the copyrighted material licensed only for the primary broadcast transmission. . . . Congress was of the view that the copyright holders should receive direct compensation for the use of their rights.

*Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc.*, 836 F.2d 599, 602 (D.C. Cir. 1988), *cert. denied* 487 U.S. 1235 (1988). In other words, Congress focused on whether a cable system retransmitted a broadcast of copyrighted programming, particularly where it did so for commercial gain, and not the manner

27

in which the broadcast was retransmitted.  Aereo unquestionably is a commercial enterprise "whose basic retransmission operations are based on the carriage of copyrighted material."    House Report at 89.    As such, Congress clearly contemplated that Aereo's conduct constitutes public performance.

Second, the context in which the Transmit Clause was drafted not only reinforces this point, but conclusively refutes arguments advanced by Aereo. Specifically, Aereo has claimed that its technology merely enhances a television viewer's ability to do what she can do on her own, *i.e.*, use an antenna to receive television signals broadcast over-the-air.  *See* Aereo's Opposition 1, 4–5; JA50–51, at 24:18–25:11.  This was precisely the reasoning embraced by the Supreme Court in *Fortnightly* and *Teleprompter* but emphatically rejected by Congress when it enacted the 1976 Copyright Act, including the Transmit Clause.

In *Fortnightly*, the Supreme Court held that cable systems were not subject to liability under the 1909 Copyright Act because they "[e]ssentially" did "no more than enhance[] the viewer's capacity to receive the broadcaster's signals" by "provid[ing] a well-located antenna with an efficient connection to the viewer's television set."  392 U.S. at 399.  The Court further concluded that "[t]he only difference in the case of [cable] is that the antenna system is erected and owned not by its users but by an entrepreneur."  *Id.* at 400.

In *Teleprompter*, the Supreme Court reaffirmed that view, stating that "[t]he privilege of receiving the broadcast electronic signals and of converting them into the sights and sounds of the program inheres in all members of the public who have the means of doing so.  [Thus, t]he reception and rechanneling of [broadcast television] signals for simultaneous viewing is essentially a viewer function" not subject to copyright liability.  415 U.S. at 408.

In the 1976 Copyright Act, Congress expressly rejected this focus on what the viewer was doing or could do.  Instead, Congress focused on what the cable companies were doing:  profiting from the retransmitting of copyrighted programming.  As explained by the Court of Appeals for the D.C. Circuit, "[u]nder *Fortnightly* and *Teleprompter*, the copyright owner was unable to share directly in [the] revenues" generated by the retransmission of broadcast signals.  *Cablevision Sys. Dev. Co.*, 836 F.2d at 602.  As the D.C. Circuit explained, in that situation, "Congress was of the view that the copyright holders should receive direct compensation for the use of their rights."  *Id.*

The only difference between Aereo's technology and the cable systems in *Fortnightly* and *Teleprompter* is the number of antennas used.  *See WNET v. Aereo, Inc.*, 712 F.3d 676, 693 n.16 (2d Cir. 2013) ("*Aereo II*").  The early cable systems placed a large antenna on a hilltop, captured signals and then retransmitted them over cable to viewers who could not pick up those signals with antennas of

their own. *See Fortnightly*, 392 U.S. at 391–92; *Teleprompter*, 415 U.S. at 399–400. With Aereo's technology, many antennas receive the same broadcast, which is then retransmitted to many subscribers. *See* JA58–59; JA504 at Fig. 10.

It is inconceivable that, in overruling the decisions in *Fortnightly* and *Teleprompter,* Congress intended to create a giant loophole through which retransmission services could avoid copyright liability through the simple contrivance of using lots of little antennas rather than one big one. Congress rejected *Fortnightly* and *Teleprompter* not because of the underlying technology, but because the companies in those cases were retransmitting the plaintiffs' copyrighted works for a fee, *i.e.*, the defendants were in the retransmission business. *See Cablevision Sys. Dev. Co.,* 836 F.2d at 602; House Report at 89.[9] Congress' intent was clear. Aereo is engaged in precisely the kind of activity that Congress had in mind when it enacted the Transmit Clause.

### 2.     The Transmit Clause Is Technology-Neutral

Congress also made explicitly clear that technological sleights of hand like those employed by Aereo fall within the scope of the Act. Under the Copyright

---

[9] Indeed, Aereo admits that it does the same thing, and performs the same service, as cable companies, *see* JA68–69, at 185:7–186:24; JA261 (quoting Aereo's CEO as acknowledging that Aereo is an alternative to cable); JA293 (quoting Aereo's CEO as acknowledging that Aereo is usurping the "profits of the middleman"), which, as a result of the 1976 Copyright Act, must obtain a license to retransmit, and thereby perform, the copyrighted programming of broadcasters. *See* House Report at 88–90; 17 U.S.C. § 111.

Act, a performance can be made public "by means of any device or process," whether the technology is "now known or later developed." 17 U.S.C. § 101. By any "device or process," Congress intended to capture "any sort of transmitting apparatus, any type of electronic retrieval system, and any other techniques and systems not yet in use or even invented." House Report at 63. Indeed, Congress could not have been clearer that it intended the Copyright Act to be technology-neutral:

> The definition of "transmit" . . . is **broad enough to include all conceivable forms and combinations of wired or wireless communications media**, including but by no means limited to radio and television broadcasting as we know them. Each and every method by which the images and sounds comprising a performance . . . are picked up and conveyed is a "transmission," and **if the transmission reaches the public in [any] form, the case comes within the scope of . . . section 106**.

House Report at 64 (emphasis added); *see also Nat'l Football League v. Insight Telecomm. Corp.*, 158 F. Supp. 2d 124, 132 & n.10 (D. Mass. 2001) ("[T]he Copyright Act should be construed with an understanding of changing technologies" and "interpretation of the Copyright Act must occur in the real world of telecommunications, not in a vacuum."); *Nat'l Cable Television Ass'n, Inc. v. Broad. Music, Inc*., 772 F. Supp. 614, 650–51 (D.D.C. 1991) ("[T]he term 'public performance' was meant to be read broadly" and "it would strain logic to conclude that Congress would have intended the degree of copyright protection to turn on

the mere method by which television signals are transmitted to the public")
(internal quotation marks and citation omitted).[10]

Aereo's system of individualized, dime-sized antennas and multiple
retransmissions and copies is just another "device or process" for transmitting a
performance to "the public." 17 U.S.C. § 101. As two courts already have held
and another judge has observed, the details of technology used to engage in
retransmission were irrelevant to Congress when determining whether a
performance is being transmitted to the public. *See FilmOn X*, 2013 WL 4763414,
*14 (explaining that Congress intended the Transmit Clause to broadly capture
new kinds of technology like Aereo's); *Aereo II*, 712 F.3d at 701 (Chin, J.,
dissenting) ("While Congress in 1976 might not have envisioned the precise
technological innovations employed by Aereo today, th[e] legislative history surely

---

[10] Also consider the early advice given the drafters of the 1976 Act by the Register
of Copyrights:

> Obviously no one can foresee accurately and in detail the evolving
> patterns in the ways author[s'] works will reach the public 10, 20, or
> 50 years from now. Lacking that kind of foresight, the bill should, we
> believe, adopt a general approach aimed at providing compensation to
> the author for future as well as present uses of his work that materially
> affect the value of his copyright . . . . A real danger to be guarded
> against is that of confining the scope of an author's rights on the basis
> of the present technology so that, as the years go by, his copyright
> loses much of its value because of unforeseen technical advances.

Staff of the H. Comm. on the Judiciary, 89th Cong., Copyright Law Revision, Part
6: *Supplementary Report of the Register of Copyrights on the General Revision of
the U.S. Copyright Law*: *1965 Revision Bill* 19, 13–14 (Comm. Print 1965).

suggests that Congress could not have intended for such a system to fall outside the definition of a public performance.'"); *see also Am. Broad. Cos., Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373, 384 (S.D.N.Y. 2012) *("Aereo I")* (observing unique playback copies at issue in *Cablevision* "could arguably have been viewed as merely part of a 'device or process' through which a large-scale transmission to the public was accomplished").

Indeed, long before the present case, courts recognized that interpretation of the Transmit Clause demands a flexible and functional approach, not a technical one. In *Columbia Pictures Industries, Inc. v. Redd Horne, Inc.*, 749 F.2d 154 (3d Cir. 1984), for example, the Third Circuit considered whether a video rental store publicly performed when it transmitted a performance from a videotape to a private viewing booth. The court held that it did, even though each transmission of the performance could be received by only one individual. *See id.* at 159. As the Third Circuit explained, the video store's "operation is not distinguishable in any significant manner from the exhibition of films at a conventional movie theater." *Id.* (internal quotation marks omitted). It did not matter to that Court that "the cassettes [could] be viewed in private." *Id.* "The essential fact [is] that [the store] is unquestionably open to the public." *Id.*

Similarly, the Northern District of California held that a company engaged in a public performance when it transmitted a movie to a hotel room to be watched

on demand by a guest. *See On Command Video Corp. v. Columbia Pictures Indus.*, 777 F. Supp. 787, 788(N.D. Cal. 1991). As that court explained, "[h]otel guests watching a video movie in their room . . . are . . . members of 'the public[,]'" "regardless of where the viewing takes place." *Id*. at 790. The court further emphasized that the statute's "different times" language was intended "to cover precisely th[at] sort of single-viewer system." *Id*. "[W]hether the number of hotel guests . . . is one or one hundred, and whether these guests view the transmission simultaneously or sequentially, the transmission is still a public performance since it goes to members of the public." *Id*.

Congress' intent is clear. Regardless of the technology it uses, Aereo transmits performances of copyrighted programs to members of the public. Aereo, therefore, is liable under the Transmit Clause.

## C.    THE DISTRICT COURT'S RELIANCE ON *CABLEVISION* IS MISPLACED

Without explicitly saying so, the district court appears to have relied on the Second Circuit's decision in *Cablevision* in misreading the Transmit Clause. ADD12–13. But any reliance on that case is misplaced.

The defendant in that case, Cablevision, was (and is) a traditional cable television company. *Cablevision*, 536 F.3d at 124. As such, Cablevision, unlike Aereo, (a) held a statutory compulsory copyright license to retransmit broadcast station programming, *see* 17 U.S.C. § 111, or (b) secured the consent of each

station whose signal it transmitted, *see* 47 U.S.C. § 325. There are thus critical factual distinctions between the activity conducted by Cablevision and that conducted by Aereo.

In addition to its licensed retransmission services, Cablevision offered its customers a remote-storage digital video recorder ("RS-DVR"). *Cablevision*, 536 F.3d at 124. The RS-DVR operated much like a set-top DVR, in that it allowed customers to time shift their viewing by recording a program to watch later. *See id.* at 125. Unlike Aereo, however, Cablevision was authorized to retransmit broadcasts of copyrighted programming to its customers. *See id.* at 124. At issue in *Cablevision* was whether the time-shifted transmissions allowed by the RS-DVR device constituted a *second* public performance (the original retransmission of a program being the first) that required an *additional* license. *See id.* at 134.

The Second Circuit ultimately held that these second transmissions were private in nature and not subject to the Transmit Clause. *See id.* at 124, 134. In so holding, however, the Second Circuit re-wrote the Transmit Clause. Specifically, although the language of the Transmit Clause expressly provides that the court consider "members of the public capable of receiving the ***performance***" that is transmitted, the Second Circuit decided that the focus should be on members of the public capable of receiving the individual ***transmission*** itself. *See* 17 U.S.C. § 101; *Cablevision*, 536 F.3d at 135. This approach underlies Aereo's position and

the district court's conclusion but has been sharply and consistently criticized by courts and copyright scholars.  *See Aereo III*, 722 F.3d at 507–508 (Chin, J., dissenting) (explaining how *Cablevision* erred by treating these terms synonymously); *FilmOn X*, 2013 WL 4763414, at *14 n.12 (agreeing that "*Cablevision* and *Aereo* mistakenly substituted 'transmission' for 'performance' in [their] analysis"); *BarryDriller*, 915 F. Supp. 2d at 1143–44 (rejecting the Second Circuit's interpretation of the Transmit Clause in *Cablevision*); *see also* Ginsburg, *Recent Developments*, *supra* page 25, at 26 ("[T]he court confused 'performance' and 'transmission.'"); Paul Goldstein, *Goldstein on Copyright* § 7.7.2.2(b) at 7:168 (3d ed. 2013) ("The error in the Second Circuit's construction of the transmit clause was to treat 'transmissions' and 'performance' as synonymous, where the Act clearly treats them as distinct—and different—operative terms."); Jeffrey Malkan, *Public Performance Problem, supra* page 23, at 536 (explaining that the court erred in using "transmission" and "performance" interchangeably).

Notwithstanding that criticism, earlier this year, the Second Circuit relied on *Cablevision* to conclude that Aereo's business model of transmitting the same program to thousands of users at a time does not constitute public performance within the meaning of the Copyright Act.  *See Aereo II*, 712 F.3d at 680.  But in doing so, the Second Circuit recognized that its analysis in *Cablevision* cannot be reconciled with the plain text of the Transmit Clause.  First, as discussed *supra*

pages 25–26, the Second Circuit acknowledged that its decision to focus only on the "potential audience of each particular transmission would essentially read out the 'different times' language, since individuals will not typically receive the same transmission at different times." *Id.* at 688 n.11. Trying to solve this problem, the court created meaning for the language out of whole cloth by concluding that separate transmissions of a single performance nevertheless are public if they originate from the ***same copy*** of the work. *See id.* at 688–89 & n.11; *Cablevision*, 536 F.3d at 138–39. This was the only way the Second Circuit could reconcile its interpretation of the Transmit Clause with the "at different times" language, and thereby give that language meaning. In so doing, however, the Second Circuit only compounded its errors.

Nothing in the statute or legislative history supports the Second Circuit's theory. Under the Transmit Clause, what makes a performance "public" is its potential audience, not the number of copies (or transmission) used to (re)transmit the underlying performance. A work is performed publicly when the performance in question is transmitted to "members of the public," regardless of whether it is transmitted from one copy or many copies, or through one transmission or many transmissions. *See* 17 U.S.C. § 101; *see also BarryDriller*, 915 F. Supp. 2d at 1144 ("[T]he concern is with the performance of the copyrighted *work*, irrespective of which copy of the work the transmission is made from.") (emphasis in original).

37

In short, commentators and courts alike repeatedly have recognized that the Second Circuit's interpretation just does not work because a performance can be public even if it is communicated to the public through multiple transmissions. *See, e.g.*, *BarryDriller*, 915 F. Supp. 2d at 1144–45 (holding that internet transmissions at separate times constituted public performance); *FilmOn X*, 2013 WL 4763414, at *13–14 (same); *Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1006–1007, 1010–11 (C.D. Cal. 2011) ("*Zediva*") (same); *Ginsburg*, *Recent Developments*, *supra* page 25, at 26; Goldstein, *Goldstein on Copyright*, *supra* page 36 at § 7.7.2.2(b). In fact, except for the court below, every other court outside the Second Circuit to have considered the issue rejected the Second Circuit's reading of the Transmit Clause.

Indeed, the Second Circuit itself was ambivalent about its interpretation. Even as it focused on hyper-technical issues, the Second Circuit acknowledged that "[p]erhaps the application of the Transmit Clause should focus less on technical details of a particular system and more on its functionality." *Aereo II*, 712 F.3d at 694. The district court judge, whose opinion was on appeal in *Aereo II*, voiced similar hesitation. In the first few lines of her opinion, she wrote that, "[b]ut for *Cablevision's* express holding regarding the meaning of the . . . transmit clause . . . Plaintiffs would likely prevail on their request for a preliminary injunction." *Aereo I*, 874 F. Supp. 2d at 375

The slippery slope created by *Cablevision* was best summarized by the Solicitor General in her opposition to certiorari of that case. She observed that:

> Some language in the court of appeals' opinion could be read to suggest that a performance is not made available "to the public" unless more than one person is capable of receiving a *particular* transmission. . . . . Such a construction could threaten to undermine copyright protection in circumstances far beyond those presented here, including with respect to [video on-demand ("VOD")] services **or situations in which a party streams copyrighted material on an individualized basis over the Internet**.
>
> Taken as a whole, however, the court of appeals' analysis of the public-performance issue should not be understood to reach VOD services or other circumstances beyond those presented in this case.

U.S. Amicus Br., 2009 WL 1511740, at *20–21 (May 29, 2009) (italics in original, bold added).[11] Unfortunately, the Second Circuit ignored the limitations on *Cablevision*'s reach that gave the Solicitor General comfort and, in *Aereo II*, extended its flawed analysis to the very factual scenarios she believed it should not reach.

## III. THE DISTRICT COURT ERRED IN CONCLUDING THAT WCVB IS NOT LIKELY TO PROVE THAT AEREO INFRINGES WCVB'S EXCLUSIVE RIGHT OF REPRODUCTION

Copyright holders enjoy the exclusive right "to reproduce the copyrighted work in copies" and to authorize others to do the same. 17 U.S.C. § 106(1). A work is "reproduced" when the copy is fixed in a tangible form "from which it can

---

[11] The government opposed certiorari because it believed that *Cablevision* was an "unsuitable vehicle" for deciding this issue. *See Aereo II*, 712 F.3d at 703, n.4 (Chin, J., dissenting).

be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device," and such fixation is "sufficiently permanent or stable to permit it to be perceived, reproduced or otherwise communicated for a period of more than transitory duration."   House Report at 62; *see also* 17 U.S.C. § 101 (defining "copies" and "fixed").

It is undisputed that each time an Aereo subscriber chooses to watch or record one of WCVB's programs, Aereo creates three copies of the program, which it stores on its hard drive.  JA534 at n.1; JA571.  These copies are fixed in a tangible form from which they can be and are perceived by Aereo's subscribers through their internet-enabled devices using Aereo's website, www.aereo.com. JA58–59; JA543 at ¶ 6 & n.1; *Aereo I*, 824 F. Supp. 2d at 392.  The copies are saved for a period of more than a transitory duration.  *Aereo I*, 874 F. Supp. 2d at 392 ("Aereo's copies cannot be viewed as purely 'temporary.'").  As Aereo's own expert concluded, Aereo's system creates "a true, fixed recording . . . ; it is not a 'buffer' that is ephemeral or overwritten by later content as it records."  JA554 at ¶ 53.  As such, Aereo reproduces WCVB's copyrighted programs.

Aereo does not dispute that its technology generates copies of WCVB's programs.  Rather, Aereo contends that its subscribers make the copies, and that Aereo merely provides the copying equipment to those subscribers.  *See* Aereo's

Opposition 11.  In other words, Aereo contends that its subscribers, and not Aereo,

engage in the "volitional" act of copying.  *See id.*

Calling it "a closer question than the issue of public performance," the

district court agreed with Aereo.  ADD15.  The court first concluded that WCVB

was required to "show volitional conduct on the part of" Aereo, observing that,

"even with a strict liability statute such as the Copyright Act, the challenged

conduct must cause the harm."  ADD14–15.  The court then concluded, without

explanation, that "it is likely that the user supplies the necessary volitional conduct

to make the copy."  ADD15.  The district court is wrong on both issues.  The First

Circuit has not adopted any volitional conduct requirement and there is no reason

to do so here given the clearly intentional copying by Aereo.  *See Society*, 689 F.3d

at 55–57 (determining that it was unnecessary to decide whether volitional conduct

must be shown because, regardless, the defendant, as here, exercised sufficient

"authority and control" over his website and the copying, which he instructed his

agent to perform, to hold him liable).  Under any reasonable volition standard,

Aereo's selection of the copied content and requirement that copies be made

regardless of its subscribers' desire, clearly establish sufficient volitional conduct

to render Aereo liable.

In concluding that volitional conduct was required and that Aereo's

subscribers, and not Aereo, engaged in the volitional act of copying, the district

court cited no facts from the record, but appears to have relied upon *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) ("*Netcom*") and *CoStar Group, Inc. v. Loopnet, Inc.*, 373 F.3d 544 (4th Cir. 2004).  ADD15.  Those cases are inapposite.

In *Netcom*, a former minister copied portions of the plaintiff's religious works to a computer bulletin board service (the "BBS"), which in turn transmitted the works to other computers using Netcom On-Line ("Netcom"), an internet service provider, or "ISP."  *Netcom*, 907 F. Supp. at 1365–67.  The challenged copying—from the BBS to Netcom and from Netcom to other internet users— occurred automatically after the former minister uploaded the works to the BBS. *See id.* at 1367.

In ruling in favor of the BBS and Netcom, the court focused heavily on the fact that neither the BBS nor Netcom "create[d] or control[led] the content of information available to its subscribers."  *Id.* at 1368, 1372.  The court also observed that the former minister could have posted his messages through countless access providers and the outcome would have been the same.  *See id.* at 1372.  As such, the court saw "no logical reason to draw a line around Netcom and [BBS] and say that they [were] uniquely responsible for distributing [the former minister's] messages."  *Id.*

In *CoStar,* the defendant played a similarly passive role, providing an internet platform that users could use to upload or post users' own content. *See CoStar*, 373 F.3d at 547. Relying on *Netcom*, the *CoStar* court emphasized that "the ISP provides a system that automatically transmits *users' material* but is itself *totally indifferent to the material's content*. In this way, it functions as does a traditional telephone company when it transmits the contents of its users' conversations." *Id.* at 551 (emphasis supplied). The ISP was, in effect, simply a "*conduit* of information." *Id.* at 550 (emphasis in original). As the *CoStar* court explained:

> something more must be shown than mere ownership of a machine used by others to make illegal copies. There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner.

*Id*. Because the defendant in *CoStar*, like in *Netcom*, was content-neutral, no liability attached. *See id.* at 551.

In *Cablevision*, the Second Circuit extended the volitional conduct analysis to the RS-DVR system offered by Cablevision, concluding that the user, not Cablevision, provided the relevant volitional conduct. *See Cablevision*, 536 F.3d at 131–32. The court reasoned that, if a Cablevision subscriber using a traditional VCR or set-top DVR supplies the volitional conduct to record programming,

logically, that subscriber also provides the volitional conduct when the DVR is located remotely. *See id.* at 131.

The *Cablevision* court, however, recognized a key distinction between copying done by a subscriber to shift his or her viewing of already licensed and paid-for programming to a more convenient time, and copying required by a content provider in an attempt to avoid copyright liability, as Aereo is trying to do:

> [the holding] does not generally permit content delivery networks to avoid all copyright liability by making copies of each item of content and associating one unique copy with each subscriber to the network, or by giving their subscribers the capacity to make their own individual copies.

*Id*. at 139. The Second Circuit went on to suggest that liability for unauthorized reproduction could result from such conduct. *See id.* at 139–40.

The *Netcom* and *CoStar* courts adopted the volitional conduct requirement to protect against boundless liability for companies merely playing a passive role in an attenuated chain of communication. *See Netcom,* 907 F. Supp. at 1372 (Court was concerned about adopting rule "that could lead to the liability of countless parties whose role in the infringement is nothing more than setting up and operating a system that is necessary for the functioning of the Internet.").[12]

---

[12] *See also* Carrie Bodner, *Master Copies, Unique Copies & Volitional Conduct: Cartoon Network's Implications for the Liability of Cyber Lockers*, 36 Colum. J.L. & Arts 491, 507 (Spring 2013) ("Netcom was motivated by the concern that, absent a volitional element, the entire Internet could be held liable for the conduct of a single user.").

Aereo, however, looks nothing like a passive internet service provider or a simple "owner of a copy machine," as the district court suggested. ADD15. Certainly, Aereo could not be surprised to learn that its "equipment" is being used to reproduce copyrighted materials. Instead, Aereo is just the kind of copy-making "content delivery network" that *Cablevision* warned against. Aereo selects which of the many over-the-air broadcast channels to make available on its service,[13] and which pay cable channels to offer.[14] Without making that material available, Aereo has no business. Moreover, Aereo intends to offer additional pay channels, just like cable and satellite companies offer their subscribers. JA68–69, at 185:7–186:24.[15] Aereo also offers its subscribers features such as a program selection guide and ways to interact via social media while watching television programming. JA245.

In short, as is evident from Aereo's own website, www.aereo.com, Aereo is no simple equipment supplier; it is a service provider that controls the variety of content it offers. As such, Aereo exercises sufficient authority and control over

---

[13] Aereo offers only 22 over-the-air channels. JA61–62.

[14] Aereo offers the Bloomberg channel, which does not broadcast over-the-air. JA62.

[15] In addition to directly profiting from WCVB's copyrighted works through the monthly fee Aereo charges its subscribers, Aereo intends to further profit by luring customers with WCVB's over-the-air broadcasts and then selling them additional content. JA70 at 214:15–24.

both the copying and the content on its website to make it liable as a direct infringer.  *See Society*, 689 F.3d at 55–57; *Playboy Enters., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 552 (N.D. Tex. 1997) (holding that even though adult website did not create and post copies of copyrighted pornographic images itself, it nevertheless was liable for direct infringement because it operated as online merchant selling its subscribers adult images); *Kalem Co. v. Harper Bros.*, 222 U.S. 55, 62–63 (1911) (holding that producer who created unauthorized film of book and then advertised film but left actual exhibition of film to others was nonetheless liable for copyright infringement); *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 436 (1984) (explaining that, in *Kalem*, "[t]he producer . . . did not merely provide the 'means' to accomplish an infringing activity; [he] supplied the work itself").

In addition to controlling the content available to its subscribers to copy, Aereo also controls the copying itself.  Aereo seeks to exploit the perceived *Cablevision* "loophole" and avoid securing copyright licenses by forcing subscribers who want to watch "live" television to watch technologically unnecessary unique copies, which Aereo's service creates.  Aereo offers a "Watch" feature, through which its subscribers are able to watch WCVB's programming "live."  JA58; JA552; JA554, at ¶ 55.  When subscribers select that feature, however, Aereo's system makes ***three*** copies.  JA571.  Aereo's subscribers have

no choice or control in the matter; three copies are made whether the subscriber wants them made or not.

In furtherance of its machinations, Aereo seeks to manufacture volition on the part of its subscribers by providing notice to them that copies are being made during its "Watch" feature. JA547. The district court appears to have accepted this contrivance, concluding that the subscriber supplies the necessary volition "because those users are informed that the system will create a copy of the program." ADD15.

Assuming for purposes of WCVB's motion that subscribers actually read the notice, this fact is of no import for two reasons. First, knowledge hardly constitutes volition. "Volition" involves the "act or an instance of making a conscious choice or decision." *Am. Heritage Dictionary* 1928 (4th ed. 2006). In *CoStar* and *Netcom*, subscribers chose to post copyrighted materials on the defendants' communications networks. *See CoStar*, 373 F.3d at 547, 555; *Netcom*, 907 F. Supp. at 1368–69. In *Cablevision*, subscribers chose to use the defendant's equipment for the express purpose of copying a program for later viewing. *See Cablevision*, 536 F.3d at 123–24. With Aereo, on the other hand, the subscriber has no choice even when she wants to watch only "live" television. Aereo's copying is an unavoidable consequence of Aereo's contrived service delivery model. Although Aereo claims it "is not the actor" in the copying performed, *see*

47

Aereo's Opposition 11, Aereo in fact is a one-man show. Subscribers play no meaningful role in that process.

In sum, Aereo hardly is a passive player that has "no interest in the copy itself." *See CoStar*, 373 F.3d at 551. Rather, its *entire business* is predicated on the transmission of copyrighted material through technologically unnecessary copies that are created in an attempt to fit into a perceived legal loophole. JA228, at 145:2–18; JA304–305, at 53:23–55:24. Under these circumstances, Aereo is without question the volitional actor.

## IV. THE DISTRICT COURT ERRED IN RULING THAT WCVB WILL NOT SUFFER IRREPARABLE INJURY IN THE ABSENCE OF IMMEDIATE INJUNCTIVE RELIEF

### A. THE UNAUTHORIZED RETRANSMISSION OF COPY-RIGHTED MATERIALS IS THE TYPE OF CONDUCT ROUTINELY FOUND TO CAUSE IRREPARABLE INJURY

Applying a sliding scale, the district court concluded that WCVB made a showing of harm that was insufficient to overcome the district court's conclusion that WCVB was unlikely to succeed on the merits of its claims. ADD17–19. As explained above, however, the district court's conclusion on WCVB's likelihood of success on the merits was based on errors of law. When the merits of WCVB's claims are considered correctly, the sliding scale clearly tips in WCVB's favor and WCVB's showing of irreparable harm is more than sufficient.

Irreparable injury is "a substantial injury that is not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). Examples of irreparable injuries include the loss of incalculable revenue and harm to goodwill or reputation. *See id.*

Every case that has addressed whether irreparable harm results from the unauthorized retransmission of copyrighted television broadcasts over the internet has concluded unequivocally that it does. *See, e.g.*, *FilmOn X*, 2013 WL 4763414, at *15; *BarryDriller*, 915 F. Supp. 2d at 1147; *Aereo I*, 874 F. Supp. 2d at 396–400; *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 617–20 (S.D.N.Y. 2011) ("*ivi I*"), *aff'd*, 691 F.3d 275, 285–87 (2d. Cir. 2012) ("*ivi II*"); *CBS Broad., Inc. v. FilmOn.com*, No. 10-cv-07532-NRB, Dkt. No. 8 (S.D.N.Y. Nov. 22, 2010); *Twentieth Century Fox Film Corp. v. iCraveTV*, Nos. 00-121 & 00-120, 2000 WL 255989, at *8 (W.D. Pa. Feb. 8, 2000); *accord Zediva*, 824 F. Supp. 2d at 1012–14.

As the Second Circuit explained in *ivi,* the unauthorized retransmission of over-the-air broadcasts threatens the free, over-the-air television broadcasting industry itself:

> The absence of a preliminary injunction would encourage current and prospective retransmission rights holders, as well as other Internet services, to follow [defendant's] lead in retransmitting plaintiffs' copyrighted programming without their consent. The strength of

49

> plaintiffs' negotiating platform and business model would decline. The quantity and quality of efforts put into creating television programming, retransmission and advertising revenues, distribution models and schedules—all would be adversely affected. These harms would extend to other copyright holders of television programming. Continued live retransmission of copyrighted television programming over the Internet without consent would thus threaten to destabilize the entire industry.

*Ivi II*, 691 F.3d at 286.  Indeed, Aereo's presence already is creating instability throughout the industry.  *See, e.g., Aereo III*, 722 F.3d at 502 (Chin, J., dissenting).

## B.  AEREO'S CONDUCT WILL CAUSE WCVB TO LOSE CONTROL OVER ITS COPYRIGHTED WORKS

Fundamental to the Copyright Act's grant of exclusive rights to a copyright owner is the owner's ability to *control* the copyrighted works.  That control permits a copyright owner alone to determine when and how best to maximize the value of her creative works.  Aereo's actions irreparably harm WCVB's overall ability to control its copyrighted works.  *See, e.g.*, *FilmOn X*, 2013 WL 4763414, at *16 (finding irreparable harm caused by loss of control over one's copyrighted programming due to unauthorized internet retransmission); *ivi II*, 691 F.3d at 285 (concluding unauthorized internet retransmissions would "dilute plaintiffs' programming and their control over their product").  This loss of control irreparably harms WCVB's first-mover status on the internet, its ability to negotiate and profit from retransmission fees, and its generation of advertising revenue.

### 1. Aereo's Conduct Will Cause WCVB To Lose "First Mover" Status On The Internet

Aereo's entry into the internet space before WCVB irreparably harms WCVB in the form of lost "first mover" status. Before WCVB may transmit its broadcast programming over the internet it must negotiate terms with its business partners. *See* JA13–14 at ¶¶ 22–24. WCVB must, for instance, consider the distribution rights of third-party copyright holders. *See* JA11 at ¶ 13; JA13–15 at ¶¶ 23–24, 28. It also must work with its current cable, satellite and telecommunications operators to, for instance, provide for safeguards for authenticating viewers. *See* JA14 at ¶ 27. In other words, WCVB must work within a regulatory and contractual scheme, one that Aereo treats as irrelevant to its core business model. It is the ultimate irony that the district court ruled that Aereo could distribute WCVB's programming on the internet without the consent of WCVB, or any other copyright holders, of its programming while WCVB, itself, cannot. The absurdity of this result underscores the manifest injustice of the district court's ruling.

WCVB recognizes the economic value of the internet distribution platform and has been actively engaged with its business partners in developing online programming solutions. *See* JA13–14 at ¶ 24. Indeed, the stakes in doing so are high. Whoever is first into that market has the opportunity, for instance, to fashion new and profitable advertising schemes, such as advertisements targeted to specific

internet users and advertising displays on banners. *See* JA14 at ¶ 26. More fundamentally, the "first mover" into the market shapes and defines that market, and it is extremely difficult, if not impossible, to reverse those effects. *See Butamax Advanced Biofuels LLC v. Gevo, Inc.*, 868 F. Supp. 2d 359, 375 (D. Del. 2012) ("[A]s the first entrant into the marketplace, defendant would have advantages that include working with the best facilities and potential customers and being perceived as an innovator in the field."). In fact, if this Court were to bless Aereo's conduct, it would result in the perverse situation where Aereo could shape the market and profit from streaming WCVB's programming over the internet, while WCVB *itself* could not do so. *See* JA13–14 at ¶¶ 23–25.

Under similar circumstances, courts consistently have found that the loss of this "first mover" status results in irreparable harm. *See, e.g., Butamax Advanced Biofuels LLC*, 868 F. Supp. 2d at 374–75 (rejecting defendant's "claim[] that it will not jeopardize plaintiff's first mover advantage," and "find[ing] that irreparable harm would exist assuming defendant were infringing"); *C.R. Bard, Inc. v. Solano*, No. 88-CV-1617-Z, 1988 WL 92469, *2 (D. Mass. Aug. 4, 1988) (finding irreparable harm where the parties were competitors "in a race" to be the first to market their product in the United States). As the Federal Circuit has explained,

> Competitors change the marketplace. Years after infringement has begun, it may be impossible to restore a [plaintiff's] . . . exclusive position by an award of damages and a permanent injunction. Customers may have established relationships with infringers . . .

> Requiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option.

*Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975–76 (Fed. Cir. 1996).

The district court addresses this harm by stating only that "WCVB's plans to put programming online are insufficiently developed."  ADD19.  The court cites no facts or case law for that proposition.  First, as the record makes clear, WCVB *already* puts some of its news programming on the internet.  *See* JA13 at ¶ 22.  Further, WCVB is in talks to provide a more robust online service, but is delayed in providing that service because, unlike Aereo, it wishes to comply with legal obligations.  *See* JA13–14 at ¶ 24.

Second, the district court's proposition is contrary to precedent. Even where a plaintiff has not yet entered a new market, the expected future harm may be irreparable.  *See New Boston Television, Inc. v. Entm't Sports Programming Network, Inc.*, No. 81-1010-Z, 1981 WL 1374, at *3 (D. Mass. Aug. 3, 1981) (finding that even where plaintiffs had not yet entered new market, "this does not permit defendants to appropriate plaintiffs' copyrighted material and effectively preclude such efforts in the future").  Simply put, it should be up to WCVB, and not Aereo, to control when and how best to maximize the value of WCVB's own copyrighted work.

## 2. Aereo's Conduct Will Cause WCVB To Lose Unquantifiable Retransmission Fees

Moreover, as the district court concluded, "the prospect of harm is real," in that "WCVB will be irreparably harmed in its ability to negotiate retransmission fees with cable providers."  ADD18.  Retransmission fees are what cable, satellite, and telecommunication companies pay television stations in exchange for consent to retransmit and resell the stations' signals to the cable, satellite, and telecommunication companies' subscribers.  *See* JA12 at ¶ 17; JA15 at ¶ 29.  As cable, satellite, and telecommunication companies have grown, these fees have taken on added—indeed, critical—financial importance to WCVB and other television stations.  *See Aereo III*, 722 F.3d at 503 (Chin, J., dissenting); JA12,at ¶ 17; JA16–17 at ¶ 33.

As explained by WCVB's General Manager, the harm to WCVB with regard to retransmission fees is threefold.  First, Aereo's service likely has caused at least some of Aereo's subscribers to cancel their subscriptions with their cable, satellite and telecommunications providers. *See* JA15–16 at ¶ 30; *Aereo I*, 874 F. Supp. 2d at 399 (finding that Aereo's service would allow consumers to bypass cable companies and would "likely prompt cable subscribers to cancel their subscriptions").  Rational subscribers will not, for long, pay cable, satellite, and telecommunication companies for a service they can otherwise obtain at a highly-discounted rate from Aereo.  As a result, WCVB will receive less retransmission

consent revenue, which in turn adversely impacts WCVB in unquantifiable ways. *See* JA15–16 at ¶ 30.

Second, by providing essentially the same retransmission services as cable, satellite, and telecommunications operators, but without paying fees, Aereo can— and indeed does—charge less for the service. *See* JA16 at ¶ 31. That diminishes the value of WCVB's programming to the licensed distributors that compete with Aereo. *See* JA16 at ¶ 32. That diminished value certainly will be reflected in what those companies are willing to pay WCVB. *See id.* As such, the presence of an unlicensed competitor such as Aereo necessarily impacts WCVB's negotiating position with its contracting partners. *See id.*; *see also BarryDriller*, 915 F. Supp. 2d at 1147; *Zediva*, 824 F. Supp. 2d at 1012–13. That harm, while real, cannot be readily quantified. *See BarryDriller*, 915 F. Supp. 2d at 1147; *Zediva*, 824 F. Supp. 2d at 1013.

Third, and most dangerous of all, if Aereo is not enjoined, licensed distributors of WCVB's broadcasts likely will opt to utilize their own Aereo-like systems, eliminating all payments to WCVB for the right to retransmit and resell WCVB's signal. *See* JA16–17 at ¶ 33; *Aereo III*, 722 F.3d at 502 (Chin, J., dissenting); *ivi II*, 691 F.3d at 286. Indeed, Aereo's own CEO has acknowledged that Aereo's model is attractive to cable providers because, if permitted, Aereo's approach would enable those providers to avoid paying fees to WCVB (and others)

for their programming.  *See* JA71–72, at 216:7–217:14.  In each of these scenarios, WCVB suffers irreparable harm because the loss of revenues it derives from licensing agreements is unquantifiable.  *See ivi II*, 691 F.3d at 285–86; *BarryDriller,* 915 F. Supp. 2d at 1147.

In its decision, the district court acknowledged this harm, but dismissed it, citing *Aereo I* for the proposition that "Hearst has not shown that WCVB will suffer the 'full magnitude' of the claimed harm before the Court disposes of the case on the merits."  ADD18.  WCVB is aware of no First Circuit case that requires a plaintiff to show the "full magnitude" of its harm before final disposition of a case.  Rather, the standard in the First Circuit requires a plaintiff to show only that it will suffer *some* irreparable harm pending final disposition of the case.  *See Kartell v. Blue Shield of Massachusetts, Inc.*, 687 F.2d 543, 553 (1st Cir. 1982) (requiring proof that plaintiffs would "suffer irreparable harm pending final disposition of the case in the district court"); *Ross-Simons of Warwick, Inc.*, 102 F.3d at 19 (recognizing that "a cognizable threat of [irreparable] harm" can support interim injunctive relief).  WCVB clearly has met that standard.  Because the district court applied the wrong standard, its findings are not entitled to any deference.  *See I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 33 (1st Cir. 1998)

("If findings are made under incorrect standards, little or no deference is due those findings.").[16]

### 3.    Aereo's Conduct Will Cause WCVB To Lose Unquantifiable Advertising Revenue

Aereo's unauthorized retransmission of WCVB's programming also undermines WCVB's ability to generate advertising revenue.  *See ivi II*, 691 F.3d at 285 ("Broadcast television stations and networks earn most of their revenues from advertising."); JA17 at ¶ 35.  Advertising rates are predicated on measurable viewership.  *See ivi II,* 691 F.3d at 285; JA17 at ¶ 34.  Viewers who watch WCVB's broadcasts using Aereo's service cannot be measured by WCVB or any audience rating service.  *See Aereo I*, 874 F. Supp. 2d at 397–98; JA17 at ¶ 35 ("[T]here currently is no commercial viewership measurement of Aereo's subscribers.").  Aereo's unauthorized exploitation of WCVB's programming could result in a material undercounting of WCVB's viewership, which is difficult, if not impossible, to quantify.  *See* JA17 at ¶ 35.  This problem worsens as Aereo's business grows and becomes more entrenched.  This undercounting adversely

---

[16] Even if the Court had applied the right standard in evaluating WCVB's showing of harm, its conclusions constitute an abuse of discretion.  An abuse of discretion occurs "when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them."  *See I.P. Lund Trading*, 163 F.3d at 33.  As explained above, the district court's brief harm analysis relies on incorrect factual findings and ignores proper factors, and makes serious mistakes in weighing the factors.

affects the amounts advertisers will pay to WCVB, *see Aereo I*, 874 F. Supp. at 398; JA17 at ¶ 35, and constitutes irreparable harm, *see New Boston Television*, 1981 WL 1374, at *3.

In addressing this issue, the district court stated that "Hearst's claim that WCVB will not be able to measure viewers who access its programming through Aereo is simply not true."  ADD18–19.  The district court's sole support for this statement, however, which directly contradicts the sworn Fine Declaration, is an unverified, internally inconsistent media article.  *See id.* at 19; JA17 at ¶ 35.  That article claims that Aereo will be picked up by Nielsen (only one of a number of rating organizations), but also states that Nielsen pledges, but is not yet ready to "measure TV viewership on iPads and other mobile devices."  JA350.  Aereo subscribers access Aereo's service on mobile devices.  *See* JA59; JA95.  The cited article also states that Nielsen only will be measuring a television set hooked up to the internet, which it defines as "the flat-screen kind," and explicitly excludes iPads from that definition.  JA350.  Not surprisingly, the two-page media article does not attempt to reconcile this inconsistency.  As such, it was reversible error for the district court to rely upon it, particularly in the face of sworn evidence to the contrary.

## V.  AN INJUNCTION IS IN THE PUBLIC INTEREST AND THE BALANCE OF EQUITIES WEIGHS HEAVILY IN WCVB'S FAVOR

There is a strong public interest in preserving over-the-air broadcasting.  *See, e.g., Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 194 (1997) (requiring cable companies to carry broadcast stations).  As the Supreme Court stated in *Turner*, "[b]roadcast television is an important source of information to many Americans. Though it is but one of many means for communication, by tradition and use for decades now, it has been an essential part of the national discourse on subjects across the whole spectrum of speech, thought and expression."  *Id.  See also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) ("[T]he importance of local broadcasting outlets 'can scarcely be exaggerated, for broadcasting is demonstrably a principal source of information and entertainment for a great part of the Nation's population.") (quoting *United States v. Sw. Cable Co.,* 392 U.S. 157, 177 (1968)).  Further, as cable and satellite companies have proliferated, the dependency on broadcasting remains, but has shifted disproportionately to "younger adults, minorities and lower-income families."  JA18 at ¶ 37.

WCVB and other broadcast companies directly impacted by Aereo provide this critical over-the-air service.  In addition to its award-winning news and entertainment programs, WCVB transmits critical emergency alerts and information, airs educational and informational programs primarily intended for

children, and provides air time for qualified political candidates.  *See* JA10 at ¶ 11.

The public has a strong interest in preserving these critical services.

Aereo directly threatens these services.  Already, there has been discussion among some broadcasters of having to remove their programming from public broadcasts in order to protect their revenue stream.  *See Aereo III*, 722 F.3d at 502 (Chin, J., dissenting) ("To protect their copyrighted material, Fox, Univision, and CBS have reportedly threatened to move their free public broadcasts to paid cable if Aereo is permitted to continue with its service.").  Cable companies also have publicly questioned why they should continue to pay fees for broadcast programming when they can use an Aereo-like approach and avoid those fees altogether.  *See id.* (Chin, J., dissenting) ("Time Warner Cable has already announced its intention to look into adopting an Aereo-like system to avoid [retransmission] fees entirely.").  If Aereo's conduct is allowed to continue, industry participants cannot wait to respond to the changing market.  The industry will need to react to it, resulting in changes to the marketplace that will be difficult, if not impossible, to reverse.  Those changes put WCVB's financial viability at risk, and with it the vital public service that they provide.  *See ivi I*, 765 F. Supp. 2d. at 621 ("If Plaintiffs lose control over their products or potential revenue sources, they will lose valuable incentives to continue to create programming."); S. Rep. No. 102-92, at 42 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1175

(recognizing that "vital local service" provided by broadcasting will be jeopardized if retransmitters are permitted to carry signals without paying programmers).

The public interest compels that Aereo, like all other distributors of television programming, be required to operate within the carefully-crafted regulatory scheme governing television broadcasting and distribution. *See* JA18–19 at ¶ 38. As the Supreme Court has long recognized, the purpose of copyright laws is to "secure a fair return for an author's creative labor" in order to "stimulate artistic creativity for the general public good." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975). It is for that reason that Congress expressly made clear in connection with the Copyright Act that "commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material" must pay copyright royalties in connection with those operations. House Report at 89; *see also Cablevision Sys. Dev. Co.*, 836 F.2d at 602. If Aereo is allowed to intercept signals intended for the general public and sell those signals in a commercial enterprise, it acts outside Congress' carefully constructed statutory scheme. Such an approach is contrary to the public interest.

In contrast to the harm inflicted on WCVB and the public, the potential harm to Aereo if an injunction is allowed would be nothing more than the loss of its illegal business. In that instance, courts consistently have held that the balance of equities weighs heavily in a plaintiff's favor. *See, e.g., ivi I*, 765 F. Supp. 2d at 621

("It is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product."); *Zediva*, 824 F. Supp. 2d at 1014–15 (concluding that balance of hardships "sharply" favors plaintiffs because defendants could not complain of harm that would befall them when properly forced to desist from their infringing activities).

## CONCLUSION

For the foregoing reasons, WCVB respectfully requests that this Court reverse the district court's denial of WCVB's motion for preliminary injunction and direct the district court to enter WCVB's proposed preliminary injunction (JA5–6) against Aereo.

Dated:  December 9, 2013

*/s/ James D. Smeallie*
James D. Smeallie (No. 60563)
Joshua C. Krumholz (No. 25262)
Brian G. Leary (No. 1160939)
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
Telephone:  (617) 523-2700
Facsimile:   (617) 523-6850
Email:     jd.smeallie@hklaw.com
              joshua.krumholz@hklaw.com
              brian.leary@hklaw.com

*Attorneys for Plaintiff-Appellant Hearst Stations Inc., d/b/a WCVB-TV*

Eve Burton
Jonathan Donnellan
Ravi Sitwala
The Hearst Corporation
300 West 57th Street
New York, NY 10019
Telephone:  212-649-2020
Facsimile:   212-649-2035
Email:     eburton@hearst.com
             jdonnellan@hearst.com
             rsitwala@hearst.com

*Of Counsel*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. P. 32(a)(6). This brief contains 13,962 words, excluding those parts of the brief exempted from the word limit requirement by Fed. R. App. P. 32(a)(7)(B)(iii). This brief has been prepared in proportionally-spaced typeface using Microsoft Office Word in 14-point Times New Roman.

Dated:  December 9, 2013

*/s/* James D. Smeallie
James D. Smeallie

# ADDENDUM

## TABLE OF CONTENTS

| **Document Description** | **Page** |
|---|---|
| Memorandum & Order, Judge Gorton | **ADD1** |
| 17 U.S.C. § 101 (Excerpts) | **ADD21** |
| 17 U.S.C. § 106 | **ADD23** |
| 17 U.S.C. § 111 | **ADD24** |
| 47 U.S.C. § 301 | **ADD38** |
| 47 U.S.C. § 307 | **ADD39** |
| 47 U.S.C. § 325 (Excerpts) | **ADD42** |
| 47 CFR § 73.624 (Excerpts) | **ADD46** |
| 47 CFR § 73.1740 (Excerpts) | **ADD47** |
| H.R. Rep. No. 94-1476 (Excerpts) | **ADD48** |
| S. Rep. No. 102-92 (Excerpts) | **ADD56** |
| 11 Comm. on the Judiciary, 89th Cong., Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill at 13–14 (Comm. Print 1965) (Excerpts) | **ADD58** |
| Carrie Bodner, Master Copies, Unique Copies & Volitional Conduct:  Cartoon Network's Implications for the Liability of Cyber Lockers, 36 Colum. J.L. & Arts 491, 507 (Spring 2013) (Excerpts) | **ADD61** |
| Jane C. Ginsburg, Recent Developments in US Copyright Law— Part II, Caselaw: Exclusive Rights on the Ebb?, Colum. Pub. L. Research Paper No. 08-192 (2008), pub'd in Revue Internationale du Droit d'Auteur, Jan. 2009 (Excerpts) | **ADD63** |
| Jeffrey Malkan, The Public Performance Problem in Cartoon Network LP v. CSC Holdings, Inc., 89 Or. L. Rev. 505, 536 (2011)  (Excerpts) | **ADD67** |

**United States District Court**
**District of Massachusetts**

```
_____
                                )
HEARST STATIONS INC. d/b/a      )
WCVB-TV,                        )
                                )
          Plaintiff,            )      Civil Action No.
                                )      13-11649-NMG
     v.                         )
                                )
AEREO, INC.,                    )
                                )
          Defendant.            )
_____)
```

**MEMORANDUM & ORDER**

**GORTON, J.**

    This case arises out of a copyright infringement dispute between two media companies.  Plaintiff Hearst Stations Inc. ("Hearst"), which owns the local television station WCVB-TV ("WCVB"), alleges that defendant Aereo, Inc. ("Aereo") is intercepting its television signals and converting its programs into a different format for retransmitting over the internet without compensating WCVB.  That, says plaintiff, infringes WCVB's exclusive rights under the Copyright Act.

    Pending before the Court are Hearst's motion for a preliminary injunction (Docket No. 4) and Aereo's motions to transfer (Docket No. 20) and stay proceedings while the Court considers its motion to transfer (Docket No. 23).  For the reasons that follow, all three motions will be denied.

**ADD1**

## I.   **Background**

### A.   **Hearst and WCVB-TV**

Hearst is a Nevada corporation with a principal place of business in New York, New York.  It owns 29 broadcast stations throughout the country, including WCVB, a Boston-area television station with a main studio in Needham, Massachusetts that broadcasts over Channel 5.  WCVB operates under a license from the Federal Communications Commission which allows it to broadcast over the air and requires it to provide content such as closed captioning and an emergency alert system.

Hearst claims that WCVB creates, produces, owns, broadcasts and distributes more than 43 hours of original programming every week and has been recognized nationally for the high quality of its local programming.  It alleges that WCVB spends considerable amounts of money, time, energy and creativity on producing original programming and building the infrastructure that allows it to transmit and distribute the programming.  WCVB's two main sources of revenue are commercial advertising and fees paid by other companies for the right to retransmit and resell WCVB's signal and it hopes to profit in the future from making its programming available over the Internet.

**ADD2**

### B.    Aereo

Aereo is a New York corporation.  Hearst alleges that
Aereo's principal office is in Boston but Aereo submits that its
principal place of business is in Long Island City, New York.

Aereo uses antenna and digital video recording ("DVR")
technology to transmit over-the-air television broadcasts over
the internet to its fee-paying subscribers.  The technology
allows users to watch programming "live" (with a few second
delay) or to record it for viewing at a later time.

In either case, when a user elects to watch a program, an
antenna that is assigned exclusively to that user for that time
period intercepts the signal as the program is broadcast over-
the-air and transmits it to the user's designated space on
Aereo's hard drive.  Aereo has installed banks of small antennas
throughout the Boston area for this purpose.

Next, Aereo's system converts the signal from its original
format to a different digital format that allows the user to
access the program over the internet.  It then generates three
copies of the program, each at a different "quality rate," to
enable recording and rewinding and to allow each user to choose
the copy most compatible with his or her internet connection.

When a user elects to watch a program "live," at least one
copy of the program is stored in a user-specific "directory" on
Aereo's hard drive until the user finishes watching.  Users who

- 3 -

**ADD3**

select this option receive a notice on their computers or other
devices which advises:

> When you press 'Watch' you will start recording this
> show, allowing you to pause and rewind the program.

If a user elects to record a program, all three copies are
retained in the user's directory on Aereo's hard drive and,
according to Hearst, may be kept there permanently.

Finally, a user accesses her individual copy of a program
by streaming it over the internet from Aereo's hard drive to her
personal computer, smart phone, or other internet-enabled
device.  The system does not permit users to download permanent
physical copies of programs to their personal hard drives.
Instead, all copies are retained on Aereo's remote hard drive.

Hearst's amended complaint alleges that, by providing this
service, Aereo engages in

> clear  copyright  violations  that  put  WCVB's  entire
> business  model  at  risk  and  undermine  a  regulatory
> regime carefully constructed by Congress.

Specifically, it contends that Aereo violates WCVB's exclusive
rights under the Copyright Act, 17 U.S.C. § 106.

Aereo, for its part, claims that it merely provides
technology that allows consumers to do what they are legally
entitled to do: 1) access free and legally accessible over-the-
air television broadcasts using an antenna, 2) create
individual, unique recordings of those broadcasts for personal

- 4 -

**ADD4**

use and 3) play the individual, unique recordings on personal
devices.  It admits that it has not received any authorization
to provide WCVB's programming to its subscribers.

### C.   Procedural History

Aereo formally launched its service in Boston on May 15,
2013, and the service became generally available to subscribers
later that month.  Hearst filed suit and moved for a preliminary
injunction on July 9 and amended its complaint on July 30, 2013.
On July 16, Aereo moved to transfer the case to the Southern
District of New York where Judge Alison J. Nathan is already
presiding over two cases to which Aereo is a party and that
involve similar issues.  It also moved to stay proceedings
pending resolution of that motion.  The Court held a hearing
with respect to the pending motions on September 18, 2013.

## II.  <u>Aereo's Motions to Transfer and Stay</u>

For the reasons that follow, the Court will deny Aereo's
motion to transfer the case to the Southern District of New
York.  Aereo's motion to stay the case pending resolution of its
transfer motion will therefore become moot and will also be
denied.

### A.   Legal Standard

District courts have the discretion to transfer "any civil
action to any other district or division where it might have
been brought" for the "convenience of parties and witnesses" and

- 5 -

**ADD5**

"in the interest of justice." 28 U.S.C. § 1404(a).  Hearst does
not dispute that the case "might have been brought" in the
Southern District of New York so the Court's analysis is limited
to whether convenience and justice favor transfer.

     While the decision to transfer a case under § 1404 lies
solely within the discretion of the court, there is a
presumption in favor of the plaintiff's choice of forum and the
defendant must bear the burden of proving that a transfer is
warranted. Holmes Grp., Inc. v. Hamilton Beach/Proctor Silex,
Inc., 249 F. Supp. 2d 12, 15 (D. Mass. 2002).  Factors to be
considered in determining whether transfer is warranted include
1) the plaintiff's choice of forum, 2) the relative convenience
of the parties, 3) the convenience of the witnesses and location
of documents, 4) any connection between the forum and the
issues, 5) the law to be applied and 6) the state or public
interests at stake. Id. at 17.

     **B.  Application**

     Aereo maintains that transfer is warranted because 1) Judge
Nathan is already familiar with the facts and legal issues that
will arise in this dispute and therefore will be able to avoid
duplicative discovery and 2) Hearst has engaged in impermissible
forum-shopping by filing in this Court rather than in New York.

     Aereo's arguments in favor of transfer do not overcome the
presumption in favor of Hearst's chosen forum.  Even if the

Court were inclined to transfer this case to New York, the actions pending before Judge Nathan are already quite advanced and therefore transfer is virtually guaranteed to either delay litigation or unfairly burden Hearst.

Nor is the Court persuaded that it would be unjust to allow Hearst's suit to proceed in this forum.  Hearst is suing Aereo in its capacity as WCVB's owner and only seeks to enjoin Aereo with respect to WCVB's local programming.  As such, it is the hometown plaintiff for the purposes of this litigation and is entitled to a strong presumption in favor of its choice of forum. See Kettenbach v. Demoulas, 822 F. Supp. 43, 44 (D. Mass. 1993); Layton v. Nat'l Freight, Inc., 2012 WL 5419140, at *2 (S.D. Miss. Nov. 5, 2012) (reasoning that plaintiff who sues in home forum has not "venue shopped").  Hearst's decision to limit the scope of the suit to WCVB's local programming and Aereo's local activities also weighs in favor of resolving the suit here rather than in New York. See Transcanada Power Mktg., Ltd. v. Narragansett Elec. Co., 402 F. Supp. 2d 343, 354 (D. Mass. 2005) (noting local interest in having local controversies decided in the local forum).

**III. <u>Hearst's Motion for a Preliminary Injunction</u>**

Hearst seeks to enjoin Aereo from infringing WCVB's exclusive rights under the Copyright Act, 17 U.S.C. § 106.  For the reasons that follow, Hearst's motion will be denied.

- 7 -

**ADD7**

**A.    Legal Standard**

To prevail on its motion, Hearst must establish

that [it] is likely to succeed on the merits, that
[it] is likely to suffer irreparable harm in the
absence of preliminary relief, that the balance of
equities tips in [its] favor, and that an injunction
is in the public interest.

Voices of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645
F.3d 26, 32 (1st Cir. 2011) (quoting Winter v. Natural Res. Def.
Council, Inc., 555 U.S. 7, 129 (2008)).

Of these factors, the likelihood of success on the merits
"normally weighs heaviest on the decisional scales." Coquico,
Inc. v. Rodriguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009).
This factor is also given particular weight in copyright cases
because "the resolution of the other three factors often turns
on the plaintiff's likelihood of success." Id.

**B.    Application**

**1.    Likelihood of Success on the Merits**

In the instant case, Hearst claims that Aereo's services
violate WCVB's exclusive rights under § 106 of the Copyright Act
to 1) publicly perform, 2) reproduce, 3) distribute and 4)
prepare derivative works based on its copyrighted programming.
Hearst fails to make a sufficient showing that it is likely to
prevail on any of these claims and therefore this factor weighs
against a preliminary injunction in its favor.

### a. Exclusive Right to Perform Copyrighted Work Publicly

The most hotly contested issue is whether Aereo infringes WCVB's exclusive right to transmit its works to the public.

### i. Relevant Statutory Provisions

Section 106 of the Copyright Act gives copyright owners the exclusive rights to "perform the copyrighted [audiovisual] work publicly." 17. U.S.C. § 106(4). Section 101 of the Act explains that "to perform" a work is

> to recite, render, play, dance or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or make the sounds accompanying it audible.

Id. § 101.

Furthermore, the statute distinguishes between public and private performances. The "Transmit Clause" of § 101 defines "to perform a work publicly" as

> to transmit or otherwise communicate a performance or display of the work to a [public place] or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

Id. Section 101 elsewhere defines "to transmit" as "to communicate [something] by any device or process whereby images or sounds are received beyond the place from which they are

- 9 -

**ADD9**

sent." Id. A "device or process" is also defined broadly to include "one now known or later developed." Id.

### ii. Legislative History

The House Committee on the Judiciary's Report on the 1976 revisions to the Copyright Act provides additional insight into the intended meaning of "perform" and "public performance." The report explains that the same copyrighted work may be "performed" in various ways:

> Concepts of public performance and public display cover not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public. Thus, for example: a singer is performing when he or she sings a song; a broadcasting network is performing when it transmits his or her performance (whether simultaneously or from records); a local broadcaster is performing when it transmits the network broadcast; a cable television system is performing when it retransmits the broadcast to its subscribers; and any individual is performing whenever he or she . . . communicates the performance by turning on a receiving set.

H.R. Rep. No. 94-1476, at 63 (1976).

### iii. Case Law

The First Circuit Court of Appeals has not addressed whether technology that allows users to record copies of over-the-air broadcasts of television programs on remote servers and view the programs using the internet violates broadcasters' exclusive public performance rights.

- 10 -

**ADD10**

The Second Circuit Court of Appeals is the only circuit court to address this issue to date and it has held that this technology does not infringe the copyright holder's exclusive right to perform its work publicly. First, in the 2008 Cablevision case, the Second Circuit held that "RS-DVR" technology that allows users to record programming on remote servers for later viewing does not infringe the original broadcaster's public performance right because technology's manner of transmitting a recorded program to the viewer who recorded it did not constitute a "public performance." Cartoon Network LP v. CSC Holdings, Inc. (Cablevision), 536 F.3d 121, 137 (2d Cir. 2008). In 2013, the Second Circuit applied Cablevision's reasoning to Aereo's service and found that Aereo's transmissions to subscribers also did not infringe. WNET, Thirteen v. Aereo, Inc., 712 F.3d 676 (2d Cir. 2013). The court described Cablevision's holding as resting on two "essential facts": 1) the RS-DVR system created unique copies of each program a customer wished to record and 2) a customer could only view the unique copy that was generated on his behalf. Id. It found that Aereo's system, which employs individually-assigned antennas to create copies unique to each user and only at the user's request, shares these two traits. Id. at 690.

- 11 -

In contrast, Judge Denny Chin, who dissented in the <u>WNET</u> case and from the Second Circuit's denial of a rehearing <u>in banc</u>, contends that the majority erred by

> erroneously conflat[ing] the phrase 'performance or display' with the term 'transmission,' shifting the focus of the inquiry from whether the transmitter's audience receives the same content to whether it receives the same transmission.

<u>WNET, Thirteen</u> v. <u>Aereo, Inc.</u>, 722 F.3d 500, 507 (2d Cir. 2013) (Chin, J., dissenting). Two district courts have similarly reasoned that what makes the transmission "public" is not its intended audience of any given copy of the program but the intended audience of the initial broadcast. <u>See</u> <u>Fox Television Stations, Inc.</u> v. <u>FilmOn X LLC</u>, Civil Action No. 13-758, 2013 WL 4763414, at *25 (D.D.C. Sept. 5, 2013); <u>Fox Television Stations, Inc.</u> v. <u>BarryDriller Content Sys., PLC</u>, 915 F. Supp. 2d 1138, 1144 (C.D. Cal. 2012).

### iv. Application

Hearst urges the Court to adopt the latter interpretation and argues that Aereo's services clearly fall within the definition of transmitting to the public because Aereo is transmitting a performance of the original program to members of the public. It contends that the fact that each user views a unique copy of the program is irrelevant to the analysis.

Aereo responds that it is transmitting private rather than public performances per <u>Cablevision</u>. It also argues that

- 12 -

Hearst's suggestion that the relevant performance is the copyrighted work reads the terms "a performance or display" out of the statutory phrase "a performance or display of the work".

Aereo's interpretation is a better reading of the statute because the "canon against surplusage" requires this Court to give meaning to every statutory term if possible. See Cablevision, 536 F.3d at 135-36.  The House Report accompanying the 1976 amendments, which explains that the process of communicating a copyrighted work from its original creator to the ultimate consumer may involve several "performances," provides further support. See H.R. Rep. No. 94-1476, at 63.  In short, while the Transmit Clause is not a model of clarity, the Court finds at this juncture that Aereo presents the more plausible interpretation.  As such, Hearst has not persuaded the Court that it is likely to succeed on the merits of its public performance claim.

### b. Exclusive Right to Reproduce Copyrighted Work

Hearst also argues that Aereo violates WCVB's exclusive right to reproduce its copyrighted work or authorize others to do so by creating three copies of WCVB's copyrighted programming every time a consumer chooses to watch or record a program and saving the subject copies for longer than a "transitory" period.

**ADD13**

### i. Legal Standard

Copyright holders enjoy the exclusive right "to reproduce the copyrighted work in copies" and to authorize others to do the same. 17 U.S.C. § 106(1). "Copies" are

> material objects . . . in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

Id. § 101. A work is "fixed" when it is

> sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.

Id.

### ii. Application

Aereo contends that it cannot be liable for infringing WCVB's exclusive right to reproduce WCVB's copyrighted works because its users provide the volitional conduct that creates the copy of the program they select. Aereo asserts that there is a well-established principle that a technology provider cannot be held directly liable on a copyright claim for providing a machine that responds automatically to user commands.

The First Circuit has not decided if a plaintiff claiming infringement must show volitional conduct on the part of the defendant. See Soc'y of Holy Transfig. Monastery, Inc. v. Gregory, 689 F.3d 29, 55 (1st Cir. 2012). The Second, Third,

- 14 -

**ADD14**

and Fourth Circuits have, however, imposed such a requirement. Those courts reason that holding a media company liable just because it provides technology that enables users to make copies of programming would be the rough equivalent of holding the owner of a copy machine liable because people use the machine to illegally reproduce copyrighted materials. <u>See, e.g.</u>, <u>CoStar Grp., Inc.</u> v. <u>LoopNet, Inc.</u>, 373 F.3d 544, 550 (4th Cir. 2004).

Requiring a showing of volitional conduct comports with the general principle that, even with a strict liability statute such as the Copyright Act, the challenged conduct must cause the harm. <u>See</u> <u>Religious Tech. Ctr.</u> v. <u>Netcom On-Line Commc'ns Serv., Inc.</u>, 907 F. Supp. 1361, 1370 (N.D. Cal. 1995). The Court finds that, in this case, it is likely that the user supplies the necessary volitional conduct to make the copy. The fact that Aereo users have the option to watch programs "live" does not command a different result because those users are informed that the system will create a copy of the program so that they can pause and rewind. This is a closer question than the issue of public performance, however, and discovery could disclose that Aereo's service infringes WCVB's right to reproduce its work.

### c.   Exclusive Right to Distribute Copyrighted Work to the Public

Hearst also submits that Aereo violates WCVB's exclusive right to distribute its copyrighted works to the public "by sale

**ADD15**

or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3).  The Copyright Act does not define what it means to "distribute" but courts have interpreted it to entail an "actual dissemination of either copies or phonorecords." Atl. Recording Co. v. Howell, 554 F. Supp. 2d 976, 981 (D. Ariz. 2008) (collecting cases).  Here, Aereo's technology allows users to stream but not download programming. As such, Aereo is more aptly described as "performing" than "distributing" copyrighted works. See William F. Patry, 3 Patry on Copyright § 8:23 (March 2013).  The Court thus finds it unlikely that Hearst could prevail on its claim that Aereo is unlawfully distributing WCVB's copyrighted works.

### d. Exclusive Right to Create Derivative Works

The Court will quickly dispose of Hearst's argument that Aereo's act of reformatting intercepted programming violates WCVB's right to prepare derivative works. 17 U.S.C. § 106(2). Hearst has presented no legal authority nor is the Court aware of any for the proposition that Aereo's technology creates a derivative work merely by converting programs from their original digital format to a different digital format compatible with internet streaming.

### 2. Irreparable Harm

The Court finds that Hearst has made a minimal showing of irreparable harm that is an insufficient basis for entering a preliminary injunction in its favor.

#### a. Legal Standard

Irreparable harm is "a substantial injury that is not accurately measureable or adequately compensable by money damages." Ross-Simons of Warwick v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996). Plaintiffs alleging irreparable harm must show more than a "tenuous or overly speculative forecast of anticipated harm." Id.

In the preliminary injunction context, the First Circuit measures irreparable harm

> on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown.

Braintree Labs., Inc. v. Citigroup Global Mkts. Inc., 622 F.3d 36, 42-43 (1st Cir. 2010) (internal quotation marks and citations omitted).

#### b. Application

Hearst suggests that Aereo's services will irreparably harm its ability to profit through 1) retransmission fees, 2) advertising fees and 3) new revenue streams that may result from making WCVB's programming available over the internet.

- 17 -

**ADD17**

The Court finds that it is possible that WCVB will be irreparably harmed in its ability to negotiate retransmission fees with cable providers.  Cable, satellite and other television communications companies currently pay WCVB retransmission fees in exchange for the right to transmit WCVB's signal.  WCVB's President and General Manager averred that Aereo's service jeopardizes these arrangements in two ways: 1) its users might cancel their cable subscriptions and, as a result, the cable companies will have less money to pay in retransmission fees and 2) the presence of a low-cost competitor harms WCVB's bargaining position with the cable companies and may even lead the companies to stop paying WCVB altogether.

Yet such a showing does not overcome Hearst's inability to demonstrate a likelihood of success on the merits. See Braintree Labs., 622 F.3d at 42-43.  While the prospect of harm is real, Hearst has not shown that WCVB will suffer the "full magnitude" of the claimed harm before the Court disposes of the case on the merits.  Instead, it seems more likely that the harm will take several years to materialize. See Am. Broad Cos., Inc. v. Aereo, Inc., 864 F. Supp. 2d 373, 399-400 (S.D.N.Y. 2012).

Next, Hearst has not made a convincing showing that WCVB will be irreparably harmed in its ability to generate advertising revenue.  Hearst's claim that WCVB will not be able to measure viewers who access its programming through Aereo is

- 18 -

simply not true.  Nielsen, one of the main organizations tracking viewership for such purposes, announced in February, 2013, that it is beginning to include online viewership in its viewership totals. See Hosp. Decl., Docket No. 42, Ex. E.

Similarly, Hearst's claim that Aereo's services threaten its prospects of profiting from putting its programs online does not meet the standard for irreparable harm because WCVB's plans to put programming online are insufficiently developed.

### 3.  Balance of Hardships and Public Interest Factors

The balance of hardships does not favor one side over the other.  Hearst has demonstrated some likelihood of injury but any harm will likely take several years to materialize if the Court does not enjoin Aereo from streaming WCVB's local programming.  Aereo, for its part, overstates the effect that a narrow injunction envisioned by Hearst would have on its business.  It would still be able to provide its users with access to the national programming that airs on WCVB and all programming on the other local channels.

Similarly, the public interest factor cuts both ways. Hearst plausibly contends that a preliminary injunction in its favor will make it more likely that WCVB has the financial resources to continue to offer its highly-regarded and unique local programming to the Boston community.  Aereo responds that enjoining its services will harm the public because it will take

off the table a "lawful and innovative option for consumers to access over-the-air broadcasting." The Court finds that those contentions balance out and therefore this factor does not weigh heavily in its analysis.

### C. Conclusion

After considering the relevant factors, the Court finds that a preliminary injunction is unwarranted. Hearst has not demonstrated a sufficient likelihood of success on the merits nor the requisite irreparable harm and therefore it is not entitled to that "extraordinary and drastic remedy." See Voice of the Arab World, 645 F.3d at 32.

### ORDER

Accordingly,

1) Aereo's motion to transfer to the Southern District of New York (Docket No. 20) is **DENIED**;

2) Aereo's motion to stay proceedings pending resolution of its transfer motion (Docket No. 23) is **DENIED AS MOOT**; and

3) Hearst's motion for a preliminary injunction (Docket No. 4) is **DENIED.**

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated October 8, 2013

## 17 U.S.C. § 101 - DEFINITIONS

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

* * *

"Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

* * *

"Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

 "Copyright owner", with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right.

* * *

A work is "created" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

* * *

A "device", "machine", or "process" is one now known or later developed.

* * *

A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made simultaneously with its transmission.

**ADD21**

* * *

To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.

* * *

To perform or display a work "publicly" means—
(1)to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or
(2)to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

* * *

To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

* * *

(http://www.law.cornell.edu/uscode/text/17/101)

## 17 USC § 106 - EXCLUSIVE RIGHTS IN COPYRIGHTED WORKS

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(**1**)to reproduce the copyrighted work in copies or phonorecords;

(**2**)to prepare derivative works based upon the copyrighted work;

(**3**)to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(**4**)in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(**5**)in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(**6**)in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

(http://www.law.cornell.edu/uscode/text/17/106)

**ADD23**

## 17 USC § 111 - LIMITATIONS ON EXCLUSIVE RIGHTS: SECONDARY TRANSMISSIONS OF BROADCAST PROGRAMMING BY CABLE

**(a) Certain Secondary Transmissions Exempted.—** The secondary transmission of a performance or display of a work embodied in a primary transmission is not an infringement of copyright if—

> **(1)**the secondary transmission is not made by a cable system, and consists entirely of the relaying, by the management of a hotel, apartment house, or similar establishment, of signals transmitted by a broadcast station licensed by the Federal Communications Commission, within the local service area of such station, to the private lodgings of guests or residents of such establishment, and no direct charge is made to see or hear the secondary transmission; or

> **(2)**the secondary transmission is made solely for the purpose and under the conditions specified by paragraph (2) of section 110; or

> **(3)**the secondary transmission is made by any carrier who has no direct or indirect control over the content or selection of the primary transmission or over the particular recipients of the secondary transmission, and whose activities with respect to the secondary transmission consist solely of providing wires, cables, or other communications channels for the use of others: Provided, That the provisions of this paragraph extend only to the activities of said carrier with respect to secondary transmissions and do not exempt from liability the activities of others with respect to their own primary or secondary transmissions;

> **(4)**the secondary transmission is made by a satellite carrier pursuant to a statutory license under section 119 orsection 122;

> **(5)**the secondary transmission is not made by a cable system but is made by a governmental body, or other nonprofit organization, without any purpose of direct or indirect commercial advantage, and without charge to the recipients of the secondary transmission other than assessments necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service.

**(b) Secondary Transmission of Primary Transmission to Controlled Group.—** Notwithstanding the provisions of subsections (a) and (c), the secondary transmission to the public of a performance or display of a work embodied in a primary transmission is actionable as an act of infringement under section 501, and is fully subject to the remedies provided by sections 502 through 506, if the primary transmission is not made for reception by the public at large but is controlled and limited to reception by particular members of the public: Provided,

however, That such secondary transmission is not actionable as an act of infringement if—

**(1)** the primary transmission is made by a broadcast station licensed by the Federal Communications Commission; and

**(2)** the carriage of the signals comprising the secondary transmission is required under the rules, regulations, or authorizations of the Federal Communications Commission; and

**(3)** the signal of the primary transmitter is not altered or changed in any way by the secondary transmitter.

**(c) Secondary Transmissions by Cable Systems.—**

**(1)** Subject to the provisions of paragraphs (2), (3), and (4) of this subsection and section 114(d), secondary transmissions to the public by a cable system of a performance or display of a work embodied in a primary transmission made by a broadcast station licensed by the Federal Communications Commission or by an appropriate governmental authority of Canada or Mexico shall be subject to statutory licensing upon compliance with the requirements of subsection (d) where the carriage of the signals comprising the secondary transmission is permissible under the rules, regulations, or authorizations of the Federal Communications Commission.

**(2)** Notwithstanding the provisions of paragraph (1) of this subsection, the willful or repeated secondary transmission to the public by a cable system of a primary transmission made by a broadcast station licensed by the Federal Communications Commission or by an appropriate governmental authority of Canada or Mexico and embodying a performance or display of a work is actionable as an act of infringement under section 501, and is fully subject to the remedies provided by sections 502 through 506, in the following cases:

**(A)** where the carriage of the signals comprising the secondary transmission is not permissible under the rules, regulations, or authorizations of the Federal Communications Commission; or

**(B)** where the cable system has not deposited the statement of account and royalty fee required by subsection (d).

**(3)** Notwithstanding the provisions of paragraph (1) of this subsection and subject to the provisions of subsection (e) of this section, the secondary transmission to the public by a cable system of a performance or display of a work embodied in a primary transmission made by a broadcast station licensed by the Federal Communications Commission or by an appropriate governmental authority of Canada or Mexico is actionable as an act of infringement under section 501, and is fully subject to the remedies provided by sections 502 through 506 andsection 510, if the content of the particular program in which the performance or display is embodied, or any

commercial advertising or station announcements transmitted by the primary transmitter during, or immediately before or after, the transmission of such program, is in any way willfully altered by the cable system through changes, deletions, or additions, except for the alteration, deletion, or substitution of commercial advertisements performed by those engaged in television commercial advertising market research: Provided, That the research company has obtained the prior consent of the advertiser who has purchased the original commercial advertisement, the television station broadcasting that commercial advertisement, and the cable system performing the secondary transmission: And provided further, That such commercial alteration, deletion, or substitution is not performed for the purpose of deriving income from the sale of that commercial time.

**(4)**Notwithstanding the provisions of paragraph (1) of this subsection, the secondary transmission to the public by a cable system of a performance or display of a work embodied in a primary transmission made by a broadcast station licensed by an appropriate governmental authority of Canada or Mexico is actionable as an act of infringement under section 501, and is fully subject to the remedies provided by sections 502 through 506, if

> **(A)** with respect to Canadian signals, the community of the cable system is located more than 150 miles from the United States-Canadian border and is also located south of the forty-second parallel of latitude, or
>
> **(B)** with respect to Mexican signals, the secondary transmission is made by a cable system which received the primary transmission by means other than direct interception of a free space radio wave emitted by such broadcast television station, unless prior to April 15, 1976, such cable system was actually carrying, or was specifically authorized to carry, the signal of such foreign station on the system pursuant to the rules, regulations, or authorizations of the Federal Communications Commission.

**(d) Statutory License for Secondary Transmissions by Cable Systems.—**

**(1) Statement of account and royalty fees.—** Subject to paragraph (5), a cable system whose secondary transmissions have been subject to statutory licensing under subsection (c) shall, on a semiannual basis, deposit with the Register of Copyrights, in accordance with requirements that the Register shall prescribe by regulation the following:

> **(A)**A statement of account, covering the six months next preceding, specifying the number of channels on which the cable system made secondary transmissions to its subscribers, the names and locations of all primary transmitters whose transmissions were further transmitted

by the cable system, the total number of subscribers, the gross amounts paid to the cable system for the basic service of providing secondary transmissions of primary broadcast transmitters, and such other data as the Register of Copyrights may from time to time prescribe by regulation. In determining the total number of subscribers and the gross amounts paid to the cable system for the basic service of providing secondary transmissions of primary broadcast transmitters, the system shall not include subscribers and amounts collected from subscribers receiving secondary transmissions pursuant to section 119. Such statement shall also include a special statement of account covering any non-network television programming that was carried by the cable system in whole or in part beyond the local service area of the primary transmitter, under rules, regulations, or authorizations of the Federal Communications Commission permitting the substitution or addition of signals under certain circumstances, together with logs showing the times, dates, stations, and programs involved in such substituted or added carriage.

(**B**)Except in the case of a cable system whose royalty fee is specified in subparagraph (E) or (F), a total royalty fee payable to copyright owners pursuant to paragraph (3) for the period covered by the statement, computed on the basis of specified percentages of the gross receipts from subscribers to the cable service during such period for the basic service of providing secondary transmissions of primary broadcast transmitters, as follows:

> (**i**)1.064 percent of such gross receipts for the privilege of further transmitting, beyond the local service area of such primary transmitter, any non-network programming of a primary transmitter in whole or in part, such amount to be applied against the fee, if any, payable pursuant to clauses (ii) through (iv);
>
> (**ii**)1.064 percent of such gross receipts for the first distant signal equivalent;
>
> (**iii**)0.701 percent of such gross receipts for each of the second, third, and fourth distant signal equivalents; and
>
> (**iv**)0.330 percent of such gross receipts for the fifth distant signal equivalent and each distant signal equivalent thereafter.

(**C**)In computing amounts under clauses (ii) through (iv) of subparagraph (B)—

> (**i**)any fraction of a distant signal equivalent shall be computed at its fractional value;

**(ii)**in the case of any cable system located partly within and partly outside of the local service area of a primary transmitter, gross receipts shall be limited to those gross receipts derived from subscribers located outside of the local service area of such primary transmitter; and

**(iii)**if a cable system provides a secondary transmission of a primary transmitter to some but not all communities served by that cable system—

> **(I)**the gross receipts and the distant signal equivalent values for such secondary transmission shall be derived solely on the basis of the subscribers in those communities where the cable system provides such secondary transmission; and
>
> **(II)**the total royalty fee for the period paid by such system shall not be less than the royalty fee calculated under subparagraph (B)(i) multiplied by the gross receipts from all subscribers to the system.

**(D)**A cable system that, on a statement submitted before the date of the enactment of the Satellite Television Extension and Localism Act of 2010, computed its royalty fee consistent with the methodology under subparagraph (C)(iii), or that amends a statement filed before such date of enactment to compute the royalty fee due using such methodology, shall not be subject to an action for infringement, or eligible for any royalty refund or offset, arising out of its use of such methodology on such statement.

**(E)**If the actual gross receipts paid by subscribers to a cable system for the period covered by the statement for the basic service of providing secondary transmissions of primary broadcast transmitters are $263,800 or less—

> **(i)**gross receipts of the cable system for the purpose of this paragraph shall be computed by subtracting from such actual gross receipts the amount by which $263,800 exceeds such actual gross receipts, except that in no case shall a cable system's gross receipts be reduced to less than $10,400; and
>
> **(ii)**the royalty fee payable under this paragraph to copyright owners pursuant to paragraph (3) shall be 0.5 percent, regardless of the number of distant signal equivalents, if any.

**(F)**If the actual gross receipts paid by subscribers to a cable system for the period covered by the statement for the basic service of providing secondary transmissions of primary broadcast transmitters are more than $263,800 but less than $527,600, the royalty fee payable under

this paragraph to copyright owners pursuant to paragraph (3) shall be—

> **(i)**0.5 percent of any gross receipts up to $263,800, regardless of the number of distant signal equivalents, if any; and
>
> **(ii)**1 percent of any gross receipts in excess of $263,800, but less than $527,600, regardless of the number of distant signal equivalents, if any.

**(G)**A filing fee, as determined by the Register of Copyrights pursuant to section 708(a).

**(2) Handling of fees.—** The Register of Copyrights shall receive all fees (including the filing fee specified in paragraph (1)(G)) deposited under this section and, after deducting the reasonable costs incurred by the Copyright Office under this section, shall deposit the balance in the Treasury of the United States, in such manner as the Secretary of the Treasury directs. All funds held by the Secretary of the Treasury shall be invested in interest-bearing United States securities for later distribution with interest by the Librarian of Congress upon authorization by the Copyright Royalty Judges.

**(3) Distribution of royalty fees to copyright owners.—** The royalty fees thus deposited shall, in accordance with the procedures provided by clause (4), be distributed to those among the following copyright owners who claim that their works were the subject of secondary transmissions by cable systems during the relevant semiannual period:

> **(A)**Any such owner whose work was included in a secondary transmission made by a cable system of a non-network television program in whole or in part beyond the local service area of the primary transmitter.
>
> **(B)**Any such owner whose work was included in a secondary transmission identified in a special statement of account deposited under clause (1)(A).
>
> **(C)**Any such owner whose work was included in non-network programming consisting exclusively of aural signals carried by a cable system in whole or in part beyond the local service area of the primary transmitter of such programs.

**(4) Procedures for royalty fee distribution.—** The royalty fees thus deposited shall be distributed in accordance with the following procedures:

> **(A)**During the month of July in each year, every person claiming to be entitled to statutory license fees for secondary transmissions shall file a claim with the Copyright Royalty Judges, in accordance with requirements that the Copyright Royalty Judges shall prescribe by regulation. Notwithstanding any provisions of the antitrust laws, for

**ADD29**

purposes of this clause any claimants may agree among themselves as to the proportionate division of statutory licensing fees among them, may lump their claims together and file them jointly or as a single claim, or may designate a common agent to receive payment on their behalf.

(**B**)After the first day of August of each year, the Copyright Royalty Judges shall determine whether there exists a controversy concerning the distribution of royalty fees. If the Copyright Royalty Judges determine that no such controversy exists, the Copyright Royalty Judges shall authorize the Librarian of Congress to proceed to distribute such fees to the copyright owners entitled to receive them, or to their designated agents, subject to the deduction of reasonable administrative costs under this section. If the Copyright Royalty Judges find the existence of a controversy, the Copyright Royalty Judges shall, pursuant to chapter 8 of this title, conduct a proceeding to determine the distribution of royalty fees.

(**C**)During the pendency of any proceeding under this subsection, the Copyright Royalty Judges shall have the discretion to authorize the Librarian of Congress to proceed to distribute any amounts that are not in controversy.

(**5**)3.75 percent rate and syndicated exclusivity surcharge not applicable to multicast streams.—The royalty rates specified in sections 256.2(c) and 256.2(d) of title 37, Code of Federal Regulations (commonly referred to as the "3.75 percent rate" and the "syndicated exclusivity surcharge", respectively), as in effect on the date of the enactment of the Satellite Television Extension and Localism Act of 2010, as such rates may be adjusted, or such sections redesignated, thereafter by the Copyright Royalty Judges, shall not apply to the secondary transmission of a multicast stream.

(**6**) **Verification of accounts and fee payments.—** The Register of Copyrights shall issue regulations to provide for the confidential verification by copyright owners whose works were embodied in the secondary transmissions of primary transmissions pursuant to this section of the information reported on the semiannual statements of account filed under this subsection for accounting periods beginning on or after January 1, 2010, in order that the auditor designated under subparagraph (A) is able to confirm the correctness of the calculations and royalty payments reported therein. The regulations shall—

(**A**)establish procedures for the designation of a qualified independent auditor—

(**i**)with exclusive authority to request verification of such a statement of account on behalf of all copyright owners whose works were the subject of secondary transmissions of primary transmissions by the cable system (that deposited the statement) during the accounting period covered by the statement; and

(**ii**)who is not an officer, employee, or agent of any such copyright owner for any purpose other than such audit;

(**B**)establish procedures for safeguarding all non-public financial and business information provided under this paragraph;

(**C**)

(**i**)require a consultation period for the independent auditor to review its conclusions with a designee of the cable system;

(**ii**)establish a mechanism for the cable system to remedy any errors identified in the auditor's report and to cure any underpayment identified; and

(**iii**)provide an opportunity to remedy any disputed facts or conclusions;

(**D**)limit the frequency of requests for verification for a particular cable system and the number of audits that a multiple system operator can be required to undergo in a single year; and

(**E**)permit requests for verification of a statement of account to be made only within 3 years after the last day of the year in which the statement of account is filed.

(**7**) **Acceptance of additional deposits.**— Any royalty fee payments received by the Copyright Office from cable systems for the secondary transmission of primary transmissions that are in addition to the payments calculated and deposited in accordance with this subsection shall be deemed to have been deposited for the particular accounting period for which they are received and shall be distributed as specified under this subsection.

(**e**) **Nonsimultaneous Secondary Transmissions by Cable Systems.**—

(**1**)Notwithstanding those provisions of the [1]subsection (f)(2) relating to nonsimultaneous secondary transmissions by a cable system, any such transmissions are actionable as an act of infringement under section 501, and are fully subject to the remedies provided by sections 502 through 506 andsection 510, unless—

(**A**)the program on the videotape is transmitted no more than one time to the cable system's subscribers;

(**B**)the copyrighted program, episode, or motion picture videotape, including the commercials contained within such program, episode, or picture, is transmitted without deletion or editing;

(**C**)an owner or officer of the cable system

    (**i**) prevents the duplication of the videotape while in the possession of the system,

    (**ii**) prevents unauthorized duplication while in the possession of the facility making the videotape for the system if the system owns or controls the facility, or takes reasonable precautions to prevent such duplication if it does not own or control the facility,

    (**iii**) takes adequate precautions to prevent duplication while the tape is being transported, and

    (**iv**) subject to paragraph (2), erases or destroys, or causes the erasure or destruction of, the videotape;

(**D**)within forty-five days after the end of each calendar quarter, an owner or officer of the cable system executes an affidavit attesting

    (**i**) to the steps and precautions taken to prevent duplication of the videotape, and

    (**ii**) subject to paragraph (2), to the erasure or destruction of all videotapes made or used during such quarter;

(**E**)such owner or officer places or causes each such affidavit, and affidavits received pursuant to paragraph (2)(C), to be placed in a file, open to public inspection, at such system's main office in the community where the transmission is made or in the nearest community where such system maintains an office; and

(**F**)the nonsimultaneous transmission is one that the cable system would be authorized to transmit under the rules, regulations, and authorizations of the Federal Communications Commission in effect at the time of the nonsimultaneous transmission if the transmission had been made simultaneously, except that this subparagraph shall not apply to inadvertent or accidental transmissions.

(**2**)If a cable system transfers to any person a videotape of a program nonsimultaneously transmitted by it, such transfer is actionable as an act of infringement under section 501, and is fully subject to the remedies provided by sections 502 through 506, except that, pursuant to a written, nonprofit contract providing for the equitable sharing of the costs of such videotape and its transfer, a videotape nonsimultaneously transmitted by it, in accordance with paragraph (1), may be transferred by one cable system in Alaska to another system in Alaska, by one cable system in Hawaii permitted to make such nonsimultaneous transmissions to another such cable system in Hawaii, or by one cable system in Guam, the Northern Mariana Islands, the Federated States of Micronesia, the Republic of Palau, or the

Republic of the Marshall Islands, to another cable system in any of those five entities, if—

    **(A)** each such contract is available for public inspection in the offices of the cable systems involved, and a copy of such contract is filed, within thirty days after such contract is entered into, with the Copyright Office (which Office shall make each such contract available for public inspection);

    **(B)** the cable system to which the videotape is transferred complies with paragraph (1)(A), (B), (C)(i), (iii), and (iv), and (D) through (F); and

    **(C)** such system provides a copy of the affidavit required to be made in accordance with paragraph (1)(D) to each cable system making a previous nonsimultaneous transmission of the same videotape.

**(3)** This subsection shall not be construed to supersede the exclusivity protection provisions of any existing agreement, or any such agreement hereafter entered into, between a cable system and a television broadcast station in the area in which the cable system is located, or a network with which such station is affiliated.

**(4)** As used in this subsection, the term "videotape" means the reproduction of the images and sounds of a program or programs broadcast by a television broadcast station licensed by the Federal Communications Commission, regardless of the nature of the material objects, such as tapes or films, in which the reproduction is embodied.

**(f) Definitions.—** As used in this section, the following terms mean the following:

**(1) Primary transmission.—** A "primary transmission" is a transmission made to the public by a transmitting facility whose signals are being received and further transmitted by a secondary transmission service, regardless of where or when the performance or display was first transmitted. In the case of a television broadcast station, the primary stream and any multicast streams transmitted by the station constitute primary transmissions.

**(2) Secondary transmission.—** A "secondary transmission" is the further transmitting of a primary transmission simultaneously with the primary transmission, or nonsimultaneously with the primary transmission if by a cable system not located in whole or in part within the boundary of the forty-eight contiguous States, Hawaii, or Puerto Rico: Provided, however, That a nonsimultaneous further transmission by a cable system located in Hawaii of a primary transmission shall be deemed to be a secondary transmission if the carriage of the television broadcast signal comprising such further

transmission is permissible under the rules, regulations, or authorizations of the Federal Communications Commission.

**(3) Cable system.——** A "cable system" is a facility, located in any State, territory, trust territory, or possession of the United States, that in whole or in part receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal Communications Commission, and makes secondary transmissions of such signals or programs by wires, cables, microwave, or other communications channels to subscribing members of the public who pay for such service. For purposes of determining the royalty fee under subsection (d)(1), two or more cable systems in contiguous communities under common ownership or control or operating from one headend shall be considered as one system.

**(4) Local service area of a primary transmitter.——** The "local service area of a primary transmitter", in the case of both the primary stream and any multicast streams transmitted by a primary transmitter that is a television broadcast station, comprises the area where such primary transmitter could have insisted upon its signal being retransmitted by a cable system pursuant to the rules, regulations, and authorizations of the Federal Communications Commission in effect on April 15, 1976, or such station's television market as defined in section 76.55(e) of title 47, Code of Federal Regulations (as in effect on September 18, 1993), or any modifications to such television market made, on or after September 18, 1993, pursuant to section 76.55(e) or 76.59 of title 47, Code of Federal Regulations, or within the noise-limited contour as defined in 73.622(e)(1) of title 47, Code of Federal Regulations, or in the case of a television broadcast station licensed by an appropriate governmental authority of Canada or Mexico, the area in which it would be entitled to insist upon its signal being retransmitted if it were a television broadcast station subject to such rules, regulations, and authorizations. In the case of a low power television station, the "local service area of a primary transmitter" comprises the area within 35 miles of the transmitter site, except that in the case of such a station located in a standard metropolitan statistical area which has one of the 50 largest populations of all standard metropolitan statistical areas (based on the 1980 decennial census of population taken by the Secretary of Commerce), the number of miles shall be 20 miles. The "local service area of a primary transmitter", in the case of a radio broadcast station, comprises the primary service area of such station, pursuant to the rules and regulations of the Federal Communications Commission.

**(5) Distant signal equivalent.——**

    **(A) In general.——** Except as provided under subparagraph (B), a "distant signal equivalent"—

**(i)** is the value assigned to the secondary transmission of any non-network television programming carried by a cable system in whole or in part beyond the local service area of the primary transmitter of such programming; and

**(ii)** is computed by assigning a value of one to each primary stream and to each multicast stream (other than a simulcast) that is an independent station, and by assigning a value of one-quarter to each primary stream and to each multicast stream (other than a simulcast) that is a network station or a noncommercial educational station.

**(B) Exceptions.—** The values for independent, network, and noncommercial educational stations specified in subparagraph (A) are subject to the following:

**(i)** Where the rules and regulations of the Federal Communications Commission require a cable system to omit the further transmission of a particular program and such rules and regulations also permit the substitution of another program embodying a performance or display of a work in place of the omitted transmission, or where such rules and regulations in effect on the date of the enactment of the Copyright Act of 1976 [2] permit a cable system, at its election, to effect such omission and substitution of a nonlive program or to carry additional programs not transmitted by primary transmitters within whose local service area the cable system is located, no value shall be assigned for the substituted or additional program.

**(ii)** Where the rules, regulations, or authorizations of the Federal Communications Commission in effect on the date of the enactment of the Copyright Act of 1976 [2] permit a cable system, at its election, to omit the further transmission of a particular program and such rules, regulations, or authorizations also permit the substitution of another program embodying a performance or display of a work in place of the omitted transmission, the value assigned for the substituted or additional program shall be, in the case of a live program, the value of one full distant signal equivalent multiplied by a fraction that has as its numerator the number of days in the year in which such substitution occurs and as its denominator the number of days in the year.

**(iii)** In the case of the secondary transmission of a primary transmitter that is a television broadcast station pursuant to the

**ADD35**

late-night or specialty programming rules of the Federal Communications Commission, or the secondary transmission of a primary transmitter that is a television broadcast station on a part-time basis where full-time carriage is not possible because the cable system lacks the activated channel capacity to retransmit on a full-time basis all signals that it is authorized to carry, the values for independent, network, and noncommercial educational stations set forth in subparagraph (A), as the case may be, shall be multiplied by a fraction that is equal to the ratio of the broadcast hours of such primary transmitter retransmitted by the cable system to the total broadcast hours of the primary transmitter.

(**iv**)No value shall be assigned for the secondary transmission of the primary stream or any multicast streams of a primary transmitter that is a television broadcast station in any community that is within the local service area of the primary transmitter.

**(6) Network station.—**

    **(A) Treatment of primary stream.—** The term "network station" shall be applied to a primary stream of a television broadcast station that is owned or operated by, or affiliated with, one or more of the television networks in the United States providing nationwide transmissions, and that transmits a substantial part of the programming supplied by such networks for a substantial part of the primary stream's typical broadcast day.

    **(B) Treatment of multicast streams.—** The term "network station" shall be applied to a multicast stream on which a television broadcast station transmits all or substantially all of the programming of an interconnected program service that—

        (**i**)is owned or operated by, or affiliated with, one or more of the television networks described in subparagraph (A); and

        (**ii**)offers programming on a regular basis for 15 or more hours per week to at least 25 of the affiliated television licensees of the interconnected program service in 10 or more States.

**(7) Independent station.—** The term "independent station" shall be applied to the primary stream or a multicast stream of a television broadcast station that is not a network station or a noncommercial educational station.

**(8) Noncommercial educational station.—** The term "noncommercial educational station" shall be applied to the primary stream or a multicast stream of a television broadcast station that is a noncommercial educational

broadcast station as defined in section 397 of the Communications Act of 1934, as in effect on the date of the enactment of the Satellite Television Extension and Localism Act of 2010.

**(9) Primary stream.—** A "primary stream" is—

> **(A)** the single digital stream of programming that, before June 12, 2009, was substantially duplicating the programming transmitted by the television broadcast station as an analog signal; or
>
> **(B)** if there is no stream described in subparagraph (A), then the single digital stream of programming transmitted by the television broadcast station for the longest period of time.

**(10) Primary transmitter.—** A "primary transmitter" is a television or radio broadcast station licensed by the Federal Communications Commission, or by an appropriate governmental authority of Canada or Mexico, that makes primary transmissions to the public.

**(11) Multicast stream.—** A "multicast stream" is a digital stream of programming that is transmitted by a television broadcast station and is not the station's primary stream.

**(12) Simulcast.—** A "simulcast" is a multicast stream of a television broadcast station that duplicates the programming transmitted by the primary stream or another multicast stream of such station.

**(13) Subscriber; subscribe.—**

> **(A) Subscriber.—** The term "subscriber" means a person or entity that receives a secondary transmission service from a cable system and pays a fee for the service, directly or indirectly, to the cable system.
>
> **(B) Subscribe.—** The term "subscribe" means to elect to become a subscriber.

---

[1] So in original. The word "the" probably should not appear.

[2] See References in Text note below.

(http://www.law.cornell.edu/uscode/text/17/111)

**ADD37**

## 47 USC § 301 - LICENSE FOR RADIO COMMUNICATION OR TRANSMISSION OF ENERGY

It is the purpose of this chapter, among other things, to maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license. No person shall use or operate any apparatus for the transmission of energy or communications or signals by radio

**(a)** from one place in any State, Territory, or possession of the United States or in the District of Columbia to another place in the same State, Territory, possession, or District; or

**(b)** from any State, Territory, or possession of the United States, or from the District of Columbia to any other State, Territory, or possession of the United States; or

**(c)** from any place in any State, Territory, or possession of the United States, or in the District of Columbia, to any place in any foreign country or to any vessel; or

**(d)** within any State when the effects of such use extend beyond the borders of said State, or when interference is caused by such use or operation with the transmission of such energy, communications, or signals from within said State to any place beyond its borders, or from any place beyond its borders to any place within said State, or with the transmission or reception of such energy, communications, or signals from and/or to places beyond the borders of said State; or

**(e)** upon any vessel or aircraft of the United States (except as provided in section 303(t) of this title); or

**(f)** upon any other mobile stations within the jurisdiction of the United States, except under and in accordance with this chapter and with a license in that behalf granted under the provisions of this chapter.

(http://www.law.cornell.edu/uscode/text/47/301)

## 47 USC § 307 - LICENSES

**(a) Grant**

The Commission, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this chapter, shall grant to any applicant therefor a station license provided for by this chapter.

**(b) Allocation of facilities**

In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same.

**(c) Terms of licenses**

**(1) Initial and renewal licenses**

Each license granted for the operation of a broadcasting station shall be for a term of not to exceed 8 years. Upon application therefor, a renewal of such license may be granted from time to time for a term of not to exceed 8 years from the date of expiration of the preceding license, if the Commission finds that public interest, convenience, and necessity would be served thereby. Consistent with the foregoing provisions of this subsection, the Commission may by rule prescribe the period or periods for which licenses shall be granted and renewed for particular classes of stations, but the Commission may not adopt or follow any rule which would preclude it, in any case involving a station of a particular class, from granting or renewing a license for a shorter period than that prescribed for stations of such class if, in its judgment, the public interest, convenience, or necessity would be served by such action.

**(2) Materials in application**

In order to expedite action on applications for renewal of broadcasting station licenses and in order to avoid needless expense to applicants for such renewals, the Commission shall not require any such applicant to file any information which previously has been furnished to the Commission or which is not directly material to the considerations that affect the granting or denial of such application, but the Commission may require any new or additional facts it deems necessary to make its findings.

**(3) Continuation pending decision**

Pending any administrative or judicial hearing and final decision on such an application and the disposition of any petition for rehearing pursuant to section 405 orsection 402 of this title, the Commission shall continue such license in effect.

**(d) Renewals**

No renewal of an existing station license in the broadcast or the common carrier services shall be granted more than thirty days prior to the expiration of the original license.

**(e) Operation of certain radio stations without individual licenses**

**(1)**Notwithstanding any license requirement established in this chapter, if the Commission determines that such authorization serves the public interest, convenience, and necessity, the Commission may by rule authorize the operation of radio stations without individual licenses in the following radio services:

**(A)** the citizens band radio service;

**(B)** the radio control service;

**(C)** the aviation radio service for aircraft stations operated on domestic flights when such aircraft are not otherwise required to carry a radio station; and

**(D)** the maritime radio service for ship stations navigated on domestic voyages when such ships are not otherwise required to carry a radio station.

**(2)**Any radio station operator who is authorized by the Commission to operate without an individual license shall comply with all other provisions of this chapter and with rules prescribed by the Commission under this chapter.

**(3)**For purposes of this subsection, the terms "citizens band radio service", "radio control service", "aircraft station" and "ship station" shall have the meanings given them by the Commission by rule.

**(f) Areas in Alaska without access to over the air broadcasts**

Notwithstanding any other provision of law,

**(1)** any holder of a broadcast license may broadcast to an area of Alaska that otherwise does not have access to over the air broadcasts via translator, microwave, or other alternative signal delivery even if another holder of a broadcast license begins broadcasting to such area,

**ADD40**

**(2)** any holder of a broadcast license who has broadcast to an area of Alaska that did not have access to over the air broadcasts via translator, microwave, or other alternative signal delivery may continue providing such service even if another holder of a broadcast license begins broadcasting to such area, and shall not be fined or subject to any other penalty, forfeiture, or revocation related to providing such service including any fine, penalty, forfeiture, or revocation for continuing to operate notwithstanding orders to the contrary.

(http://www.law.cornell.edu/uscode/text/47/307)

## 47 USC § 325 - FALSE, FRAUDULENT, OR UNAUTHORIZED TRANSMISSIONS

* * *

**(b) Consent to retransmission of broadcasting station signals**

    **(1)**No cable system or other multichannel video programming distributor shall retransmit the signal of a broadcasting station, or any part thereof, except—

        **(A)**with the express authority of the originating station;

        **(B)**under section 534 of this title, in the case of a station electing, in accordance with this subsection, to assert the right to carriage under such section; or

        **(C)**under section 338 of this title, in the case of a station electing, in accordance with this subsection, to assert the right to carriage under such section.

    **(2)**This subsection shall not apply—

        **(A)**to retransmission of the signal of a noncommercial television broadcast station;

        **(B)**to retransmission of the signal of a television broadcast station outside the station's local market by a satellite carrier directly to its subscribers, if—

            **(i)**such station was a superstation on May 1, 1991;

            **(ii)**as of July 1, 1998, such station was retransmitted by a satellite carrier under the statutory license of section 119 of title 17; and

            **(iii)**the satellite carrier complies with any network nonduplication, syndicated exclusivity, and sports blackout rules adopted by the Commission under section 339(b) of this title;

        **(C)**until December 31, 2014, to retransmission of the signals of network stations directly to a home satellite antenna, if the subscriber receiving the signal—

**ADD42**

**(i)**is located in an area outside the local market of such stations; and

**(ii)**resides in an unserved household;

**(D)**to retransmission by a cable operator or other multichannel video provider, other than a satellite carrier, of the signal of a television broadcast station outside the station's local market if such signal was obtained from a satellite carrier and—

**(i)**the originating station was a superstation on May 1, 1991; and

**(ii)**as of July 1, 1998, such station was retransmitted by a satellite carrier under the statutory license of section 119 of title 17; or

**(E)**during the 6-month period beginning on November 29, 1999, to the retransmission of the signal of a television broadcast station within the station's local market by a satellite carrier directly to its subscribers under the statutory license of section 122 of title 17.
For purposes of this paragraph, the terms "satellite carrier" and "superstation" have the meanings given those terms, respectively, in section 119(d) of title 17, as in effect on October 5, 1992, the term "unserved household" has the meaning given that term under section 119(d) of such title, and the term "local market" has the meaning given that term in section 122(j) of such title.

**(3)**

**(A)**Within 45 days after October 5, 1992, the Commission shall commence a rulemaking proceeding to establish regulations to govern the exercise by television broadcast stations of the right to grant retransmission consent under this subsection and of the right to signal carriage under section 534 of this title, and such other regulations as are necessary to administer the limitations contained in paragraph (2). The Commission shall consider in such proceeding the impact that the grant of retransmission consent by television stations may have on the rates for the basic service tier and shall ensure that the regulations prescribed under this subsection do not conflict with the Commission's obligation under section 543(b)(1) of this title to ensure that the rates for the basic service tier are reasonable. Such rulemaking proceeding shall be completed within 180 days after October 5, 1992.

(**B**)The regulations required by subparagraph (A) shall require that television stations, within one year after October 5, 1992, and every three years thereafter, make an election between the right to grant retransmission consent under this subsection and the right to signal carriage under section 534 of this title. If there is more than one cable system which services the same geographic area, a station's election shall apply to all such cable systems.

(**C**)The Commission shall commence a rulemaking proceeding to revise the regulations governing the exercise by television broadcast stations of the right to grant retransmission consent under this subsection, and such other regulations as are necessary to administer the limitations contained in paragraph (2). Such regulations shall—

(**i**)establish election time periods that correspond with those regulations adopted under subparagraph (B) of this paragraph;

(**ii**)until January 1, 2015, prohibit a television broadcast station that provides retransmission consent from engaging in exclusive contracts for carriage or failing to negotiate in good faith, and it shall not be a failure to negotiate in good faith if the television broadcast station enters into retransmission consent agreements containing different terms and conditions, including price terms, with different multichannel video programming distributors if such different terms and conditions are based on competitive marketplace considerations; and

(**iii**)until January 1, 2015, prohibit a multichannel video programming distributor from failing to negotiate in good faith for retransmission consent under this section, and it shall not be a failure to negotiate in good faith if the distributor enters into retransmission consent agreements containing different terms and conditions, including price terms, with different broadcast stations if such different terms and conditions are based on competitive marketplace considerations.

(**4**)If an originating television station elects under paragraph (3)(B) to exercise its right to grant retransmission consent under this subsection with respect to a cable system, the provisions of section 534 of this title shall not apply to the carriage of the signal of such station by such cable system. If an originating television station elects under paragraph (3)(C) to exercise its

**ADD44**

right to grant retransmission consent under this subsection with respect to a satellite carrier, section 338 of this title shall not apply to the carriage of the signal of such station by such satellite carrier.

**(5)**The exercise by a television broadcast station of the right to grant retransmission consent under this subsection shall not interfere with or supersede the rights under section 338, 534, or 535 of this title of any station electing to assert the right to signal carriage under that section.

**(6)**Nothing in this section shall be construed as modifying the compulsory copyright license established in section 111 of title 17 or as affecting existing or future video programming licensing agreements between broadcasting stations and video programmers.

**(7)**For purposes of this subsection, the term—

　　**(A)**"network station" has the meaning given such term under section 119(d) of title 17; and

　　**(B)**"television broadcast station" means an over-the-air commercial or noncommercial television broadcast station licensed by the Commission under subpart E of part 73 of title 47, Code of Federal Regulations, except that such term does not include a low-power or translator television station.

* * *

(http://www.law.cornell.edu/uscode/text/47/325)

**ADD45**

## 47 CFR 73.624 - DIGITAL TELEVISION BROADCAST STATIONS.

\* \* \*

**(b)** DTV broadcast station permittees or licensees must transmit at least one over-the-air video program signal at no direct charge to viewers on the DTV channel. Until such time as a DTV station permittee or licensee ceases analog transmissions and returns that spectrum to the Commission, and except as provided in paragraph (b)(1) of this section, at any time that a DTV broadcast station permittee or licensee transmits a video program signal on its analog television channel, it must also transmit at least one over-the-air video program signal on the DTV channel. The DTV service that is provided pursuant to this paragraph must be at least comparable in resolution to the analog television station programming transmitted to viewers on the analog channel.

> **(1)** DTV broadcast station permittees and licensees required to construct and operate a DTV station by May 1, 2002, or May 1, 2003, pursuant to paragraph (d) of this section must, at a minimum, beginning on the date on which the DTV station is required to be constructed, provide a digital video program signal, of the quality described in paragraph (b) of this section, during prime time hours as defined in § 79.3(a)(6) of this chapter. These licensees and permittees must also comply with the minimum operating hours requirements in paragraph (f) of this section.
>
> **(2)** DTV licensees or permittees that choose to commence digital operation before the construction deadline set forth in paragraph (d) of this section are not subject to any minimum schedule for operation on the DTV channel.

\* \* \*

(http://www.law.cornell.edu/cfr/text/47/73.624)

**ADD46**

## 47 CFR 73.1740 - MINIMUM OPERATING SCHEDULE.

* * *

**(c)** The license of any broadcasting station that fails to transmit broadcast signals for any consecutive 12-month period expires as a matter of law at the end of that period, notwithstanding any provision, term, or condition of the license to the contrary.

* * *

(http://www.law.cornell.edu/cfr/text/47/73.1740)

| 94TH CONGRESS | HOUSE OF REPRESENTATIVES | REPORT |
|---|---|---|
| *2d Session* | | No. 94–1476 |

## COPYRIGHT LAW REVISION

SEPTEMBER 3, 1976.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. KASTENMEIER, from the Committee on the Judiciary, submitted the following

# REPORT

together with

## ADDITIONAL VIEWS

[To accompany S. 22]

The Committee on the Judiciary, to whom was referred the bill (S. 22) for the general revision of the copright law, title 17 of the United States Code, and for other purposes, having considered the same, report favorably thereon with an amendment in the nature of a substitute and recommend that the bill as amended do pass.

The amendments are as follows:

Strike all after the enacting clause and insert in lieu thereof the following:

SEC. 101. Title 17 of the United States Code, entitled "Copyrights", is hereby amended in its entirety to read as follows:

### TITLE 17—COPYRIGHTS

| Chapter | Sec. |
|---|---|
| 1. Subject Matter and Scope of Copyright | 101 |
| 2. Copyright Ownership and Transfer | 201 |
| 3. Duration of Copyright | 301 |
| 4. Copyright Notice, Deposit, and Registration | 401 |
| 5. Copyright Infringement and Remedies | 501 |
| 6. Manufacturing Requirement and Importation | 601 |
| 7. Copyright Office | 701 |
| 8. Copyright Royalty Commission | 801 |

### Chapter 1.—SUBJECT MATTER AND SCOPE OF COPYRIGHT

Sec.
101. Definitions.
102. Subject matter of copyright : In general.
103. Subject matter of copyright : Compilations and derivative works.
104. Subject matter of copyright : National origin.
105. Subject matter of copyright : United States Government works.
106. Exclusive rights in copyrighted works.
107. Limitations on exclusive rights : Fair use.
108. Limitations on exclusive rights : Reproduction by libraries and archives.
109. Limitations on exclusive rights : Effect of transfer of particular copy or phonorecord.
110. Limitations on exclusive rights : Exemption of certain performances and displays.
111. Limitations on exclusive rights : Secondary transmissions.
112. Limitations on exclusive rights : Ephemeral recordings.

KF
2990
058c

ADD48

\* \* \*

61

### Section 106. Exclusive Rights in Copyrighted Works

*General scope of copyright*

The five fundamental rights that the bill gives to copyright owners—the exclusive rights of reproduction, adaptation, publication, performance, and display—are stated generally in section 106. These exclusive rights, which comprise the so-called "bundle of rights" that is a copyright, are cumulative and may overlap in some cases. Each of the five enumerated rights may be subdivided indefinitely and, as discussed below in connection with section 201, each subdivision of an exclusive right may be owned and enforced separately.

The approach of the bill is to set forth the copyright owner's exclusive rights in broad terms in section 106, and then to provide various limitations, qualifications, or exemptions in the 12 sections that follow. Thus, everything in section 106 is made "subject to sections 107 through 118," and must be read in conjunction with those provisions.

The exclusive rights accorded to a copyright owner under section 106 are "to do and to authorize" any of the activities specified in the five numbered clauses. Use of the phrase "to authorize" is intended to avoid any questions as to the liability of contributory infringers. For example, a person who lawfully acquires an authorized copy of a motion picture would be an infringer if he or she engages in the business of renting it to others for purposes of unauthorized public performance.

*Rights of reproduction, adaptation, and publication*

The first three clauses of section 106, which cover all rights under a copyright except those of performance and display, extend to every kind of copyrighted work. The exclusive rights encompassed by these clauses, though closely related, are independent; they can generally be characterized as rights of copying, recording, adaptation, and publishing. A single act of infringement may violate all of these rights at once, as where a publisher reproduces, adapts, and sells copies of a person's copyrighted work as part of a publishing venture. Infringement takes place when any one of the rights is violated: where, for example, a printer reproduces copies without selling them or a retailer sells copies without having anything to do with their reproduction. The references to "copies or phonorecords," although in the plural, are intended here and throughout the bill to include the singular (1 U.S.C. §1).

*Reproduction.*—Read together with the relevant definitions in section 101, the right "to reproduce the copyrighted work in copies or phonorecords" means the right to produce a material object in which the work is duplicated, transcribed, imitated, or simulated in a fixed form from which it can be "perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." As under the present law, a copyrighted work would be infringed by reproducing it in whole or in any substantial part, and by duplicating it exactly or by imitation or simulation. Wide departures or variations from the copyrighted works would still be an infringement as long as the author's "expression" rather than merely the author's "ideas" are taken. An exception to this general principle, applicable to the reproduction of copyrighted sound recordings, is specified in section 114.

**ADD49**

62

"Reproduction" under clause (1) of section 106 is to be distinguished from "display" under clause (5). For a work to be "reproduced," its fixation in tangible form must be "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." Thus, the showing of images on a screen or tube would not be a violation of clause (1), although it might come within the scope of clause (5).

*Preparation of derivative works.*—The exclusive right to prepare derivative works, specified separately in clause (2) of section 106, overlaps the exclusive right of reproduction to some extent. It is broader than that right, however, in the sense that reproduction requires fixation in copies or phonorecords, whereas the preparation of a derivative work, such as a ballet, pantomime, or improvised performance, may be an infringement even though nothing is ever fixed in tangible form.

To be an infringement the "derivative work" must be "based upon the copyrighted work," and the definition in section 101 refers to "a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." Thus, to constitute a violation of section 106(2), the infringing work must incorporate a portion of the copyrighted work in some form; for example, a detailed commentary on a work or a programmatic musical composition inspired by a novel would not normally constitute infringements under this clause.

*Use in information storage and retrieval systems.*—As section 117 declares explicitly, the bill is not intended to alter the present law with respect to the use of copyrighted works in computer systems.

*Public distribution.*—Clause (3) of section 106 establishes the exclusive right of publications: The right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." Under this provision the copyright owner would have the right to control the first public distribution of an authorized copy or phonorecord of his work, whether by sale, gift, loan, or some rental or lease arrangement. Likewise, any unauthorized public distribution of copies or phonorecords that were unlawfully made would be an infringement. As section 109 makes clear, however, the copyright owner's rights under section 106(3) cease with respect to a particular copy or phonorecord once he has parted with ownership of it.

*Rights of public performance and display*

*Performing rights and the "for profit" limitation.*—The right of public performance under section 106(4) extends to "literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works and sound recordings" and, unlike the equivalent provisions now in effect, is not limited by any "for profit" requirement. The approach of the bill, as in many foreign laws, is first to state the public performance right in broad terms, and then to provide specific exemptions for educational and other nonprofit uses.

This approach is more reasonable than the outright exemption of the 1909 statute. The line between commercial and "nonprofit" organizations is increasingly difficult to draw. Many "non-profit" organizations are highly subsidized and capable of paying royalties, and

63

the widespread public exploitation of copyrighted works by public broadcasters and other noncommercial organizations is likely to grow. In addition to these trends, it is worth noting that performances and displays are continuing to supplant markets for printed copies and that in the future a broad "not for profit" exemption could not only hurt authors but could dry up their incentive to write.

The exclusive right of public performance is expanded to include not only motion pictures, including works records on film, video tape, and video disks, but also audiovisual works such as filmstrips and sets of slides. This provision of section 106(4), which is consistent with the assimilation of motion pictures to audiovisual works throughout the bill, is also related to amendments of the definitions of "display" and "perform" discussed below. The important issue of performing rights in sound recordings is discussed in connection with section 114.

*Right of public display.*—Clause (5) of section 106 represents the first explicit statutory recognition in American copyright law of an exclusive right to show a copyrighted work, or an image of it, to the public. The existence or extent of this right under the present statute is uncertain and subject to challenge. The bill would give the owners of copyright in "literary, musical, dramatic, and choreographic works", pantomimes, and pictorial, graphic, or sculptural works", including the individual images of a motion picture or other audiovisual work, the exclusive right "to display the copyrighted work publicly."

*Definitions*

Under the definitions of "perform," "display," "publicly," and "transmit" in section 101, the concepts of public performance and public display cover not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public. Thus, for example: a singer is performing when he or she sings a song; a broadcasting network is performing when it transmits his or her performance (whether simultaneously or from records); a local broadcaster is performing when it transmits the network broadcast; a cable television system is performing when it retransmits the broadcast to its subscribers; and any individual is performing whenever he or she plays a phonorecord embodying the performance or communicates the performance by turning on a receiving set. Although any act by which the initial performance or display is transmitted, repeated, or made to recur would itself be a "performance" or "display" under the bill, it would not be actionable as an infringement unless it were done "publicly," as defined in section 101. Certain other performances and displays, in addition to those that are "private," are exempted or given qualified copyright control under sections 107 through 118.

To "perform" a work, under the definition in section 101, includes reading a literary work aloud, singing or playing music, dancing a ballet or other choreographic work, and acting out a dramatic work or pantomine. A performance may be accomplished "either directly or by means of any device or process," including all kinds of equipment for reproducing or amplifying sounds or visual images, any sort of transmitting apparatus, any type of electronic retrieval system, and any other techniques and systems not yet in use or even invented.

The definition of "perform" in relation to "a motion picture or other audio visual work" is "to show its images in any sequence or to make

**ADD51**

64

the sounds accompanying it audible." The showing of portions of a motion picture, filmstrip, or slide set must therefore be sequential to constitute a "performance" rather than a "display", but no particular order need be maintained. The purely aural performance of a motion picture sound track, or of the sound portions of an audiovisual work, would constitute a performance of the "motion picture or other audiovisual work"; but, where some of the sounds have been reproduced separately on phonorecords, a performance from the phonorecord would not constitute performance of the motion picture or audiovisual work.

The corresponding definition of "display" covers any showing of a "copy" of the work, "either directly or by means of a film, slide, television image, or any other device or process." Since "copies" are defined as including the material object "in which the work is first fixed," the right of public display applies to original works of art as well as to reproductions of them. With respect to motion pictures and other audiovisual works, it is a "display" (rather than a "performance") to show their "individual images nonsequentially." In addition to the direct showings of a copy of a work, "display" would include the projection of an image on a screen or other surface by any method, the transmission of an image by electronic or other means, and the showing of an image on a cathode ray tube, or similar viewing apparatus connected with any sort of information storage and retrieval system.

Under clause (1) of the definition of "publicly" in section 101, a performance or display is "public" if it takes place "at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered." One of the principal purposes of the definition was to make clear that, contrary to the decision in *Metro-Goldwyn-Mayer Distributing Corp.* v. *Wyatt*, 21 C.O. Bull. 203 (D. Md. 1932), performances in "semipublic" places such as clubs, lodges, factories, summer camps, and schools are "public performances" subject to copyright control. The term "a family" in this context would include an individual living alone, so that a gathering confined to the individual's social acquaintances would normally be regarded as private. Routine meetings of businesses and governmental personnel would be excluded because they do not represent the gathering of a "substantial number of persons."

Clause (2) of the definition of "publicly" in section 101 makes clear that the concepts of public performance and public display include not only performances and displays that occur initially in a public place, but also acts that transmit or otherwise communicate a performance or display of the work to the public by means of any device or process. The definition of "transmit"—to communicate a performance or display "by any device or process whereby images or sound are received beyond the place from which they are sent"—is broad enough to include all conceivable forms and combinations of wired or wireless communications media, including but by no means limited to radio and television broadcasting as we know them. Each and every method by which the images or sounds comprising a performance or display are picked up and conveyed is a "transmission," and if the transmission reaches the public in my form, the case comes within the scope of clauses (4) or (5) of section 106.

Under the bill, as under the present law, a performance made available by transmission to the public at large is "public" even though the

* * *

**ADD52**

* * *

88

right. This exemption applies only if the performance is not transmitted beyond the place where the establishment is located and is within the immediate area where the sale is occurring.

*Transmission to handicapped audiences*

The new clause (8) of subsection 110, which had been added to S. 22 by the Senate Judiciary Committee when it reported the bill on November 20, 1975, and had been adopted by the Senate on February 19, 1976, was substantially amended by the Committee. Under the amendment, the exemption would apply only to performances of "nondramatic literary works" by means of "a transmission specifically designed for and primarily directed to" one or the other of two defined classes of handicapped persons: (1) "blind or other handicapped persons who are unable to read normal printed material as a result of their handicap" or (2) "deaf or other handicapped persons who are unable to hear the aural signals accompanying a transmission." Moreover, the exemption would be applicable only if the performance is "without any purpose of direct or indirect commercial advantage," and if the transmission takes place through government facilities or through the facilities of a noncommercial educational broadcast station, a radio subcarrier authorization (SCA), or a cable system.

## Section 111. Secondary Transmissions

*Introduction and general summary*

The complex and economically important problem of "secondary transmissions" is considered in section 111. For the most part, the section is directed at the operation of cable television systems and the terms and conditions of their liability for the retransmission of copyrighted works. However, other forms of secondary transmissions are also considered, including apartment house and hotel systems, wired instructional systems, common carriers, nonprofit "boosters" and translators, and secondary transmissions of primary transmissions to controlled groups.

Cable television systems are commercial subscription services that pick up broadcasts of programs originated by others and retransmit them to paying subscribers. A typical system consists of a central antenna which receives and amplifies television signals and a network of cables through which the signals are transmitted to the receiving sets of individual subscribers. In addition to an installation charge, the subscribers. In addition to an installation charge, the subscribers pay a monthly charge for the basic service averaging about six dollars. A large number of these systems provide automated programing. A growing number of CATV systems also originate programs, such as movies and sports, and charge additional fees for this service (paycable).

The number of cable systems has grown very rapidly since their introduction in 1950, and now total about 3,450 operating systems servicing 7,700 communities. Systems currently in operation reach about 10.8 million homes. It is reported that the 1975 total subscriber revenues of the cable industry were approximately $770 million.

Pursuant to two decisions of the Supreme Court (*Fortnightly Corp.* v. *United Artists Television, Inc.*, 382 U.S. 390 (1968), and *Teleprompter Corp.* v. *CBS, Inc.*, 415 U.S. 394 (1974)), under the 1909

**ADD53**

89

copyright law, the cable television industry has not been paying copyright royalties for its retransmission of over-the-air broadcast signals. Both decisions urged the Congress, however, to consider and determine the scope and extent of such liability in the pending revision bill.

The difficult problem of determining the copyright liability of cable television systems has been before the Congress since 1965. In 1967, this Committee sought to address and resolve the issues in H.R. 2512, an early version of the general revision bill (see H.R. Rep. No. 83, 90th Cong., 1st Sess.). However, largely because of the cable-copyright impasse, the bill died in the Senate.

The history of the attempts to find a solution to the problem since 1967 has been explored thoroughly in the voluminous hearings and testimony on the general revision bill, and has also been succinctly summarized by the Register of Copyrights in her Second Supplementary Report, Chapter V.

The Committee now has before it the Senate bill which contains a series of detailed and complex provisions which attempt to resolve the question of the copyright liability of cable television systems. After extensive consideration of the Senate bill, the arguments made during and after the hearings, and of the issues involved, this Committee has also concluded that there is no simple answer to the cable-copyright controversy. In particular, any statutory scheme that imposes copyright liability on cable television systems must take account of the intricate and complicated rules and regulations adopted by the Federal Communications Commission to govern the cable television industry. While the Committee has carefully avoided including in the bill any provisions which would interfere with the FCC's rules or which might be characterized as affecting "communications policy", the Committee has been cognizant of the interplay between the copyright and the communications elements of the legislation.

We would, therefore, caution the Federal Communications Commission, and others who make determinations concerning communications policy, not to rely upon any action of this Committee as a basis for any significant changes in the delicate balance of regulation in areas where the Congress has not resolved the issue. Specifically, we would urge the Federal Communications Commission to understand that it was not the intent of this bill to touch on issues such as pay cable regulation or increased use of imported distant signals. These matters are ones of communications policy and should be left to the appropriate committees in the Congress for resolution.

In general, the Committee believes that cable systems are commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material and that copyright royalties should be paid by cable operators to the creators of such programs. The Committee recognizes, however, that it would be impractical and unduly burdensome to require every cable system to negotiate with every copyright owner whose work was retransmitted by a cable system. Accordingly, the Committee has determined to maintain the basic principle of the Senate bill to establish a compulsory copyright license for the retransmission of those over-the-air broadcast signals that a cable system is authorized to carry pursuant to the rules and regulations of the FCC.

The compulsory license is conditioned, however, on certain requirements and limitations. These include compliance with reporting re-

90

quirements, payment of the royalty fees established in the bill, a ban on the substitution or deletion of commercial advertising, and geographic limits on the compulsory license for copyrighted programs broadcast by Canadian or Mexican stations. Failure to comply with these requirements and limitations subjects a cable system to a suit for copyright infringement and the remedies provided under the bill for such actions.

In setting a royalty fee schedule for the compulsory license, the Committee determined that the initial schedule should be established in the bill. It recognized, however, that adjustments to the schedule would be required from time to time. Accordingly, the Copyright Royalty Commission, established in chapter 8, is empowered to make the adjustments in the initial rates, at specified times, based on standards and conditions set forth in the bill.

In setting an initial fee schedule, the Senate bill based the royalty fee on a sliding scale related to the gross receipts of a cable system for providing the basic retransmission service, and rejected a statutory scheme that would distinguish between "local" and "distant" signals. The Committee determined, however, that there was no evidence that the retransmission of "local" broadcast signals by a cable operator threatens the existing market for copyright program owners. Similarly, the retransmission of network programing, including network programing which is broadcast in "distant" markets, does not injure the copyright owner. The copyright owner contracts with the network on the basis of his programing reaching all markets served by the network and is compensated accordingly.

By contrast, their transmission of distant non-network programing by cable systems causes damage to the copyright owner by distributing the program in an area beyond which it has been licensed. Such retransmission adversely affects the ability of the copyright owner to exploit the work in the distant market. It is also of direct benefit to the cable system by enhancing its ability to attract subscribers and increase revenues. For these reasons, the Committee has concluded that the copyright liability of cable television systems under the compulsory license should be limited to the retransmission of distant non-network programing.

In implementing this conclusion, the Committee generally followed a proposal submitted by the cable and motion picture industries, the two industries most directly affected by the establishment of copyright royalties for cable television systems. Under the proposal, the royalty fee is determined by a two step computation. First, a value called a "distant signal equivalent" is assigned to all "distant" signals. Distant signals are defined as signals retransmitted by a cable system, in whole or in part, outside the local service area of the primary transmitter. Different values are assigned to independent, network, and educational stations because of the different amounts of viewing of non-network programing carried by such stations. For example, the viewing of non-network programs on network stations is considered to approximate 25 percent. These values are then combined and a scale of percentages is applied to the cumulative total.

The Committee also considered various proposals to exempt certain categories of cable systems from royalty payments altogether. The Committee determined that the approach of the Senate bill to require some payment by every cable system is sound, but established separate

\* \* \*

**ADD55**

# CABLE TELEVISION CONSUMER PROTECTION AND COMPETITION ACT OF 1992

*P.L. 102–385, see page 106 Stat. 1460*

### DATES OF CONSIDERATION AND PASSAGE

*Senate: January 27, 29, 30, 31, September 22, 1992*

*House: July 23, September 17, 1992*

**Cong. Record Vol. 138 (1992)**

Senate Report (Commerce, Science, and Transportation
Committee) No. 102–92, June 28, 1991
[To accompany S. 12]

House Report (Energy and Commerce Committee) No. 102–628,
June 29, 1992
[To accompany H.R. 4850]

House Conference Report No. 102–862, Sept. 14, 1992
[To accompany S. 12]

*The Senate bill was passed in lieu of the House bill. The
Senate Report (this page) is set out below and the House Confer-
ence Report (page 1231) follows.*

## SENATE REPORT NO. 102–92

[page 1]

The Committee on Commerce, Science, and Transportation to
which was referred the bill (S. 12) to amend title VI of the Commu-
nications Act of 1934 to ensure carriage on cable television of local
news and other programming and to restore the right of local regu-
latory authorities to regulate cable television rates, and for other
purposes, having considered the same, reports favorably thereon
with an amendment in the nature of a substitute and recommends
that the bill as amended do pass.

### PURPOSE

The legislation in general provides for additional governmental
oversight of the cable television industry. The purpose of this legis-
lation is to promote competition in the multichannel video market-
place and to provide protection for consumers against monopoly
rates and poor customer service. S. 12 also requires the Federal
Communications Commission (FCC) to adopt regulations aimed at
curbing the cable operators' and programmers' market power and

1133

* * *

* * *

CABLE TV CONSUMER ACT

P.L. 102–385

[page 42]

phasizes responsiveness to the local community and places the broadcaster in the role of public trustee for the frequencies it is permitted to use. There is no doubt that, over the past forty years, television broadcasting has provided vital local service through its programming, including its news and public affairs offerings and its emergency broadcasts. The Committee believes this service should continue; however, it will be jeopardized if cable operators use their market power either to preclude carriage of television broadcast signals or to carry such signals but without proper consideration to the programmer. This view was expressed to the Committee by Edward Fritts, President of the National Association of Broadcasters:

> This system [of local television broadcasting] cannot function properly, of course, unless local television stations have access to the viewers they are licensed and required by the FCC to serve. An "open gate" between local stations and their viewers must be preserved, for stations simply cannot respond to viewers that they cannot reach.
>
> Access to local audiences can be both enhanced by, and frustrated by, cable. As it originally developed, the cable industry was a means to facilitate reception of local over-the-air television stations. Indeed, cable first was called "community antenna television." Today, cable provides many additional kinds of programs, but retransmission of local television signals remains one of cable's most important attractions to subscribers.
>
> Once a home is connected to cable, however, that home becomes extremely dependent upon that cable for reception of local television stations. Even though these signals theoretically are available over-the-air, when a local television station is not carried on a cable system, cable subscribers effectively lose their ability to watch it. The cable becomes a gate over which the local system has control.[101]

There is substantial objective evidence that cable operators have and will continue to deny local broadcasters carriage on their systems. The most prominent study of the cable industry's behavior was performed by the FCC in 1988.[102] Its results demonstrate that, absent legislative action, the free local off-air broadcast system is endangered, thereby threatening diversity of choice not only for cable subscribers, but also for those who do not subscribe to cable. The Report found, among other things, that:

1. Of the 4,303 cable systems that voluntarily disclosed data to the FCC, 869 systems admitted denying carriage to 704 television stations in 1,820 instances.[103] Moreover 279 of the stations

---

[101] "Must Carry," Hearing Before the Subcommittee on Communications of the Senate Committee on Commerce, Science, and Transportation (101–427), October 25, 1989, p. 38; See also, the testimony of Preston Padden, for a discussion of the Century decision and the Court of Appeals' rationale. The court stated that it saw no evidence of harm to television broadcasters because it found that few stations had been dropped from cable systems. However, as demonstrated in this testimony and elsewhere in the record, a cable operator can use market power to obtain various types of increased consideration from broadcasters. Thus, it is not correct to base harm merely on whether stations are dropped.

[102] "Cable System Broadcast Signal Carriage Survey," Staff Report by the Policy and Rules Division, Mass Media Bureau, Sept. 1, 1988.

[103] Id., Table 2.

1175

* * *

**ADD57**

| 89th Congress }<br>1st Session } | HOUSE COMMITTEE PRINT |
|---|---|

# COPYRIGHT LAW REVISION
## Part 6

### SUPPLEMENTARY REPORT OF THE REGISTER OF COPYRIGHTS ON THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW:

### 1965 REVISION BILL

## MAY 1965

Printed for the use of the House Committee on the Judiciary

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1965

47–330

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C., 20402 - Price $1.00

EVISION

nd exhibitions—Cont.　Page
ons_____ 40
_____ 40
e public; community
systems _____ 40
exclusively to private
_____ 43
nsmission in a public
_____ 44
_____ 44
nd sculptural works in
_____ 47
_____ 49
_____ 49
_____ 49
rhts_____ 50
d distributing phono-
_____ 53
_____ 53
pulsory license_____ 54
compulsory license____ 55
ulsory license_____ 56
right owner_____ 56
alty_____ 56
ient of royalties_____ 58
_____ 59
l machines_____ 59

## Chapter 2

## EXCLUSIVE RIGHTS UNDER COPYRIGHT

### A. Basic Approach of the Bill

It is hard to predict which provisions of the bill will ultimately be most significant in the development of the copyright law, but on the basis of our discussions there is no question as to which group of sections is most important to the interests immediately affected. The nine sections setting forth the scope and limitations on the exclusive rights of copyright owners represent a whole series of direct points of conflict between authors and their successors on the one side, and users, both commercial and noncommercial, on the other. Moreover, of the many problems dealt with in the bill, those covered by the exclusive rights sections are most affected by advancing technology in all fields of communications, including a number of future developments that can only be speculated about. It is not surprising, therefore, that these sections proved extremely controversial and difficult to draft.

In a narrow view, all of the author's exclusive rights translate into money: whether he should be paid for a particular use or whether it should be free. But it would be a serious mistake to think of these issues solely in terms of who has to pay and how much. The basic legislative problem is to insure that the copyright law provides the necessary monetary incentive to write, produce, publish, and disseminate creative works, while at the same time guarding against the danger that these works will not be disseminated and used as fully as they should be because of copyright restrictions. The problem of balancing existing interests is delicate enough, but the bill must do something even more difficult. It must try to foresee and take account of changes in the forms of use and the relative importance of the competing interests in the years to come, and it must attempt to balance them fairly in a way that carries out the basic constitutional purpose of the copyright law.

Obviously no one can foresee accurately and in detail the evolving patterns in the ways author's works will reach the public 10, 20, or 50 years from now. Lacking that kind of foresight, the bill should, we believe, adopt a general approach aimed at providing compensation to the author for future as well as present uses of his work that materially affect the value of his copyright. As shown by the jukebox

13

Case: 13-2282    Document: 00116624260    Page: 134    Date Filed: 12/12/2013    Entry ID: 5787483

exemption in the present law, a particular use which may seem to have little or no economic impact on the author's rights today can assume tremendous importance in times to come. A real danger to be guarded against is that of confining the scope of an author's rights on the basis of the present technology so that, as the years go by, his copyright loses much of its value because of unforeseen technical advances.

For these reasons, we believe that the author's rights should be stated in the statute in broad terms, and that the specific limitations on them should not go any further than is shown to be necessary in the public interest. In our opinion it is generally true, as the authors and other copyright owners argue, that if an exclusive right exists under the statute a reasonable bargain for its use will be reached; copyright owners do not seek to price themselves out of a market. But if the right is denied by the statute, the result in many cases would simply be a free ride at the author's expense.

We are entirely sympathetic with the aims of nonprofit users, such as teachers, librarians, and educational broadcasters, who seek to advance learning and culture by bringing the works of authors to students, scholars, and the general public. Their use of new devices for this purpose should be encouraged. It has already become clear, however, that the unrestrained use of photocopying, recording, and other devices for the reproduction of authors' works, going far beyond the recognized limits of "fair use," may severely curtail the copyright owner's market for copies of his work. Likewise, it is becoming increasingly apparent that the transmission of works by nonprofit broadcasting, linked computers, and other new media of communication, may soon be among the most important means of disseminating them, and will be capable of reaching vast audiences. Even when these new media are not operated for profit, they may be expected to displace the demand for authors' works by other users from whom copyright owners derive compensation. Reasonable adjustments between the legitimate interests of copyright owners and those of certain nonprofit users are no doubt necessary, but we believe the day is past when any particular use of works should be exempted for the sole reason that it is "not for profit."

As possible methods of solving the practical difficulties of clearance with respect to both commercial and noncommercial uses, various suggestions have been advanced for voluntary clearinghouses or for systems of compulsory licensing under the statute. All of these suggestions deserve consideration, but we are inclined to doubt the present need to impose a statutory licensing system upon the exercise of any of these rights. We believe that the work already in progress toward developing a clearinghouse to license photocopying offers the basis for a workable solution of that problem, and, if found necessary, could be expanded to cover other uses.

<br>

***

# Master Copies, Unique Copies and Volitional Conduct: *Cartoon Network*'s Implications for the Liability of Cyber Lockers

*Carrie Bodner*[*]

## INTRODUCTION

As technology advances, new types of devices and increasing compatibility of data formats make it possible to use files previously accessible on only one or two devices. For example, a person might wish to access a business file (formerly stored on a work computer or perhaps even in a file cabinet at the office) from her smart phone. Similarly, another might wish to access his MP3 collection (stored on an iPod or personal computer) from his work computer. Such technological progress has paved the way for innovative digital, cable and Internet services that enable users to enjoy copyrighted content in new ways: from time-shifting via VCRs[1] to place-shifting via new TV devices;[2] from instantly purchasing a movie through video on demand to watching a live stream of sports coverage on the Internet. One type of service that has recently proliferated is the digital storage locker—also known as the cyber locker.[3] Digital storage lockers enable users to

---

[*]    J.D., Columbia Law School, 2012; B.A. English, Cornell University, 2007. Special thanks to Professor Jane Ginsburg and Professor June Besek for their insight on this Note, and for furthering my interest in and knowledge of copyright and trademark law as a law student. Many thanks to Bissie Bonner, Marissa Crespo and Rob Bernstein for their hard work and thoughtful feedback throughout the publication process, and also to Gerald Bodner, Candy Bodner, Ben Rankin and Megan Dubatowka for their encouragement and support.

1.    Time-shifting is watching a television show at a later hour than its original broadcast. *See* 2 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 8B.01[B] (Matthew Bender rev. ed. 2012) (discussing time-shifting and the landmark case *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), which held that time-shifting for private use is fair use).

2.    Place-shifting is a service in which a device set by the provider receives and records television program broadcasts in one country and transmits the programs to its customers via the Internet, so that the customers can watch them from anywhere in the world. *See* Naoya Isoda, *Copyright Infringement Liability of Placeshifting Services in the United States and Japan*, 7 WASH. U. J.L. TECH. & ARTS 149, 153 (2011). Currently, U.S. place-shifting providers include Cablevision, SageTV, Orb Networks and Sony. *Id.* at 155. The term "space-shifting" was initially adopted by providers of file sharing services to favorably compare their services to that of time-shifting, which was protected by fair use. *Id.* at 155–56. Arguing that space-shifting was also fair use, such service providers claimed that a "person who owns a copyrighted compact disc who then copies the content to a digital file does not engage in infringement. Instead, that person is merely shifting material that she already owns from one 'space' to another." *See* Dominic H. Rivers, Note, *Paying for Cable in Boston, Watching It on a Laptop in L.A.: Does Slingbox Violate Federal Copyright Laws?*, 41 SUFFOLK U. L. REV. 159, 192 (2007).

3.    *See, e.g.*, Jennifer Martinez, *Policing the Digital Storage Landscape*, POLITICO (Sept. 21, 2011, 10:41 PM), http://www.politico.com/news/stories/0911/64053.html (describing cyber lockers as the next "frontier" for storing movies, music and personal files on the Internet). While cyber lockers are often used for legitimate purposes, they are also frequently used by consumers to share copyrighted

491

* * *

### 2. Volitional Conduct

Like the public performance reasoning, the Second Circuit's volitional conduct analysis has raised numerous questions.[105] In particular, was it proper to extend *Netcom*, which concerned an Internet service provider, to cable television? *Netcom* was motivated by the concern that, absent a volitional element, the entire Internet could be held liable for the conduct of a single user.[106] Although the *Cablevision* district court thought *Netcom* should be limited to its Internet context, the Second Circuit expressly disagreed, finding the volitional element a "particularly rational interpretation of § 106, rather than a special-purpose rule applicable only to ISPs."[107] Yet even if the substantive context were similar enough, the *Netcom* decision was handed down in 1995; significant changes in technology and copyright law have since taken place.[108]

The Second Circuit's decision to impose a volitional element at all was also somewhat surprising.[109] Is volitional conduct merely a subcomponent of an infringement claim that has always existed (just not explicitly), or did *Cartoon Network* essentially create an affirmative defense for service providers?[110] One hypothesis suggests that lurking behind the court's reasoning was an implicit conclusion that the services of the RS-DVR were all too similar to those of the VCR, which the Supreme Court deemed noninfringing in *Sony Corp. of America v. Universal City Studios*.[111]

Much confusion remains regarding the volitional element. Although the Second Circuit described what is *not* volitional conduct when it comes to automated systems, what exactly *is* volitional conduct when it comes to an automated service? Moreover, should it apply to Internet service providers who may be eligible for safe harbor protection under the DMCA? These questions will be further explored below through a comparison of cyber locker cases that reached different

---

105. *See, e.g.*, Ginsburg, *supra* note 26, at 15 ("[I]t is not clear that volition must always be a distinct element of the violation of the reproduction right.").

106. *See* Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc., 907 F. Supp. 1361, 1372 (N.D. Cal. 1995); *see also* Cartoon Network LP v. CSC Holdings, Inc., 536 F.3d 121,131 (2d Cir. 2008) (discussing the *Netcom* court's concern).

107. *Cartoon Network*, 536 F.3d at 131. This is the same conclusion the Fourth Circuit reached in *CoStar*. *See* CoStar Group, Inc. v. Loopnet Inc., 373 F.3d 544, 549 (4th Cir. 2004).

108. For example, the legal disputes over Napster and Grokster and the enactment of the DMCA. Professor Nimmer describes the *Netcom* decision as an appropriate resolution of the "novel issues then pending," but "inapposite at present" in light of amendments to the Copyright Act. 4 NIMMER & NIMMER, *supra* note 1, § 13.08[C]. Furthermore, there is an argument that the DMCA codified *Netcom*'s volitional requirement for some but not all of the safe harbors. *See infra* Part III.C.

109. *See, e.g.*, 4 NIMMER & NIMMER, *supra* note 1, § 13.08[C] (describing the Second Circuit's description of volition as an element as "revolutionary," given that cases up to the Supreme Court level have defined only two elements for copyright infringement).

110. *E.g.*, *id.*

111. *See* Ginsburg, *supra* note 26, at 16 ("Because the users' were engaged in a higher-tech form of 'time shifting,' and, under *Sony*, time shifting (at least of free broadcast television) is non infringing, then the higher-tech version must be non infringing, too. That calculus may have informed the court's assessment of 'who' made the copy.").

[11 December 2008]
For Revue Internationale du Droit d'Auteur, Oct. 2008 [*forthcoming* January 2009]

**Recent Developments in US Copyright Law – Part II, Caselaw: Exclusive Rights on the Ebb?**

Jane C. Ginsburg
Columbia University School of Law[*]

*Abstract*

　　*The 1976 Act announces broad exclusive rights, offset by a myriad of specific exemptions, and one wide exception for "fair use." In words and intent, the exclusive rights are capacious, but new technologies may have caused some of the general phrases to become more constraining than might have been expected from a text whose drafters took pains to make forward-looking. Thus, the scope of the reproduction right turns on the meaning of "copy;" the reach of the distribution right on "distribute copies" and "transfer of ownership;" the range of the public performance right on "public" and "perform." Entrepreneurs and users of new technological means of exploiting copyrighted works have urged narrow constructions of each of these terms, arguing that broad interpretations will chill future innovation (and suppress present markets for copyright-exploiting devices or services). Copyright owners, concerned that unfettered new uses will supplant traditional copyright-controlled markets, have contended that the literal language, or, failing that, congressional intent, encompass the contested use. In addition, new technologies have called into question the identification of the person who "does" the copyright-implicating acts. Who makes a copy when the act is decomposed into steps taken by different actors? Who performs or displays a work when the work resides on one person's server, but the public perceives it through another person's website?*

　　*Several US courts have narrowly construed the reach of the exclusive rights of reproduction, distribution, public performance and public display, thus putting into doubt their efficacy in the digital environment. In particular, the Second Circuit's recent decision in* Cartoon Networks v. CSC Holdings, *if followed, could substantially eviscerate the reproduction and public performance rights. The growing number of decisions rejecting a "making available" right attests to some difficulties in adapting the distribution right to online exploitation. By contrast, one bright spot for authors appears in the area of moral rights, in which digital media may provide a means to make at least some authors' attribution interests enforceable. Because the decisions emanate from lower courts, including first-level courts, it is too soon to discern whether US copyright law is adopting a constricted conception of the scope of the economic rights under copyright, and if so, whether the decisions betoken an evolving (if often unarticulated) determination that copyright prerogatives should yield to technological preferences. In either event, the analyses and results contrast*

---
[*] Thanks for suggestions and criticisms to Professor Graeme Austin, Professor Jessica Litman, Professor R. Anthony Reese, David Carson, Esq., and to my colleague June M. Besek, Executive Director of the Kernochan Center for Law, Media and the Arts, and for research assistance to Emily Weiss, Columbia Law School class of 2009.

\* \* \*

* * *

public distribution, public performance, or public display of another's copyrighted work.[100]

In sum, most of the courts which have explicitly confronted the question have declined to interpret the section 106(3) distribution right to include a making available right. In rejecting that right, some of the decisions acknowledge that their holdings may be inconsistent with the United States' representation, in ratifying the 1996 WIPO Copyright Treaties without amending the Copyright Act to add a "making available" right, that US law already covered that right, notably through the distribution right.[101]  We will consider the courts' disinclination to interpret the US Copyright Act harmoniously with US international obligations in Part II.

C. Public performance and display rights

Section 106(4) and (5) confer the exclusive rights to publicly perform and publicly display certain copyrighted works.[102] Digital media have called into question the meaning of both "public" and "perform," as well as "who" engages in a performance or display.

1.      *Public* performance or display

Public performances or displays can occur in public places, or by transmission. The latter is relevant to digital exploitations.  The Act defines public performance or display by transmission:

> (2) to transmit or otherwise communicate a performance or display of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

The definition was broadly-written, anticipating new forms of transmissions, notably video on demand.[103]   The plaintiffs in *Cablevision* contended that the statutory language covered the remote video delivery service.  The Second Circuit, however, having truncated the scope of the reproduction right in the digital environment, went on to announce a similarly constricted construction of the public performance right. Recall that the Cablevision remote play-back system stored copies of television programming in virtual storage boxes dedicated to individual subscribers.  When the subscriber chose to view the program, Cablevision would transmit it to her, using the copy in the subscriber's storage box as the source of the transmission.  Cablevision therefore asserted that the transmission was not "to the public" because each copy was transmitted only to the particular subscriber.  The Second Circuit agreed, focusing on "who precisely is 'capable of receiving' a particular transmission of a performance. . . . [The definition] speaks of people capable of receiving a particular 'transmission' or

---

[100] 2008 U.S. Dist. LEXIS 84155 at *40.
[101] See, e.g., *Capitol Records*, 2008 U.S. Dist. LEXIS 84155 at *41-44; Elektra v. Barker, 551 F.Supp.2d at 243 n.7.
[102] Sound recordings do not enjoy full public performance rights; section 106(6) provides for a digital public performance right further detailed in section 114.
[103] 1976 House Report, supra note 12, at 64-65.

25

**ADD64**

'performance,' and not of the potential audience of a particular 'work.'"[104]    Because Cablevision had set up the playback system so that only one person (or her family or circle of social acquaintance – the statutory non "public"[105]) would be "capable" of receiving the transmission that originates from her storage box, the performance was not "public," the court ruled.

The court's parsing of the text of the Copyright Act is peculiar if not perverse. The key phrase in the definition is "to the public."    "The public" in the case of a television transmission is the intended audience, or, in the case of a cable service, the subscribers.    The phrase "members of the public capable of receiving the performance" is not intended to *narrow* the universe of "the public."    On the contrary, its role is to clarify that a transmission is still "to the public" even if its receipt is individualized.[106]    The "members of the public capable of receiving the performance" do not stop being "members of the public" just because they are "capable of receiving the performance" one at a time.    By the same token, it should not matter whether "the performance" originates from a single source copy repeatedly transmitted to individual members of the public "in different places at different times,"[107] or from multiple copies each corresponding to a particular place and/or time.    The court's declaration "that when Congress speaks of transmitting a performance to the public, it refers to the performance created by the act of transmission,"[108] demonstrates that the court confused "performance" and "transmission."    The statute does not refer to the performance *created* by the act of transmission.    The transmission does not *itself* "perform" (as in "play" or "render"[109]) the work; it communicates a work so that its performance will be perceived as the member of the public receives the communication.[110]    The court's construction clashes with the text of the Act in another important way as well: it is not possible to transmit a performance "created by *the* act of transmission" to members of the public "at different times."    While such a "performance" could be transmitted simultaneously to differently located recipients, recipients differently situated in time cannot receive the same transmission.[111]    The court's interpretation thus reads non simultaneous receipt out of the statute.    As a result, *Cablevision*'s potential impact on the scope of the public performance right stretches beyond scenarios in which the transmission entity invites subscribers to make individual copies for subsequent individual transmission to them from its server. If the "performance" does not occur "publicly" because its transmission is individualized (only one member of the public is "capable of receiving" the particular transmission that she requests), then the decision's rationale reaches even conventional on-demand streaming operations.    Because the Act explicitly covers

---

[104] 536 F.3d at 135.

[105] See 17 USC sec 101 (first part of the definition of public performance: in a "place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered").

[106] 1976 House Report, supra note 12**Error! Bookmark not defined.**, at 64-65.

[107] See On Command Video Corp. v. Columbia Pictures Industries, 777 F. Supp. 787 (N.D. Cal. 1991)(videocassette machine transmitted individualized showings of the same cassette to different hotel guestrooms at different times: held a public performance)

[108] 536 F.3d at 136.

[109] See 17 USC sec 101 (definition of "perform").

[110] For further development of the difference between transmission and performance, see discussion of United States v ASCAP (in re America Online), infra, notes 114-22.

[111] Thanks very much to David Carson for this observation.

26

performances that are transmitted to members of the public who are separated in time, however, the Second Circuit's statutory construction cannot be correct.

The following scenario may help illustrate some additional bizarre consequences of the court's problematic interpretations of the section 106(1) and (4) exclusive rights. Recall the hypothetical variation on the Cablevision service, in which Cablevision would offer its subscribers individualized storage boxes of programming that Cablevision is *not* licensed to deliver, even by means of real time transmissions.[112] Under the Second Circuit's reasoning, Cablevision would not "make" the storage copies, and the copies it made by deviating the signal to the storage boxes through the buffer would not be actionable "copies." Finally, the transmissions Cablevision would make to its subscribers would not be "public" because there is only one member of the public "capable" of receiving each "performance." Although "the public" receives unauthorized transmissions, at no step of the way would an exclusive right be infringed. In fact, the court seems to have recognized the precarious ground its analyses stake out, for, like King Canute trying to hold back the tide, the court foresaw the potential onslaught of new copyright-avoiding business models that its decision might inspire, and proclaimed "This holding, we must emphasize, does not generally permit content delivery networks to avoid all copyright liability by making copies of each item of content and associating one unique copy with each subscriber to the network, or by giving their subscribers the capacity to make their own individual copies. We do not address whether such a network operator would be able to escape any other form of copyright liability, such as liability for unauthorized reproductions or liability for contributory infringement."[113] As the analyses of the statutory term "to perform," and of the question of *who* performs or displays a work will show, however, *Cablevision*'s potential for eviscerating the public performance right may be even greater than the Second Circuit's pious wish portends.

2.   To "perform"

Digital media blur the boundary between reproduction and public performance because digital transmissions implicate the communication of transitory copies between the point of origin of the transmission and its receipt in individual end-user computers. As we have already seen, the characterization of those copies as "copies" for purposes of the reproduction right is currently uncertain. But if every digital transmission were potentially a distribution of copies, would it also be true that every distribution of digital copies can also be a public performance by transmission? Put another way, if digital "streaming" might entail at least temporary "downloads" of copies, does every download implicate a public performance by transmission? In *US v ASCAP (In re America Online)*,[114] the federal court which reviews the rates ASCAP proposes for various kinds of exploitations of the public performance right in non dramatic musical compositions, sought to determine a reasonable fee for the use of ASCAP-represented songs by several online services. The uses included both streaming and downloading; the court ruled that "the downloading of a digital music

---

[112] See supra note 58 and accompanying text.
[113] 536 F.3d at 139-140.
[114] 485 F. Supp. 2d 438 (SDNY 2007).

**ADD66**

JEFFREY MALKAN*

# The Public Performance Problem in
# *Cartoon Network LP v. CSC Holdings,*
# *Inc.*

| | | |
|---|---|---|
| I. | Reprise of the Betamax Case? | 507 |
| II. | The Phenomenon of Physical Embodiment | 509 |
| III. | Copying and Performing | 511 |
| IV. | Mysteries of the "Transmit Clause" | 513 |
| V. | Maxwell's Video Showcase | 515 |
| VI. | The "Virtual Locker" Analogy | 521 |
| VII. | Performances Without Ever Taking Possession of a Copy | 524 |
| VIII. | "Capable of Receiving the Performance" | 529 |
| IX. | How Far Upstream? | 532 |
| X. | A Performance of *a Copy* of a Work | 535 |
| XI. | "What Is Meant by a Copy?" | 539 |
| XII. | Interactive Services and Digital Copies | 542 |
| XIII. | "Virtual" Time-Shifting as Fair Use? | 547 |
| Conclusion | | 552 |

> Copyright law, precisely because it has taken shape around the model of a book communicated to the public by multiplication of copies, has experienced difficulty, not to say frustration, with cases where communication is by performance or representation.[1]
>
> – Judge Benjamin Kaplan

Works of authorship are intangible arrangements of words, numbers, lines, shapes, colors, notes, sounds, and the like,

---

* Clinical Professor of Law, State University of New York at Buffalo.

[1] Benjamin Kaplan, *Publication in Copyright Law: The Question of Phonograph Records*, 103 U. PA. L. REV. 469, 473 (1955).

[505]

* * *

**ADD67**

programming back to themselves. Such retransmissions could be considered non-infringing private performances because a transmission to oneself is not directed "to the public."[117] Judge Walker, however, expressly declined to decide the issue of who will be doing the transmitting. Instead he took the "arguendo" path of assuming that "even if . . . *Cablevision makes the transmission when an RS-DVR playback occurs*, we find that the RS-DVR playback, as described here, does not involve the transmission of a performance 'to the public.'"[118]

The studios, therefore, could afford to concede that each party is responsible for its own transmissions. Cablevision isn't responsible for unauthorized uses of HBO's feed by Comcast or some other cable network; and if that unauthorized use ever occurs, the studios won't complain to Cablevision. However, isn't Cablevision still responsible for its own unauthorized uses of HBO's feed? If so, the question of whether Cablevision's RS-DVR transmissions will be permissible private performances or unauthorized public ones remained unanswered.

X

A PERFORMANCE OF *A COPY* OF A WORK

In order to place a limit on liability for "upstream" transmissions by legal strangers, Judge Walker inferred that the transmit clause requires a new performance to begin each time the identity of the transmitter changes.[119] Cablevision, therefore, is responsible only for transmissions that occur "downstream" from its initial, real-time transmission.[120] This is a sensible way to think about what happens legally when broadcasts ripple across multiple networks, but it doesn't explain the result in *Cartoon Network* because all transmissions through Cablevision's RS-DVR service will be downstream from its real-time transmissions. Therefore, shielding Cablevision from liability for upstream transmissions by legal strangers doesn't shield Cablevision from liability for its own

---

[117] Of course, transmissions of Cablevision's programming from its subscribers back to themselves would be "downstream" from the initial network telecasts, and these subscribers are hardly "legal strangers."

[118] *Id.* at 134 (emphasis added). Why didn't the court try to answer the question of who will be the transmitter? *See supra* note 19.

[119] *See id.* at 136.

[120] *Id.*

downstream transmissions.  If the upstream/downstream distinction was a red herring, what was the true *ratio decidendi*?

Judge Walker based his holding on what he thought was the key fact in the case—that only one subscriber (the one who ordered the RS-DVR copy) will be capable of receiving each RS-DVR transmission because only that subscriber will have access to it.[121] This, he concluded, makes each RS-DVR transmission a private rather than a public performance.[122]  The studios, in contrast, had focused on what they thought was the key fact in the case—that all RS-DVR copies will be copied from Cablevision's live programming feed.  This, they claimed, will make all RS-DVR transmissions into time-delayed public performances of those network telecasts rather than private performances of original source material.[123]

The reason that the studios were right and Judge Walker was wrong was that he derived his conclusion from a misreading of the statute.  As noted before, the transmit clause specifies that "members of the public" must be "capable of receiving the *performance*," not "capable of receiving the *transmission*."[124]  Judge Walker thought that the words "performance" and "transmission" were interchangeable in this context because the statute imposes liability on anyone who transmits an unauthorized performance to the public.[125] But even though the transmit clause refers, as Judge Walker put it, to "the performance created by the act of transmission,"[126] a transmission and a performance remain, technically and legally, two distinct things.  The difference between them is that a transmission is the medium through which a performance is delivered "to the public."[127]  This is why there may be more than one transmission of the same performance, that is, why members of the public may receive a public performance at "different times."

To put this difference in the form of an example, the transmit clause says that, when HBO transmits its live programming feed of *The Sopranos* to Cablevision, it is performing *The Sopranos*.  When Cablevision relays the HBO feed to its subscribers in real time, it is

---

[121] *Id.* at 137–38.
[122] *Id.* at 139.
[123] *Id.* at 136.
[124] 17 U.S.C. § 101.
[125] *Cartoon Network*, 536 F.3d at 134.
[126] *Id.* at 136.
[127] *See* 17 U.S.C. § 101.

doing the same thing—performing *The Sopranos*. In both instances, the performance of *The Sopranos* is what the transmission transmits. To say, as Judge Walker did, that a performance is *created by* the act of transmission[128] is a compressed way of saying that the transmitter is legally responsible for compensating the copyright owner for this particular rendering of the work (i.e., the use protected by the performance right). A transmission, a lawyer can say, is *constructively* a legal performance, and the transmitter is *constructively* a performer. But this interpretation doesn't make it literally so.

When trying to assess the scope of the transmit clause, it helps to bear in mind that Congress in 1976 inherited the legal fictions that were woven into the preexisting body of judge-created doctrine dealing with performance rights. As a whole, the trend of copyright policy throughout the twentieth century was to expand the performance right to encompass technological innovations that would allow works to be experienced in remote locations and by dispersed audiences.[129] These new technologies were anticipated and acknowledged in the 1976 Act by the open-textured language of the "separate places/different times" provision.

The first legal fiction is that of the "mechanical copy," which maintains that activating a recording of a work on a mechanical or electronic playback device is a performance of the work as well as a performance of the recording (i.e., the copy).[130] This means that playing a recording of a performance in public *is* a public performance. This legal fiction expanded the performance right to

---

[128] *Cartoon Network*, 536 F.3d at 136.

[129] *See, e.g.*, Stadler, *supra* note 11, at 727–28.

[130] This legal fiction dates back to the legislative response to *White-Smith Music Publishing Co. v. Apollo Co.*, 209 U.S. 1 (1908). The court in *White-Smith* held that piano rolls ("mechanical copies") of musical compositions were not legally copies of musical works because they weren't legible to human musicians, but only readable by mechanical devices (i.e., player pianos). *Id.* at 17. Therefore, the unauthorized publication of the piano rolls did not violate the copyright held by the authors of the sheet music. *Id.* at 18.

In section 1(e) of the 1909 Act, Congress worked around *White-Smith* by providing a compulsory license for recordings of performances of musical compositions (known as the "mechanical license"). *Cf.* 17 U.S.C. § 115 (present-day compulsory license provision for making and distributing phonorecords). Although the ghost of *White-Smith* lingers in the 1976 Act's distinction between "copies" and "phonorecords," the current statute, in its § 101 definition of "to 'perform,'" expressly recognizes that the authors of musical compositions are entitled to performance rights for the public rendition of such recordings (viz., rendition "by means of any device or process"). 17 U.S.C. § 101.

538                OREGON LAW REVIEW            [Vol. 89, 505

include public renditions of recorded performances, such as showing a movie in a theater or playing a phonorecord in a retail store or restaurant.

The second legal fiction is the multiple performance doctrine, which maintains that an electronic transmission of a performance, such as showing a movie on TV or playing a phonorecord over the radio, is itself a performance, both on the part of the transmitter and the receiver.[131]    Although receiving a radio broadcast is something more than "listening to a distant rendition of the same program,"[132] it is still something much less than a human performance from a script or score, or even a mechanical performance from a copy or phonorecord.  What the metaphor of "transmission as performance" means is that electronic transmitters are responsible for compensating the owner of the work's performance rights *as if* they have actually performed the work or a copy of it.

This legal fiction is miles away from any layperson's notion of what a performer or a transmitter does, but it makes sense on its own terms in the legal context of defining what a public performance is. As such, it sets out the boundaries of the performance right but without reducing performances and transmissions to the same literal thing.  Performances are ways of realizing works in perceptible form, that is, of transforming the author's intangible expression into sounds and images that will be perceptible to an audience.  Transmissions, in contrast, are a mode of distribution rather than one of embodiment.

These two legal fictions reflect how broadcast technologies work—copies embody performances, and transmissions communicate them to the public.  Indeed, Judge Walker took the trouble to note that performances of audiovisual works cannot be transmitted at all unless the transmitter has obtained copies of them.[133]    This is why the question he asked of whether Cablevision will transmit a performance of a work to the public[134] implicitly contained the more pointed one of whether Cablevision will transmit a performance of *a copy* of a

---

131 *See* Buck v. Jewell-LaSalle Realty Co., 283 U.S. 191, 197–98 (1931).

132 *Id.* at 199.  "We are satisfied that the reception of a radio broadcast and its translation into audible sound is not a mere audition of the original program.  It is essentially a reproduction." *Id.* at 199–200.  A better word would have been "rendition" because "reproduction" in copyright parlance implies the creation of a copy.

133 *Cartoon Network*, 536 F.3d at 137–38 ("[N]o transmission of an audiovisual work can be made, we assume, without using a copy of that work: to transmit a performance of a movie, for example, the transmitter generally must obtain a copy of that movie.").

134 *See supra* note 102.

work to the public.[135]   It is reasonable and perhaps necessary for anyone trying to parse the transmit clause to infer that the technology of broadcasting requires the word "copy" to be read into it.   This inference, however, also leads to confusion about what is being "performed" in these transmissions.

The confusion was reflected in the dispute over the RS-DVR service in *Cartoon Network*.  Cablevision claimed that two different performances, both legally "private," would result from two different RS-DVR transmissions, as long as the two transmissions emanated from two distinct copies.[136]   The studios responded, however, that those two copies would be copies of exactly the same thing—the public performance of the work that had been transmitted to the public by the initial network telecast.[137]   The perplexing problem posed by the *Cartoon Network* case was what the legal status of the RS-DVR performances should be.   The solution, to the Second Circuit in 2008, as to the Supreme Court in 1908, appeared to depend on what is meant by the word "copy."[138]

## XI

### "WHAT IS MEANT BY A COPY?"

In legal arguments, the same facts often have a different significance depending on how they are framed in relation to each other.  Context determines how the facts cohere, what they mean, and,

---

[135] This may also be why Judge Walker was so receptive to Professor Nimmer's "same copy" theory of the "different times" provision.  He commented that "[u]nfortunately, neither the *Redd Horne* court nor Prof. Nimmer explicitly explains *why* the use of a distinct copy affects the transmit clause inquiry" and offered his own explanation that "the use of a unique copy may limit the potential audience of a transmission."  *Cartoon Network*, 536 F.3d at 138.

[136] *Id.* at 135.

[137] *Id.* at 136.

[138] The question is quoted from the *White-Smith* case, in which the Supreme Court wrestled unsuccessfully with a puzzling new entity—mechanical copies of performances, or what falls within the category of work that the statute now defines as "sound recordings."  *See* White-Smith Music Publ'g Co. v. Apollo Co., 209 U.S. 1, 17 (1908).

It may be true that in a broad sense a mechanical instrument which reproduces a tune copies it; but this is a strained and artificial meaning. . . . In no sense can musical sounds which reach us through the sense of hearing be said to be copies, as that term is generally understood, and as we believe it was intended to be understood in the statutes under consideration.

*Id.*

* * *

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 12th day of December 2013, this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated:  December 12, 2013

*/s/* James D. Smeallie    
James D. Smeallie

#26796771_v11